```
 1                IN THE UNITED STATES DISTRICT COURT FOR
                    THE WESTERN DISTRICT OF WASHINGTON
 2                             AT SEATTLE

 3   UNITED STATES OF AMERICA,      )
                                    )      Case No. CR02-209R
 4                    Plaintiff,    )
                                    )      Seattle, Washington
 5           v.                     )      October 15, 2002
                                    )
 6   EDWARD DARRELL KOPLIN,         )
                                    )
 7                    Defendant.    )
                                    )
 8   _____    )
```

For the Plaintiff:        Bruce Miyake
                          Ilene Miller
                          Assistant U.S. Attorney
                          601 Union Street, Suite 5100
                          Seattle, Washington  98101-3903

For the Defendant·        Michael Filipovic
                          Federal Public Defender's Office
                          1111 Third Avenue, Suite 1100
                          Seattle, Washington 98101

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

FILED ____ENTERED
LODGED ____RECEIVED

SA  OCT 2 2 2002

AT SEATTLE
CLERK U S DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
                        DEPUTY

Joseph F. Roth
Official Court Reporter
600 U.S. Courthouse
Seattle, Washington 98104
(206) 553-1899

CR 02-00209 #00000047

Proceedings recorded by computer-aided stenography.

1    THE COURT· Good morning, all.  Counsel, do you want to
2  make your appearances?

3    MS. MILLER:  Your Honor, Ilene Miller and Bruce Miyake
4  appearing on behalf of the government.

5    MR FILIPOVIC:  Good morning, Your Honor.  Michael
6  Filipovic on behalf of Mr Koplin.  Also seated at counsel table
7  with me is Vicki Lei, she's a research attorney with the Federal
8  Public Defender; Mr. Koplin, and Kevin Love, who's the Federal
9  Defender investigator on this case.  And I'd ask permission of
10 the Court to allow him to be present.

11   THE COURT:  Surely.  No problem.  Okay.  How are we
12 going to proceed, counsel?  Is the government prepared to call
13 certain witnesses?

14   MS. MILLER:  Yes, Your Honor.

15   THE COURT:  Okay.  Do you want to do so?

16   MS. MILLER·  Yes, Your Honor.

17   THE COURT:  Wait.  Let me ask you:  Did you want to
18 make any opening statement?

19   MR. FILIPOVIC:  Not an opening statement, Your Honor,
20 but if I could just make a couple of comments briefly for the
21 record.

22   THE COURT:  Sure.

23   MR. FILIPOVIC:  First, both the government and the
24 defense have submitted a series of exhibits and copies.  The
25 defense exhibits are from A-1 through A-31, and they're in an

1    envelope -- two separate envelopes, one the originals and one a

2    copy, that are with the clerk. The government has submitted

3    their exhibits in a darker brown envelope. And I believe both

4    sides are moving to admit all of their exhibits at the beginning

5    of the hearing with no objection from the other side. So we can

6    hopefully speed things up a little bit during the hearing.

7              THE COURT: Fine. And the government has how many

8    exhibits?

9              MR. MIYAKE: We have four exhibits, Your Honor.

10             THE COURT: So Government's 1 through 4 will be

11   admitted, and Defense 1 through 31 will be admitted. Are you

12   assuming you're going to use all of them, or should I wait and

13   see which you really use?

14             MR. FILIPOVIC: Well, I believe we could admit all of

15   them, and we would use one or more -- or most of them during the

16   hearing, is my expectation.

17             MR. MIYAKE: We could withdraw all the ones that are

18   not used, or tend to become irrelevant.

19             THE COURT: Okay. Whichever is easiest. Okay.

20             MR. FILIPOVIC: Your Honor, the only other request I

21   would have is other than one case agent for either side we'd

22   move to exclude witnesses.

23             MR. MIYAKE: That's fine.

24             THE COURT: Okay. Are there any prospective witnesses

25   seated in the audience? Okay. There aren't. So if you see

1  anybody come in that either side recognizes is a witness, just
2  let me know and I'll instruct them to leave.
3     Anything else, Mr. Filipovic?
4          MR. FILIPOVIC:  No, Your Honor.  Thank you.
5          THE COURT:  Ms. Miller, ready to call your first
6  witness?
7          MS. MILLER:  Yes, Your Honor.  The government calls
8  Sergeant Mark Gustafson.
9  MARK GUSTAFSON,             BEING SWORN, TESTIFIED AS FOLLOWS:
10         THE COURT:  Would you take the stand, please.  And once
11 you take the stand, state your full name and spell your last
12 name for the court reporter.
13         THE WITNESS:  Yes, ma'am.  My name is Mark Gustafson,
14 G-u-s-t-a-f-s-o-n.
15                    DIRECT EXAMINATION
16 BY MS. MILLER:
17 Q   Where do you work?
18 A   I work for the city of Kent Police Department, ma'am.
19 Q   And what is your rank?
20 A   I'm a police sergeant.
21 Q   And how long have you worked for the Kent Police Department?
22 A   23 and a half years
23 Q   And what did you do prior to that?
24 A   Prior to being a police officer with the city of Kent?
25 Q   Yes.

1  A    I was in the U.S. Army.  I was a military police officer in

2  the United States Army.

3  Q    And how long did you do that?

4  A    Three years.

5  Q    And what are your specific duties or responsibilities with

6  respect to your employment?

7  A    I supervise a squad of patrol officers.  I manage the street

8  during my particular shift, which is 10:30 a.m. to 8:30 p.m.

9  Q    And how long have you had those particular responsibilities?

10  A    I've been a sergeant for 11 years.

11  Q    And are you in a particular unit?

12  A    I'm in the patrol division at this time.

13  Q    And what unit were you in prior to being in the patrol

14  division?

15  A    Up until February of 2002 I was the detective sergeant in

16  charge of the Kent police major crimes and family violence

17  crimes team for six and a half years.

18  Q    And could you tell us a little bit about your

19  responsibilities and duties at that time?

20  A    When I was a detective supervisor I oversaw and supervised

21  and was responsible for all crimes against people, basically

22  murder, homicide, kidnaping, rape, robbery, child abuse, felony

23  family domestic violence, felony assault.  And we managed a

24  tracking program, a domestic violence tracking program called

25  Red Flag.

1  Q   And do you have any particular experience dealing with child

2  abuse?

3  A   I do.

4  Q   Child sexual abuse?

5  A   I do.

6  Q   Could you please tell the Court a little bit about that

7  experience?

8  A   I was -- in the early -- or mid '80s, before I became a

9  sergeant, I was a detective, where I worked a variety of crimes,

10 from 1984 to 1988.  I worked a variety of persons crimes,

11 including child abuse, received some training at that time.

12     When I became a detective supervisor in 1995 I oversaw the

13 supervision of that function.  I had two full-time detectives

14 working nothing but child abuse cases.  I reviewed -- I was

15 responsible for reviewing all child abuse referrals sent over by

16 CPS, Child Protective Service, of the State of Washington.

17     We have a mandatory reporting law in the State of

18 Washington.  So by law any suspected child abuse involving

19 neglect, physical abuse or sexual abuse is reported to CPS

20 They, in turn, generate a document.  That document is then

21 referred to me.  I review that.  I make a decision on what

22 category of -- I mean, risk assessment it should fit under.  And

23 then I decide on which detective or how it's best investigated.

24 Q   And about how long did you do that for?

25 A   I did that for six and a half years.

1  Q    And about how many cases involving child abuse, child sexual

2  abuse specifically would you say that you were involved in

3  investigating?

4  A    Well, I oversaw the investigation of probably -- in that

5  time probably 400.

6  Q    And the patrol duties that you just spoke of, were these the

7  same duties and responsibilities that you had on June 6th of

8  2002?

9  A    I'm sorry, ma'am.  Can you repeat the question?

10  Q   Yes.  The patrol duties -- when I first asked you what your

11  current job was, you said that you were a patrol sergeant?

12  A   Yes.

13  Q   Those duties and responsibilities, were those the same

14  duties and responsibilities that you had on June 6th of 2002?

15  A   Yes, it was.

16  Q   And on June 6th, 2002, were you involved in a 911 welfare

17  check in the early morning hours?

18  A   I was.

19  Q   And where did that call come from?

20  A   The location where the welfare check was located?

21  Q   Yes.

22  A   That was at the Marriott Towne Place Motel located at 18123

23  72nd Avenue South in the city of Kent.

24  Q   And did you receive that call from dispatch?

25  A   I did.

1   Q   And about what time was that?

2   A   Approximately 0850 hours a.m.

3   Q   Did you then proceed to respond to that call?

4   A   I did.

5   Q   What information were you provided with from dispatch?

6   A   I had heard that the welfare check involved checking the

7   welfare of an 11-year-old girl that was in the presence of a

8   68-year-old man named Edward Koplin.  The reporting person in

9   this call was a relative of Mr. Koplin, and they were asking us

10  to check the welfare of this little girl, because they felt that

11  Mr. Koplin was armed, he was out of state, and they wanted to

12  ensure that the little girl's safety was ensured.  And they had

13  called us to make the appropriate investigation.

14  Q   And while en route to that call, did you receive any other

15  information?

16  A   I did.

17  Q   And where did that information come from?

18  A   My former detective, Detective Hemmen, who was still working

19  CPS cases at that time -- she worked for me for three years in

20  that capacity.  So I had a very close relationship with her.

21  She heard the call on the radio, and she was en route to a

22  meeting here in Seattle, and she got ahold of me on a different

23  frequency, saying, "Hey, I'd like to talk to you on a different

24  frequency."  And she did.

25      She told me that she had received a CPS referral the day

1 | before on this very incident involving the same people, and that
2 | she had some serious concerns about it, and to keep her posted
3 | on what we found during our initial investigation.
4 | Q    And what, if anything, did the fact that this was a CPS
5 | referral and that you had received that call from Detective
6 | Hemmen mean to you?
7 | A    Well, I was intimately involved with the protocol on how we
8 | set our risk assessment and our risk category concerning CPS
9 | referrals.  I was very involved in setting that protocol up.  So
10 | I knew that if she had this case it was a fairly serious call,
11 | or serious case, because if it was -- sometimes CPS referrals,
12 | frankly, don't have a lot of information, and so there's not a
13 | lot to go on.  And so we info file those.  They're more of an
14 | information type of report.  But we don't really conduct an
15 | active investigation, so they don't -- they don't -- they are
16 | not assigned to a detective.
17 |     The fact that she had a case assigned to her told me that
18 | the -- my replacement, Detective Sergeant Thomas, felt that this
19 | was an important enough case to assign it to a detective and
20 | generate a case number on it.
21 | Q    So prior to actually reaching the motel, what information
22 | total did you have?
23 | A    This is what I had:  I knew that we were checking the
24 | welfare of an 11-year-old girl in the presence of a 68-year-old
25 | man.  One.  Two, they were at a motel, implying -- and they were

1  from out of state, implying that there was a transient nature of

2  their behavior.  That's number two.

3      Number three, the family gave us information to implicate

4  that the suspect was armed.  That was a significant concern for

5  me, because usually it's been my experience that the family

6  knows a lot more about the person's behavior, and if they're

7  going to go to the trouble of call -- most families cover for a

8  family member.  In fact, they're more likely than not unwilling

9  to cooperate with the police often -- in often case -- in some

10  cases.

11          MR. FILIPOVIC:  I'd object as non-responsive at this

12  point.

13          THE COURT:  Overruled.

14  A    (continued)  So the third thing, as far as -- the third

15  thing, as far as being armed, the fact that the family had

16  basically called on him elevated my suspicions significantly,

17  because what does the family know about this guy that they're

18  not saying.  So if they're willing to call us, they must have a

19  concern also.  So I think it's important that we validate that

20  concern.

21      Number four, I knew that Detective Hemmen, who I had

22  personally supervised for over three years, had concerns about

23  this.  She's an excellent detective, and so when she tells me

24  she has concerns, I need to validate that as well.  She would

25  not have gotten ahold of me like this if it was a mundane case.

1    Number five, you know, I was frankly concerned that we might

2    have a potential hostage or kidnap situation  I wanted to avoid

3    that at all costs.

4    Q   (By Ms. Miller)  Did you have any information with regards

5    to the relationship between this man and the little girl?

6    A   I did not have any specific information in regards to the

7    relationship, although I had some suspicions.

8    Q   Did you know if they were related?

9    A   There was no indication that they were.

10   Q   And prior to getting there were there any concerns that were

11   going through your mind besides a potential hostage situation?

12   A   Well, I mean, based on my training and experience, I felt

13   that, you know, this was a highly unusual circumstance.  That is

14   what I was feeling based on the totality.  And I had been

15   involved in prior cases where there was an older man and a

16   younger girl.  Most of our child molesters, sexual abuse cases,

17   involve just that.

18           MR. FILIPOVIC:  Objection, Your Honor, foundation and

19   relevance.

20           THE COURT:  Well, the foundation has been laid in the

21   fact that he worked in this arena for many years.  And this goes

22   to his own state of mind as to what he was concerned about that.

23   So I'll overrule the objection.  The same reason I did before.

24   Q   (By Ms. Miller)  Did you have any other concerns?

25   A   Well, the fact that if he was armed I was concerned about

1    the safety of my officers responding and the surrounding -- if
2    it's in a motel, it's fairly confined. And so, you know, you're
3    running -- as a supervisor, I'm responsible for the outcome of
4    every one of these calls. It's on me. You can't pass the buck.
5        And so you're -- a million things are going through your
6    mind, the worst-case, best-case scenario situations. And if you
7    err -- I'm trained if I'm going to err I'm going to err on the
8    side of caution.
9        One, I'm going to err on the side of the safety of the
10   child. We knew that there was an 11-year-old girl in there. We
11   did not know if she was there voluntarily or not. So, again,
12   worst-case, best-case scenario. You're responding to a scene
13   not knowing everything, but having some bad feelings based on
14   what little information you do know, and based on past history
15   and experience.
16       And so, you know, it's a difficult situation to be in, and
17   so you're trying to assess this thing in an evolving way, and
18   you're hoping for the best, you're hoping to make the right call
19   at the time.
20   Q   Based upon all of that information, what did you decide that
21   you needed to do once you arrived at the hotel?
22   A   When we arrived at the hotel, I directed Officer Lorette to
23   make -- to confirm that these people were there, one. You know,
24   see who's in the room. Confirm with management what information
25   we did have.

1    I informed Officer Lorette I would look for the van. We

2   were told initially that the driver -- or that Mr. Koplin was

3   driving a van with out-of-state plates. I found that van. I

4   confirmed that van with -- it had an Idaho license plate 645

5   David Edward. It was a green Dodge Caravan. Parked on the west

6   side, kind of behind -- it's in a fairly -- it's behind the

7   apartment com -- or the motel complex. It wasn't out in plain

8   view. It was kind of on the west side near the freeway. So it

9   was in the back of the motel room. I ran that plate and it came

10  back registered to a Mr. Koplin out of -- with an Idaho address.

11  So, again, we have an out-of-state van. We have a transient

12  situation. Officer Lorette was able to confirm that the people

13  were staying in a particular room.

14    Mr. Hendricks, Bill Hendricks, who is a CPS caseworker, met

15  us at the scene. Again, that's highly unusual. Most CPS

16  caseworkers do not meet us at the scene. So I knew from my

17  training and experience that if a CPS caseworker was willing to

18  come out to the scene, then I knew that they had felt maybe the

19  situation warranted, you know, further investigation.

20  Q   Besides Officer Lorette and Bill Hendricks from CPS, who

21  else arrived at the scene?

22  A   Officer Ben Krauss and Officer Brandon Wales.

23  Q   And about what time did you arrive at the hotel?

24  A   Approximately 8 -- 0855.

25  Q   And were you in charge of the officers that responded to

1    that call?

2    A    I was.

3    Q    After you ran those plates and confirmed that they did come

4    back to Mr. Koplin, did you then meet with the officers?

5    A    I did.  We developed an action plan at that time.

6    Q    And had Officer Lorette been able to verify that the

7    defendant was staying at the hotel?

8    A    Yes.

9    Q    And was he able to get a room number?

10   A    Yes.

11   Q    And do you know what that room number is?

12          THE COURT:  It doesn't matter, counsel.  That's not a

13   key point.

14          THE WITNESS:  Okay.

15   Q    (By Ms. Miller)  So after you -- tell us a little bit about

16   the conversation that you had with the officers that you met

17   with.

18   A    We confirmed -- after we -- we gathered this information,

19   everybody was on the same page.  Everybody knew what we had.  I

20   confirmed with Mr. Hendricks that they had had a prior CPS

21   referral

22       It was basically, you know, now what?  The decision was

23   made -- I made the decision at that time that we needed to

24   separate Mr. Koplin from any potential weapon and from a

25   potential hostage or potential kidnap victim.  We didn't know.

1     And so we put Officer Lorette -- we borrowed a maintenance
2   man uniform from the hotel -- or motel. And we put him -- he's
3   a pretty youthful looking guy, pretty non-threatening looking,
4   and we put the -- we put the maintenance man shirt over his
5   uniform.

6   Q   And why did you decide to do that?

7   A   Well, because it would not be unusual in a motel to have a
8   maintenance man, or housekeeping, or whatever. He didn't quite
9   look like a maid. So a maintenance man was probably the better
10   deal. It was better for us and for the operation and the
11   investigation that we low-key this thing as much as possible,
12   rather than, you know, surrounding the place and calling him
13   out. I mean, that creates a whole other dynamic, if in fact
14   this woman -- this girl is a kidnap victim, or potential
15   hostage. Now we're just exacerbating an already bad situation.

16     We wanted to separate Mr. Koplin and low-key this as much as
17   possible. And so we put him in this uniform, had him knock on
18   the door. We had surrounded -- set up a perimeter, had an
19   eyeball on the place. And had him knock on the door, and
20   hopefully Mr. Koplin, thinking it was maintenance, would feel
21   non-threatened by this, and his suspicions would be
22   significantly reduced and he would open the door and we would be
23   able to -- visually Officer Lorette could visually assess the
24   situation, make contact with him, find out what his state of
25   mind was at that time.

1  Q   And where were you situated when Officer Lorette knocked on

2  the door?

3  A   I was on the south corner of the building.

4  Q   Were you able to hear any conversation that followed?

5  A   I was not able to hear much of the conversation.

6  Q   Were you able to see what was happening?

7  A   I was able to see Officer Lorette, because this is the

8  building and this is the door in the middle.  And there's motels

9  on either -- motel rooms on either side.  I was here, so I had

10  kind of a horizontal view down the building.  So I could see

11  Officer Lorette there, and Officer Krauss was kind of near him,

12  but I could not see Mr. Koplin.

13  Q   What did you see what happened next?  I guess I should say

14  what is the next thing that you saw happen?

15  A   Officer Lorette knocked on the door.  Mr. Koplin, I could

16  hear him open -- I could hear the door open.  There's some sort

17  of conversation.  And then Officer Lorette reached -- Officer

18  Lorette and Krauss -- Krauss was kind of hidden behind a window

19  near the wall.  He kind of came around.  And they grabbed Mr.

20  Koplin and pulled him out of the room.

21  Q   And then what happened?

22  A   They handcuffed him and escorted him over to -- escorted him

23  to our police cars, which were parked on the west side parking

24  lot behind the building.

25  Q   And do you know why he was handcuffed?

1  A    We frequently detain and handcuff and secure people in that

2  situation to avoid them being able to fight us or resist us, or

3  possibly obtain a firearm.  We had information that Mr. Koplin

4  had a firearm, had access to a firearm, fairly valid

5  information, and I didn't want him going for a gun, hurting my

6  officers.  It's common procedure for us to handcuff.  We're

7  trained to do that.

8  Q    And where was the defendant taken?

9  A    He was taken to our patrol vehicles parked on the west side

10 of the parking lot.

11 Q    And why was he taken to the patrol vehicle?

12 A    We frequently -- again, for safety reasons we wanted him

13 separated from any potential -- we wanted him separated from the

14 11-year-old girl.  We wanted him separated from any potential

15 handguns or weapons inside the room.  We had not searched him

16 yet.  And we wanted to secure him until we could assess the

17 situation.

18 Q    And after the defendant was taken out of the room, what did

19 you do?

20 A    I made contact -- Mr. Hendricks was in talking with the

21 girl.  He and I escorted her back into the room.  And she -- his

22 primary role was to interview her, and I wanted to observe the

23 interview to find out what exactly was going on here.

24 Q    And you did this inside the hotel room?

25 A    We did.

1   Q    What was -- and her name was Amanda?

2   A    Amanda Brinkley.

3   Q    What was her demeanor like?

4   A    She was upset, crying, frightened, fearful.  It was -- you

5   know, she's an 11-year-old girl, and you could see the fright in

6   her eye.  That was not a good situation.

7   Q    And while you were in the hotel room, did you search it?

8   A    No.

9   Q    Did you do a cursory check of the room?

10  A    Well, we looked in the bathroom.  I mean, it's not a very

11  big room.  There's a little kitchenette and a bed and a couch

12  and a coffee table and a bathroom.  I mean, you look -- you look

13  under the bed to see if there's anybody else in there.  I mean,

14  you don't know until you look.  We didn't find anybody else in

15  there.

16  Q    Did you also do a cursory check for the weapon?

17  A    Visually, just kind of looked around for the weapon.  I

18  didn't search anything, though.

19  Q    And why did you decide to conduct the initial interview of

20  Amanda in the hotel room?

21  A    Well, because Mr. Koplin was out of the room.  It wouldn't

22  have made any sense for Mr. Koplin to remain in the room with

23  any potential firearms that we felt might have been present and

24  interview her in the back of a police car.  That would not have

25  been appropriate.

1  Q    And about how long were you in the room total for that
2  initial interview?

3  A    During the first contact with Amanda, I was probably in the
4  room 10 minutes.

5  Q    And what did she tell you while you were in the room?

6  A    Can I refer to my report?

7  Q    Sure.

8  A    She informed us that they live -- she lives with her mother
9  and father and family in Utah, and Mr. Koplin lives in Utah as
10  well.  She states that Mr. Koplin was her grandfather, was her
11  mother's father.  They're on vacation visiting his sister and
12  family here in the State of Washington.

13        She states that they left last Friday.  When asked how long
14  they'd been in the Kent area, she said a few nights and that
15  they were staying in the motel.  And, you know, I asked her if
16  she knew the difference between a good touch and a bad touch,
17  and she stated she did.  I asked her what a bad touch was, and
18  she stated when somebody touches your private areas.

19        I asked her if she knew the difference between a lie and
20  telling the truth, and she stated she did.  I asked her if she
21  was telling us the truth at this time about, you know, him being
22  her grandfather, them being from Utah and all that, and she
23  stated she was telling the truth.

24        I asked her where she slept in the motel room last night,
25  because the bed was unmade.  There was a sleeping bag on the

1    couch.  And she stated that she -- she slept, you know, on the

2    couch in the sleeping bag.  And I asked her where Mr. Koplin

3    slept, and she stated in the bed.

4        And then we asked her if he had touched her inappropriately

5    or made her feel uncomfortable, and she said, no, Ed did not do

6    anything wrong, and that she loved him.

7    Q    And after hearing this information from Amanda, did you then

8    leave the room?

9    A    I did.

10   Q    And where did you go?

11   A    I went to the -- our patrol vehicles, where we had staged.

12   Q    And what did you do while you were there?

13   A    I informed -- I directed one of the officers, I think it was

14   Lorette, Officer Lorette or Krauss, to unhandcuff Mr. Koplin.

15   Q    And did you talk to him at that time?

16   A    I did.

17   Q    Did Officer Lorette inform you that he had read him his

18   Miranda rights?

19   A    He did.

20   Q    And what did you talk to the defendant about?

21   A    He wanted to know what was going on, and I wanted to find

22   out what was going on and needed his assistance.  And I

23   basically asked him about the relationship with Amanda.

24   Q    And what did he tell you?

25   A    He told me that he is a friend of the family's, and has

1  known the mother -- the family and Amanda for approximately one

2  year.  He told us that he met the mother through a laundry mat

3  at their trailer park in Utah.  At that point they became

4  friends, he took a liking to Amanda, and started to help her

5  with some of her problems.

6      He stated he bought her two horses, got her into 4-H, and

7  became a tutor to help improve her grades at school.  He said

8  that she does not feel loved by her parents, and that he is

9  trying to improve her life and self-esteem.

10     I asked him if he had a gun, and he told me that he did and

11 he had a permit out of the state of Utah, a gun permit out of

12 state of Utah.  And in fact he even said if we wanted to see his

13 gun permit it was in his wallet near his bed in the room.

14     I asked him where the gun was located.  He said it was

15 underneath the seat of his van.  And we confirmed that the green

16 van parked right there -- it was right there near our patrol

17 vehicles -- was in fact his vehicle.  We confirmed that with

18 him.

19     And I asked him if he would give us a consent to search his

20 vehicle so we could find the weapon and confirm his story.  And

21 I told him it was totally up to him whether he wanted to give us

22 consent or not, and he stated he would.

23     And --

24 Q   Did you discuss anything else with him?

25 A   Yes.  I was very frank with him.  I told him that I was

1    going to be honest with him, and said basically we're trying to

2    determine the relationship between him and Amanda to determine

3    if there's any sexual impropriety going on.  He stated there was

4    no sexual impropriety going on.  That he never touched Amanda

5    inappropriately and treated her like a granddaughter.  Although

6    he confirmed he was not her grandfather in any way.  And there

7    was no blood relationship at all.

8        I then asked him where Amanda slept last night, and he said

9    she slept in the bed with him.  I asked him why this occurred,

10   and he initially said that she was sleeping in the sleeping bag

11   on the couch, but kept falling off the couch onto the floor.

12   And then for the last two nights he encouraged her to sleep in

13   the bed with him, so she could get some sleep and not fall off

14   the couch.

15       I asked him about giving back rubs and body massages.

16   Q    And why did you do that?

17   A    Well, during my initial contact with Amanda inside the room,

18   in plain view, right near the couch, there was like a

19   double-headed massage unit of some sort plugged into the wall.

20   It had like tennis ball sized --

21   Q    Like a vibrating massage?

22   A    Something -- yeah, yeah, yeah.

23   Q    And what was his response?

24   A    I asked him about giving body rubs and body -- he says he

25   has a bad back, and occasionally she would give him a back rub.

1 I asked him about the vibrating massage unit or instrument near

2 the couch, and he stated that's what he uses for his back rubs.

3 I asked him if Amanda was the one who gave him back

4 massages, and he said yes. I asked him if he gave her back

5 massages, and he told me he did. He would occasionally use the

6 vibrating instrument on her back and legs. But then he

7 reaffirmed that there was nothing sexually inappropriate going

8 on during that time.

9 Q And about how long were you at the patrol car talking to the

10 defendant?

11 A Again, you know, this was pretty fast, 10, 15 minutes maybe.

12 Q Were you inside the patrol car or outside the patrol car?

13 A We were outside the patrol car. Mr. Koplin was outside of

14 the patrol car unhandcuffed.

15 Q And what did you do with the information that he gave you?

16 A Went back, you know, and met with Mr. Hendricks and Amanda

17 again.

18 Q Did you speak with Amanda again?

19 A I did.

20 Q And what did she tell you?

21 A Well, I confronted her with the fact that, you know, she

22 might have been mistaken about the initial information she had

23 given us, and that Mr. Koplin -- I told her that Mr. Koplin was

24 not really her grandfather after all, is that not right? And

25 she said, "Well, he's not really my grandfather. He's my

1  godfather." And I said, "That's impossible, Amanda, because

2  you've only known this guy for a year. So, therefore, he can't

3  be your godfather."

4      And, you know, she started to cry at that point. And, you

5  know, she composed herself. And I asked her if she had given

6  him back rubs or massages, or if he had given her back rubs or

7  massages, and she said that maybe they have done that in the

8  past.

9      I asked her if he had used any type of instrument or

10  vibrating massage tool on her, or if she had used one on him,

11  and she indicated that they had. She stated that, yeah, that

12  might have gone on, but there was nothing, you know, wrong with

13  that. And that she did not want Ed to get into any kind of

14  trouble.

15      At this point in time Mr. Hendricks gave me a handwritten

16  note that he'd found in plain view on the table. He was

17  interviewing at this little kitchen table. And, you know, you

18  could tell it was a child's handwriting. On the note it said,

19  "Loved Ed, too," indicating also. There were also some 35

20  millimeter photographs on the coffee table in plain view of

21  Amanda riding a horse and of family time.

22  Q   Did you ask Amanda about those photos?

23  A   I did. And she said that was when she was in Utah, and that

24  was her horses that apparently Mr. Koplin had purchased for her.

25  Q   And about how long were you in the room with Amanda that

1  time?

2  A    10 minutes.  You know, we're trying to keep it short,

3  bouncing back and forth, not a long time.

4  Q    And what did you do with that information?

5  A    I then came out and recontacted Mr. Koplin.

6  Q    And what did you say to him?

7  A    I told him that there's something rotten in Denmark here.

8  This doesn't fit.  There's something highly suspicious.  And he

9  told me there's nothing suspicious at all.  There's nothing

10 inappropriate going on.  This is a perfectly normal

11 relationship, in that, you know, they were on vacation visiting,

12 I think it was his sister.  He had a cabin up near Port Susan,

13 somewhere near the Canadian border, and that he was visiting his

14 sister in Bellevue.

15      I then asked him if there was anything in the room that

16 would embarrass him.

17 Q    And what was his response?

18 A    He indicated, yeah, maybe there was.  There was some

19 personal items in there   And I asked him what they were, and

20 that he -- he told me that he had recently went to an adult sex

21 shop in Bellevue and purchased some toys for some friends of

22 his.

23 Q    And did you ask him if you could then search his room?

24 A    Before we got to that, I wanted to delve a little bit into

25 what these -- why would he buy toys for friends of his   And he

1  told me that he had a relationship with two ladies in Utah,

2  adult ladies. Then I asked him, I said, was the -- you know,

3  these -- did you buy -- is there anything that -- child sex

4  porn, or something like that, in the room. And he said, "No,

5  there's no child sex porn. It's all adult legitimate stuff.

6  There might be a movie or two. But it's all legitimate adult

7  movies." And that he bought this for two of his friends.

8      And he said he had a relationship with these two ladies who

9  were in their fifties in Utah, and that he was buying them --

10 initially he told me he was buying these items at their request,

11 and I said, "You know, Ed, I kind of find that difficult to

12 believe. Why would ladies in their fifties want you to buy them

13 these items? Why couldn't they just go down to a Lovers

14 Packages in Salt Lake and pick it up?"

15 Q   And what did he say?

16 A   He said, "They don't have Lovers Packages in Utah, because

17 it's a predominantly Morman state and they don't have these

18 kinds of stores there " And I said, you know, "I -- even at

19 that, Ed, that just doesn't sound right. Why would they ask --

20 why come to Washington? Why not go to Nevada?" It just didn't

21 sound right.

22     And he says, "Well, they weren't --" they didn't ask him to

23 do that. He changed his story right there. He says they didn't

24 ask him to buy those things. He was buying them as a present

25 for them for their birthday.

1    And I said, "Well, can we confirm this information?  I'd

2  like to be able to confirm that, you know.  Do you have their

3  names and phone numbers?"  And he initially gave me the name of

4  one, and he refused to give me the name of the other.

5  Q   At that point did you then ask him for consent to search his

6  room?

7          MR. FILIPOVIC:  Your Honor, I would object to the

8  sergeant continuing to read from his report, unless he can't

9  remember, and then --

10          THE COURT:  Are you reading --

11          MR. FILIPOVIC:  -- asks for permission.

12          THE WITNESS:  I'm referring to my report, ma'am.

13          THE COURT:  Do you have an independent recollection of

14  what went on?

15          THE WITNESS:  I do, but I want to keep the sequence

16  correct.  That's my only reason for referring.  Because I

17  bounced back and forth quite a bit, as you can tell, and I just

18  wanted to keep the sequence correct.

19          THE COURT:  Are you reading from the report?

20          THE WITNESS:  At times, Your Honor.

21          THE COURT:  Well, why don't we just see how it goes.

22  He can use the report to refresh his recollection, Mr.

23  Filipovic.

24  Q   (By Ms. Miller)  At that point did you ask the defendant to

25  consent to a search of his room?

1  A    I did.

2  Q    And can you tell us a little bit about that conversation?

3  A    Yes.  I asked him -- I said, "Okay, Ed, you know, we need --

4  we need to look at these items to make sure there's nothing

5  going on here.  Is it okay if we look in your room?"  And he

6  said, yeah, he has nothing to hide.  But he wanted a cigarette.

7  He wanted to smoke a cigarette real bad.  And he said he had to

8  take his medication.  And --

9  Q    So what did you do at that point?

10 A    We walked him back into the room.  I agreed to Mr. Koplin's

11 request, but I didn't want him in there with Amanda.

12 Q    So what happened?

13 A    Well, I -- prior to escorting Mr. Koplin into the room, I

14 entered the room and told Mr. Hendricks, who was interviewing

15 Amanda, what was going on there.  And I informed him that at

16 this point I felt that clearly Amanda, her safety was in

17 jeopardy if we left the situation alone.

18     So I informed Mr. Koplin that I was taking protective

19 custody.  In the State of Washington police officers have the

20 authority to take protective custody of any child they feel

21 might possibly be abused.

22     So at this point in time I felt that Amanda was possibly

23 being sexually abused, and I took protective custody of her and

24 released her to Mr. Hendricks' custody, and informed Mr.

25 Hendricks that I wanted him to take her back to the office, do

1   the background on the family, make arrangements to get her home,

2   and that we would conduct the investigation of Mr. Koplin, find

3   out what's going on here, and I will keep him apprised of what

4   was happening.

5   Q   Did you ask him to take Amanda out of the room at that time?

6   A   I did.

7   Q   And did he do that?

8   A   Yes.

9   Q   And at that point was Mr. Koplin in the room?

10  A   Not -- not initially.  There was a --

11  Q   Is there a brief overlap?

12  A   There was a brief overlap.

13  Q   What happened when you brought Mr. Koplin back into the

14  room?

15  A   He was allowed to sit on the bed.  He needed some oxygen, so

16  he hooked himself up to some oxygen.  Took his meds and had a

17  cigarette.

18  Q   And at that point did you go over a consent to search the

19  room with him?

20  A   At this point in time, you know, we sort of needed to know

21  one way or another what was happening, and so --

22  Q   And is that what you told him?

23  A   I did.  I said, "I need to know a decision one way or

24  another, Ed.  It's your call."

25  Q   Meaning about consenting to search the room?

1    A    Absolutely.

2    Q    And what was his response?

3    A    He gave us consent to search. Actually, initially he asked

4    us -- he says, "Well, what if I don't consent?" And I told him

5    very specifically exactly what was going to occur, because I had

6    been in that situation countless times before as a detective

7    supervisor.

8    Q    What did you tell him?

9    A    I told him, "This is what's going to happen, Ed. You can --

10    it's your right to refuse. No problem at all. But this is

11    what's going to happen. I'm going to impound the room. We're

12    going to take you out of here and we're going to put you

13    someplace, and I'm going to impound the room. And I'm going to

14    call the detectives, and they're going to come up here and

15    they're going to -- I'm going to tell them what we know so far.

16    And they're going to assess the situation.

17    "After they assess the situation, in all likelihood, having

18    been in that situation, in all likelihood they will apply for a

19    search warrant. They will contact a prosecutor, a King County

20    prosecutor. They'll review the affidavit of search warrant with

21    them, and then they'll review it with the Judge. And it's up to

22    the Judge on whether the Judge signs it or not. And once -- if

23    they get a search warrant, they will search your room and find

24    whatever is in here."

25    Q    At any time did you ever tell the defendant that you were

1   going to for sure be able to get a warrant?

2   A    I didn't tell him we would for sure get a warrant.  I told

3   him it would be up to a Judge on whether the Judge approved a

4   warrant or not.

5   Q    And what was his response?

6   A    He gave us consent.

7   Q    And he'd also given you consent to search his van?

8   A    He did.

9   Q    And what did you do at that point?

10  A    The first thing, we got a signed -- we had a consent to

11  search form provided by the Kent Police Department.  We

12  completed that.  And then I searched his van.

13  Q    And what did you find in his van?

14  A    I found a firearm.  It was a .25 caliber semiautomatic

15  pistol, a Lorcin, L-o-r-c-i-n, make, Model No. L-25.  Do you

16  need me to read the serial number?

17  Q    No, that's okay.

18  A    It was in a box.  It was like brand new.  And it was in a

19  box.  It was sitting right next to a box of .25 caliber

20  ammunition.  And it was underneath the -- the weapon was

21  unloaded underneath the front seat of the vehicle.

22  Q    And what else did you see in the van?

23  A    I found six teddy bears and/or stuffed animals, numerous

24  toys and play things for children.  There was a computer disk

25  with a yellow sticky note on it titled Amanda's poems.  I took

1   the computer disk, because, based on my training and experience,

2   sometimes victims of sexual abuse will keep a journal, or

3   notebook, or write poetry, or keep a story, a fictitious story,

4   where they're really the person, but they're writing about

5   somebody else, documenting and expressing their experiences.

6       And --

7   Q   And that was all?

8   A   Yeah, that was all I found in the vehicle.

9   Q   Did you seize anything else from the van at that time?

10  A   We confirmed that Mr. Koplin did have a valid concealed

11  weapons permit out of the state of Utah, and so I left -- left

12  the firearm.  Took the disk.  That was the only thing I took out

13  of the vehicle.

14  Q   And after you got done searching the van, where did you go?

15  A   I went back into the room.

16  Q   And what was going on at that time?

17  A   Mr. Koplin was hooked up to oxygen and he was having another

18  cigarette

19  Q   Was anybody searching the room at that point?

20  A   No, not at that point.

21  Q   Had anybody gotten the written consent to search signed at

22  that point?

23  A   Yes.

24  Q   And do you know who did that?

25  A   I think that was Officer Lorette.

1   Q    And did Officer Lorette then begin to search the room?

2   A    He did.  I directed him to search the room at that point.

3   Q    And what types of things was Officer Lorette finding during

4   the search?

5   A    He was finding a -- vibrators, sex toys, pornographic

6   magazines, pornographic videos, Viagra blister caps.  Some were

7   still contained in the blister cap.  Some were empty.

8   Pornographic reading material   In the garbage can he found a

9   handwritten, kind of a several pages of what we call Q and A,

10  question so and so, answer so and so.

11  Q    And what was the nature of that Q and A?

12  A    It was of a -- clearly it was from Mr. Koplin and Amanda.

13  Mr  Koplin was asking the questions, and Amanda was providing

14  the answers, and it was of a graphic sexual detail.

15  Q    And as Officer Lorette was finding these various items, did

16  you discuss what was being found with the defendant?

17  A    Yes, ma'am, I did.

18  Q    And can you tell us a little bit about that?

19  A    Well, at this point in time I had -- I felt I had

20  established a pretty good relationship with Mr. Koplin.  I mean,

21  I was on a first name basis with him   And it was almost like I

22  was talking to Mr. Koplin as if he was my brother or my uncle.

23      And each time Officer Lorette would find the most graphic of

24  sexual literature, I would ask Mr. Koplin to explain himself.  I

25  would ask Mr. Koplin to explain himself about the variety of

1   sexual toys found in that room.

2       I would ask Mr. Koplin to explain himself on why there were

3   used Viagra blister packets, you know, empty.  I would ask Mr.

4   Koplin to explain himself concerning, you know, this graphic Q

5   and A handwritten several pages of notes and questions found in

6   this garbage can.

7   Q   And what was his response?

8   A   It was pretty weak initially.

9   Q   What do you mean by that?

10  A   Well, he -- concerning the Viagra tablets, he said he had

11  girlfriends in the area.  And I said, "Well, that -- you know,

12  you're visiting here, Ed.  I mean, come on   I mean, what, do

13  you go to like a singles bar?  What do you do, Ed?  Come on.  I

14  mean, this doesn't make any sense."  And he maintained that

15  story.

16      And then regarding the toys, he maintained that -- now,

17  remember, these sex toys weren't in the packages.  They were --

18  had been removed.  So -- I mean, they had obviously been used.

19              MR. FILIPOVIC:  Objection, Your Honor, foundation.

20              THE COURT:  Overruled.

21  A   (continued)  And so it was like, "Ed, you know, help me

22  understand this, man.  Why is this?  Why are these used?"  And

23  he just -- his response was pretty non-responsive.

24  Q   (By Ms. Miller)  What about when you got to the Q and A,

25  when you asked him about that?

1   A    Well, when we got to the Q and A portion, he indicated that,

2   if I recall, that he wasn't the -- she'd been masturbating

3   before he met her.

4   Q    That was his response?

5   A    Yeah.

6   Q    And did you follow up on that?

7   A    I did.

8   Q    What did he say?

9   A    Let's see.  If I may refer here, just so I have the sequence

10  right.  I asked him to explain himself about the questions, and

11  he said Amanda was masturbating before he met her   I asked him

12  to explain himself further, and he stated that Amanda knew how

13  to masturbate before he knew her or her family.

14      I asked him if ever watched her masturbate, and he stated he

15  had.  I asked how many times he watched her masturbate, and he

16  took a moment to think and then said, "At least six times."  I

17  then asked him when's the last time he watched her masturbate,

18  and he said it was in the state of Utah.

19  Q    And at that point did you decide to arrest the defendant?

20  A    Yes.  At that point in time I directed Officer Lorette and

21  Officer Krauss to place Mr. Koplin in custody for investigation

22  of child rape, child molestation and child sexual abuse.

23  Q    And did you have any further contacts with the defendant

24  after that?

25  A    I did.  I asked him why, you know, he just didn't tell us

1  the truth earlier, and he told us he was scared.  I informed him

2  that I felt that he was a pedophile and child molester and he

3  needed psychiatric help.

4      I told him that if he felt he was losing control and needed

5  the appropriate medical help that that could be arranged.  He

6  looked up and said -- he looked at me and said he did feel like

7  he was ill and requested an opportunity to speak to somebody who

8  could help him.  And I told him that a detective would be

9  contacting him later -- at a later time.

10 Q   And what else did you do with regards to this case?

11 A   He was -- I directed, I believe it was, Officer Krauss to

12 transport Mr. Koplin to the city of Kent correctional facility.

13 I directed Officer Lorette to package all the evidence we had

14 found and submit it into Kent police evidence.

15     We notified the motel management of our situation and our

16 investigation.  And I called Detective Sergeant Ken Thomas, who

17 was my replacement, and informed him that we had a pretty

18 serious child abuse case, sexual abuse case, and that we needed

19 to brief his team on what we had.  And we did that.

20 Q   And did you brief the team?

21 A   Yes.

22 Q   About how long was it from start to finish that you were at

23 the hotel, until the defendant was taken away, from the time you

24 arrived until he was taken away?

25 A   I believe it was about -- it was probably close to two

1    hours.

2    Q    Okay.

3              MS. MILLER:  I have no further questions.

4              THE COURT:  Tell you what, Mr. Filipovic, why don't we

5    take a brief recess, a 15-minute recess, before we begin your

6    cross-examination, okay?

7              MR. FILIPOVIC:  Thank you, Your Honor.

8              (Recess.)

9              THE COURT:  Please be seated.

10             MR. MIYAKE:  We forgot our witness.  We will bring him

11   back in.

12             THE COURT:  I noticed somebody was missing.  Ms.

13   Miller, let me ask you:  How many witnesses do you have?

14             MS. MILLER:  We have eight witnesses, Your Honor.

15             THE COURT:  Eight witnesses?

16             MS. MILLER:  Yes, Your Honor.

17             THE COURT:  You may resume the stand, please.

18                        CROSS-EXAMINATION

19   BY MR. FILIPOVIC:

20   Q    Good morning, Sergeant Gustafson.

21   A    Good morning, sir.

22   Q    My name is Michael Filipovic.  I represent Mr. Koplin.

23   Sergeant Gustafson, on June 6th, immediately after you cleared

24   the scene, that's when you dictated the report that you've been

25   reviewing this morning on the witness stand, is that correct?

1   A    That's correct.

2   Q    You have no other notes or reports that were done in this

3   case?

4   A    No.

5   Q    Now, you did not have either an arrest warrant or a search

6   warrant on June the 6th, a search warrant for the motel room or

7   an arrest warrant for Mr. Koplin, is that correct?

8   A    Correct, sir.

9   Q    And as a result of your investigation in this case, it was

10  clear to you, was it not, that it was Mr. Koplin, Edward Koplin,

11  that actually rented Room D132 at the Marriott Towne Place

12  Suites, is that correct?

13  A    Yes.

14  Q    And that the only occupants of that room were Mr. Koplin and

15  Amanda Brinkley, is that correct?

16  A    Yes, sir.

17  Q    Now, you've referenced the fact that Officer Lorette at one

18  time had -- you believe had given Mr. Koplin Miranda warnings,

19  is that correct?

20  A    Yes.

21  Q    You had never personally given Mr. Koplin any Miranda

22  warnings, is that correct?

23  A    I did not, sir.

24  Q    Now, when you first heard about this case, it was from the

25  dispatcher, is that true?

1   A    Yes.

2   Q    And the dispatcher essentially told you that this was a

3   welfare check that you were doing at the motel?

4   A    Yes.

5   Q    And is it correct -- and you can refer to your report if you

6   need to -- that what the dispatcher told you is that the suspect

7   may possibly be armed with a handgun?

8   A    Yes.

9   Q    Okay   And those were your words, may possibly be armed with

10  a handgun?

11  A    Yes.

12  Q    Did you ask the dispatcher -- well, let me ask this

13  question:  You're able to communicate with the dispatcher, is

14  that not correct?

15  A    Yes.

16  Q    Did you talk to the dispatcher and ask her who provided her

17  with the information that you were receiving?

18  A    No, because we have MDCs, mobile data computers, in our

19  cars.   They're laptops mounted in our cars.   And so everything

20  that's dispatched over the air comes back through our CAD,

21  computer-aided dispatch, through our MDCs.  So on the CAD it has

22  various information.

23  Q    So you're not getting verbal information, you're simply

24  getting written information from the dispatcher?

25  A    A combination of both.

1  Q    But you are able to communicate either in writing or

2  verbally with the dispatcher, is that correct?

3  A    Yes, sir, we are.

4  Q    Did you contact the dispatcher to ask any more information

5  about the gun?

6  A    No, sir.  I did not, no, sir.

7  Q    Okay.  Did you ask if this individual had a felony record?

8  A    No, sir

9  Q    Did you --

10  A    I don't believe we had a date of birth, frankly.

11  Q    But you didn't ask, you didn't ask --

12  A    No, no.

13  Q    -- if they would do anything like that?  And you were not

14  told that this was a hostage situation, the dispatcher never

15  said this was a hostage situation?

16  A    True story.

17  Q    Okay.  And they never told you this was a kidnapping

18  situation, is that correct?

19  A    No, they did not.

20  Q    Okay.  Basically they said check on this person's welfare in

21  the motel?

22  A    Yes.

23  Q    And what you did know was that -- going in was that the

24  people in the motel room, as far as you knew, one was a

25  68-year-old man and the other one was an 11-year-old girl, is

1  that correct?

2  A   Yes, and we had Mr. Koplin's name.

3  Q   And you knew from speaking with Detective Hemmen before you

4  went in that the referral had initially come in the day before,

5  is that correct?

6  A   Yes, sir.

7  Q   Now, before you actually entered the room you or some of the

8  other officers contacted the management of the motel, is that

9  correct?

10  A   Yes.

11  Q   And they were cooperative with you, is that not right?

12  A   They were.

13  Q   In fact, they loaned you some maintenance uniforms for two

14  of your officers?

15  A   Yeah.  I think it was one, but -- yeah, one officer wore a

16  uniform.

17          MR  FILIPOVIC:  Your Honor, if I could have the clerk

18  show the witness Defense Exhibit A-1.

19          THE COURT:  Surely.

20  Q   (By Mr. Filipovic)  Sergeant Gustafson, I'm showing you an

21  exhibit which is a diagram of the grounds of the Towne Place

22  Suites.  Does that look familiar to you?

23  A   Yes, sir, it does.

24          MR. FILIPOVIC:  Your Honor, with the Court's

25  permission, could I ask the witness to mark on the diagram where

1    the hotel room was that Mr. Koplin was staying?

2            THE COURT:  Sure.  Go ahead

3            THE WITNESS:  Oh.

4    A    I think it was either D134 or D132.

5    Q    (By Mr. Filipovic)  Do you need to refer to your report to

6    refresh your memory?

7    A    Well, I wrote down the name of the apartment -- or the motel

8    and the address.  I didn't happen to get the motel number, the

9    room number.

10   Q    I'll ask another witness then to mark the diagram.

11   A    Oh.

12   Q    If you -- just looking at the diagram, however, in that

13   general vicinity, it depicts a parking area just immediately to

14   the -- what would be the west of that complex of the buildings,

15   is that correct?

16   A    Yes, sir   I'm familiar with that.

17   Q    And is that where Mr. Koplin's van was parked?

18   A    Yes   I could point that out.

19   Q    Okay.  Could you mark on that -- in the parking area to the

20   west where Mr. -- approximately where Mr. Koplin's van was with

21   a V?

22            MR. MIYAKE:  Your Honor, we'd stipulate that the room

23   number was 132.

24            THE COURT:  Okay.  D132?

25            MR. MIYAKE:  Yes, Your Honor.

1  Q    (By Mr. Filipovic)   When Mr. Koplin was removed from the

2  room, is it correct that he was also walked out to that same

3  parking area west of the complex?

4  A    Yes, sir, right near his vehicle is where our police

5  vehicles were parked.

6  Q    And this is not an enclosed motel, this is a motel style

7  complex, where when you come out of the room you're actually out

8  in the open, is that correct?

9  A    Yes.

10  Q    So to take Mr. Koplin from D132 to the parking lot, he had

11  to be walked down an outside sidewalk, and then take a left out

12  into the parking lot, is that correct?

13  A    Yes, sir.

14        MR. FILIPOVIC:  Your Honor, could I have the clerk show

15  Sergeant Gustafson Defense Exhibit A-13?

16  Q    Sergeant Gustafson, Exhibit A-13, does that appear to be a

17  photograph of Mr. Koplin, along with a photograph depicting you

18  and another officer?

19  A    Yes, sir, it does.

20  Q    Who is the third officer?

21  A    That's Officer Lorette, and he's still in the maintenance

22  uniform.

23  Q    And that photo was taken on the morning of June the 6th?

24  A    It was.

25  Q    And as you can see from the photograph, Mr. Koplin is only

1    wearing a pair of boxer shorts, is that correct?

2    A    Yes, sir

3    Q    And that's how he was taken from the room and marched out to

4    the parking lot?

5    A    It was.

6    Q    And at any time prior to him returning to the room, was he

7    provided with shoes, pants, shirt, any type of clothing?

8    A    I want to say we gave him a shirt, but I didn't give him a

9    shirt.

10   Q    Okay.  There's no shirt depicted in the photograph, is

11   there?

12   A    No, but I think before we went into the room, I think

13   somebody gave him a shirt.

14   Q    Okay.  But this is after he was hand -- unhandcuffed --

15   A    Yes.

16   Q    -- is that right?

17   A    Right, right.  That was after he was unhandcuffed and

18   removed from the back seat of the police car.

19   Q    And you were the -- of the patrol officers who responded,

20   you were the officer that -- or the sergeant that was really in

21   charge of that scene, is that correct?

22   A    I was.

23   Q    And it was you that instructed that Mr. Koplin be handcuffed

24   when he was removed from the room, is that correct?

25   A    Well, I didn't specifically say handcuff this guy   It's

1  understood through our training and protocols that when you

2  detain a potentially armed suspect under these conditions that

3  he would most likely be handcuffed.

4  Q    Let me ask you this:  When Mr. Koplin was yanked out of the

5  room and actually just pulled out, did you have visual contact

6  with Mr. Koplin from where you were standing?

7  A    At that point I did, sir, yes.

8  Q    At that moment in time he was dressed the way he is depicted

9  in the picture, correct?

10 A    He was.

11 Q    And the officers had both of his arms, is that correct?

12 A    Yes.

13 Q    Okay.  And you did not see a firearm or a gun of any sort,

14 did you?

15 A    No, I did not.

16 Q    And he wasn't wearing shoes, so there was no possible place

17 where a gun could be hidden in his shoes, is that correct?

18 A    No, sir.

19 Q    Okay.  And you watched as your officers handcuffed him --

20 A    I did.

21 Q    -- is that correct?

22 A    Yes.

23 Q    And you watched as they took him down to the patrol car?

24 A    Yes.

25 Q    You didn't tell them to unhandcuff him at that point, when

1   it was clear he did not have a weapon, is that correct?

2   A    No, I didn't.  But it was -- according to Officer Lorette,

3   the guy initially --

4   Q    Well, Officer Lorette will be testifying.

5   A    Okay.

6   Q    Now, you testified on direct that after Mr. Koplin was taken

7   to the patrol car you interview Amanda with Mr. Hendricks, then

8   go out and interview Mr. Koplin, come back, reinterview Amanda,

9   and go back out a second time to interview Koplin, and then he's

10  brought back into the room, is that correct?

11  A    Yeah.  I think that that occurred three times, I guess.

12          MR. FILIPOVIC:  If I could ask the clerk to show the

13  witness Defense Exhibit A-5.

14  Q    Do you recognize that photograph?

15  A    I do

16  Q    Is that a photograph taken of Mr. Hendricks seated at the

17  table with Amanda and you seated at the couch adjacent to the

18  table?

19  A    It is.

20  Q    And is it correct that when you were interviewing Amanda and

21  you asked where she slept, she indicated on the couch, where you

22  were sitting, is that correct?

23  A    Yes.

24  Q    So she was basically referring to that -- to what's depicted

25  in the picture, you are sitting on the couch?

1  A    Yes, sir.

2  Q    Did you take any photographs of the scene at all that day on

3  June the 6th?

4  A    I don't believe I did.  No, I don't think I did.

5  Q    Do you know who took this picture and other pictures while

6  you were in the room with Amanda?

7  A    I don't have a clue.  I directed Officer Lorette to take

8  photographs of the evidence we found after the consent to

9  search, but --

10 Q    But that was later, right?

11 A    That was later, yeah.

12 Q    These pictures were obviously taken earlier, is that

13 correct?

14 A    Yes, sir.  I have no idea who took these photographs.

15 Q    But it must have been a police officer, right?

16 A    It's the first time I've seen them.

17 Q    Well, this was not a very large motel room, was it?  I mean,

18 you --

19 A    Oh, no.

20 Q    You would notice if someone came in who was not a police

21 officer?

22 A    Yeah, I guess I would.

23        MR. FILIPOVIC:  If I can ask the clerk, please, to show

24 the witness Defense Exhibit A-22.

25 Q    Sergeant Gustafson, on direct examination you referenced a

1 massage-type tool that was in plain view next to the couch, is

2 that correct?

3 A    Yes, sir.

4 Q    Does A-22 depict what you referred to on direct examination?

5 A    Yes, sir, it does.

6 Q    Do you recall, is this the item that has the lettering on it

7 that says something to the effect of Health-o-meter, or

8 something along those lines?

9 A    I don't recall the lettering on the item, but that looks

10 just like the item.

11 Q    Now, at some point it's your understanding that Amanda

12 Brinkley made a phone call to her mother back in Utah, is that

13 correct?

14 A    When did she do that?

15 Q    Well, let me ask you a question.  Were you present when

16 Amanda Brinkley used a cell phone in the motel room to call her

17 mother in Utah?

18 A    I was -- I don't remember that, sir.  I was not present if

19 that happened.

20 Q    Okay.  You would have been outside of the room when that

21 phone call took place?

22 A    I probably would have been outside the room at that time.

23 Q    Now, going to your first contact with Amanda Brinkley, when

24 you're sitting on the couch speaking with her and CPS worker

25 Hendricks.  During that first conversation, she basically told

1  you that nothing inappropriate had been happening between her

2  and Mr. Koplin, is that correct?

3  A    That's correct, sir.

4  Q    Okay.  And when you went and spoke with Mr. Koplin for the

5  first time in the parking lot, when you first approached he was

6  locked in the back of the patrol car, is that correct?

7  A    He was in the back -- seated in the rear seat of the patrol

8  vehicle, yes.

9  Q    Now, these patrol vehicles, typically the back seat you

10  can't open from the inside, you have to open it from the

11  outside?

12  A    I'm not sure -- he was in the back seat, but I'm not sure if

13  the back door wasn't open or not.  I don't recall.

14  Q    Okay.  But when the doors are closed, you can only open them

15  from the outside?

16  A    Absolutely, yes.

17  Q    And he was actually handcuffed in the back of the car?

18  A    He was, yes.

19  Q    And there were at least two police officers standing nearby

20  and possibly three when you approached?

21  A    That's correct.

22  Q    Okay.  So at that point you asked that he be removed from

23  the patrol car and unhandcuffed, is that correct?

24  A    Yes.

25  Q    But he's still wearing his underwear?

1  A    Yes.

2  Q    At that point in time, if Ed Koplin said, listen, I'm

3  leaving, I'm walking -- I'm walking down the highway, or I'm

4  going to get in my van, you would not have let him leave, would

5  you?

6  A    At that point in time I would not have let him leave, sir,

7  because I felt at this point we clearly had a Terry stop

8  situation.

9  Q    And at that point, if he had said, listen, I'm going back to

10  my room to get my clothes, you wouldn't have let him do that

11  either?

12  A    If he would have asked for clothes, I would have gladly

13  gotten them.

14  Q    But if he said, I want to go back to the room myself --

15  A    I would not have let him -- I would not -- one, I didn't

16  know if there was a weapon in the room or not, so, of course, I

17  would not have allowed him to enter -- reenter that room.  Plus

18  we were interviewing Amanda Brinkley.

19  Q    And during that first interview with Ed Koplin, he also told

20  you there was nothing inappropriate going on between himself and

21  Amanda Brinkley, is that correct?

22  A    Initially that's what he said, yes.

23  Q    And he also told you that he had permission from her parents

24  to take her on this trip?

25  A    We had not been able to confirm that, but, yes, that's what

1   he told us initially.

2   Q   And he told you that the gun he had he had a permit and that

3   it was in the van?

4   A   Yes.

5   Q   Now, during this first contact with Mr. Koplin, you asked

6   for consent to search, is that correct?  If I could refer you to

7   page --

8   A   The bottom of page 3?

9   Q   -- page 3.

10  A   Yes.

11  Q   And you asked for consent to search the room, is that

12  correct?

13  A   Yes.

14  Q   And what he said specifically was that he did not really

15  know, and again asked you what this was all about?

16  A   That's correct.

17  Q   So he did not at that point give you consent to search?

18  A   At that point he did not.  He didn't tell us we couldn't

19  either.  He just didn't give us consent.

20  Q   He said -- but when you asked him for consent, he said he

21  did not really -- didn't really know --

22  A   Didn't know

23  Q   Okay.

24  A   He was more interested in what was going on.

25  Q   Now, then you went back to the room to speak with Amanda and

1   left Ed in the parking lot, is that correct?

2   A    Yes.

3   Q    And Ed is in the parking lot not by himself, but with at

4   least two uniformed police officers?

5   A    Yes, sir.

6   Q    Okay.  All the police officers, all four of you that day had

7   firearms, is that correct?

8   A    We did.

9   Q    And when you went back and reinterviewed Amanda, again she

10  never said that anything inappropriate had happened between her

11  and Mr. Koplin, she never said there was any sexual contact

12  between the two of them?

13  A    No, sir, she didn't.

14  Q    And it was after that that you returned for the second

15  interview of Mr. Koplin into the parking lot, is that correct?

16  A    I went back and talked -- spoke with Amanda initially, and

17  that was the second time we spoke with Amanda

18  Q    Okay.  But after speaking to Amanda the second time, you

19  returned to speak with Mr. Koplin the second time?

20  A    Yes, yes.

21  Q    And again he said nothing inappropriate was going on between

22  the two of them?

23  A    Well, yes, yes, that's true.

24  Q    And he's still in the parking lot.  Is he outside of the car

25  at that point?

1    A    Yes, he's outside of the car in the parking lot.

2    Q    Okay.  And he's as depicted in that picture?

3    A    Yes.

4    Q    And at that point, when you asked him for his consent to

5    search, he acquiesced but wanted a cigarette and wanted to take

6    his medication, is that what he told you?

7    A    Yes.

8    Q    And then after he said that, that's when you allowed him to

9    go back to the room?

10   A    Yes.

11        MR. FILIPOVIC:  Your Honor, if I could ask the clerk to

12   please show the witness Exhibit A-4.

13   Q    Does that look familiar to you, Sergeant Gustafson?

14   A    It does.

15   Q    That depicts the bedroom area of the motel room, is that

16   correct?

17   A    Yes.

18   Q    Okay.  And on the left-hand side of the picture, does that

19   depict the oxygen tanks that Mr. Koplin was using?

20   A    Yes.

21   Q    Okay.  And does this depict the oxygen tanks before he used

22   the tanks?

23   A    I think so.  Again, I don't know who took this picture.  So

24   I think so.

25   Q    But you did not take that picture?

1  A    I did not.

2  Q    Now, after you consented -- or after you -- Mr. Koplin

3  signed the consent to search and you conducted the search, or

4  Officer Lorette conducted the search, did you use -- you used

5  items from the search and questioned Mr. Koplin about those

6  items, is that correct?

7  A    I did, yes.

8  Q    And before doing that you didn't advise him of his Miranda

9  rights, did you, you personally?

10  A    No, I did not.

11  Q    And at that point in time he made statements that you

12  considered to be incriminating, is that correct?

13  A    Yes, sir.

14  Q    Then on the -- just before he leaves, just before he gets

15  removed, Mr. Koplin gets removed from the motel room, you tell

16  him that you believe he's a pedophile and that he needed

17  psychiatric help and that could be arranged?

18  A    I did.

19  Q    Okay.  And right after you told him that, that he looked at

20  you, said he felt like he was ill and requested the opportunity

21  to speak with someone who could help him, is that correct?

22  A    Yes.

23  Q    And after -- when he made that comment, you responded by

24  telling him I told him in that case he would be referred to the

25  detectives and a detective would contact him at a later time?

1  A    Yes, sir.

2  Q    So when he asked for help, you said a detective would be

3  coming to respond to that request for help?

4  A    That's the next logical sequence in the investigation, yes,

5  sir.

6  Q    And then Officer Krauss transported him and you were not

7  involved in that?

8  A    Yes.

9  Q    Just going back to your initial call to the scene, you

10  indicated there had been a call to 911.  Were you aware of the

11  fact that the call to 911 was made CPS worker Hendricks?

12  A    No, I thought it had been made by a family member.

13  Q    And, again, when that call was made, it was basically -- or

14  what you were told is just do a welfare check, there was no

15  hostage situation, no kidnaping, nothing of that sort?

16  A    Yes, that's correct.

17  Q    Okay.  And there was no suggestion that the -- that there

18  was a firearm that was being used illegally, or possessed

19  illegally, or being waved around, or anything like that?

20  A    Well, there was an indication that Mr. Koplin may be armed

21  Q    But beyond that, no other information?

22  A    No.

23  Q    Do you recall when the actual officers -- you were watching

24  as, I believe, Krauss and Lorette went to the door.  Did they

25  have their firearms drawn?

1   A   No.

2   Q   Or were they -- okay.  And you also didn't have information

3   that the 11-year-old girl was there involuntarily or against her

4   will in any way, is that correct?

5   A   No.

6   Q   You indicated that --

7           THE COURT·  Wait a minute.  Is that correct, yes,

8   that she wasn't -- never mind.  It was one of those questions

9   that the -- if the answer is no, "is that correct" is going to

10  be confusing.  But he agrees with you, he had no information

11  that she was there involuntarily.

12  Q   (By Mr. Filipovic)  Did you -- when you were interviewing

13  Amanda Brinkley, did you ever make an effort to contact the

14  management at the motel to see if they would make an interview

15  available to you in the conference center?

16  A   I did not, sir.

17  Q   Okay.  Do you know if anybody else did that?

18  A   Not to my knowledge.

19  Q   And you testified earlier that you couldn't let Mr. Koplin

20  in the room because you still hadn't searched for weapons and

21  because Amanda was there, and he was in the patrol car, but

22  there were actually several patrol cars present in the parking

23  lot at that point?

24  A   Yes, sir.

25  Q   In fact, did each of you come in a separate patrol car, all

1  four of you?

2  A    We did.

3  Q    Now, on direct examination you indicated that when you found

4  the sexual aids in the motel room, that Mr. Koplin told you that

5  he got those for some adult women friends of his, is that

6  correct?

7  A    Yes.

8  Q    In your report it doesn't state that the women friends asked

9  him to purchase those items, does it?

10 A    Well, during the initial interview, when we were outside the

11 room, before actually finding them, the initial contact about

12 why he had these embarrassing things, if there's anything

13 embarrassing, he indicated that these -- he had two lady friends

14 in Utah who had asked him -- the initial part of that was that

15 they had asked him to purchase these for -- asked him to

16 purchase them for them.

17 Q    And then later he said it was actually a gift?

18 A    It was actually a gift, yeah.

19 Q    Now, as he was walked -- were you with him as he was walked

20 back to the room?

21 A    I don't know.  I don't remember --

22 Q    Okay.

23 A    -- if I was right with him, or in front of him, or I had

24 gone in -- I think I had gone in to talk to Mr. Hendricks ahead

25 of time.

1    Q    Now, is it your testimony that the room was not searched

2    before he was returned to the motel room?

3    A    We did not search the room prior to --

4    Q    So was he rehandcuffed before he was brought into the hotel

5    room?

6    A    No, he was not.

7    Q    But you still weren't sure whether there was a gun in the

8    motel room?

9    A    That's correct.

10   Q    And you allowed him to be unhandcuffed at that point?

11   A    We did.  Do you want to know why?

12   Q    I'll have another question for you.

13   A    Okay.

14          MR. FILIPOVIC:  Let me just have a moment, Your Honor.

15   Q    Sergeant Gustafson, if you could take another look at

16   Exhibit A-13.

17   A    Is it this one, sir?

18   Q    The one of Mr. Koplin in the parking lot.

19   A    Okay.  I'm sorry.  Thank you.

20   Q    The van that's depicted in the background, is that Mr.

21   Koplin's van, do you recall?

22   A    Yes, it is.

23          MR. FILIPOVIC.  I have no further questions.

24          THE COURT:  Redirect?

25          MS. MILLER:  Yes, Your Honor.

1    REDIRECT EXAMINATION

2    BY MS. MILLER:

3    Q    Sergeant Gustafson, at any point during your encounter with

4    the defendant were your firearms drawn?

5    A    No.

6    Q    And is that just yourself, or is that also with Officer

7    Lorette and Officer Krauss?

8    A    Well, I never drew my firearm.  I never saw Officer Lorette

9    or Officer Krauss or Officer Wales draw their firearms.

10   Q    Now, you stated during cross-examination that you allowed

11   him to be unhandcuffed as you went back to the hotel room.  Why

12   was that?

13   A    Because we had a whole lot more information about what was

14   happening here than we did when we made initial contact.  One,

15   Amanda was out of the room at that point.  Two, Mr Koplin told

16   us that he had a firearm, admitted he had a firearm, and told us

17   it was in the van.  So -- I mean, I had no reason not to believe

18   him about the firearm at that point.

19        Three, there were three other police officers, four,

20   including myself, who were in the room with him at that point.

21   Four, he wasn't real imposing.  He was a 68-year-old man who at

22   that point in time, when we made the decision to have him go

23   back into the room unhandcuffed, he was obviously taking

24   medication, he was on oxygen.  He wasn't real threatening at

25   that point to our safety.  So even if he had lunged for a

1   firearm, hypothetically, if one had been in the room, I felt
2   very comfortable that the three police officers and myself could
3   have handled the situation appropriately.
4   Q    And you didn't have any of that information when you
5   initially encountered the defendant?
6   A    We had none of that information.  You get a feel when you
7   assess risk assessment, risk assessments, you get a feel for
8   people and situations and circumstances.  And I felt very
9   comfortable allowing Mr. Koplin at that point back into that
10  room.  Even if there would have been a firearm in that room, I
11  felt very comfortable that we could have handled the situation
12  appropriately.
13  Q    Now, also during cross-examination you were stating that you
14  went back and forth between Amanda and the defendant, even
15  though both of them stated that there was no sexual impropriety
16  going on.
17       Why is it that you continued to question them?
18  A    Well, because there was lies   I mean, I found
19  contradictions and misstatements and lies in what they had --
20  each one had told me, and based on my training and experience,
21  it's very common for victims of sexual abuse to minimize and/or
22  deny the offender's behavior.  And that's exactly what Amanda
23  was doing.
24  Q    You felt that that was going on here?
25  A    No question about it

1  Q    After your initial contact with Amanda and the defendant,

2  would you have felt comfortable just leaving the situation as it

3  was?

4  A    Absolutely not.

5            MS. MILLER:  Your Honor, I'd ask that the clerk show

6  the witness Government's Exhibit No. 1, please.

7  Q    If you could please turn to the second page of Government's

8  Exhibit No. 1.

9  A    The CAD report?

10 Q    Yes.  Could you please tell the Court what that is?

11 A    This is a CAD report, a computer-aided dispatch report of

12 the call.  All calls coming through our dispatch center receive

13 one of these, no matter what it is.

14 Q    And is that the information that you received on June 6th?

15 A    Yes.

16 Q    And that's contained within the text of the CAD report?

17 A    Yes.

18 Q    And is that the information that is actually coming up on

19 your screen in your patrol vehicle?

20 A    It's in a different format, but generally, yes.

21           THE COURT:  Which number is this, counsel?

22           MS. MILLER:  This is Government's Exhibit No. 1, Your

23 Honor, the second and third page.

24           THE COURT:  Okay.

25           MS. MILLER:  Thank you.  I have no further questions.

1    MR. FILIPOVIC: Just briefly, Your Honor.

2                    RECROSS-EXAMINATION

3    BY MR. FILIPOVIC:

4    Q    With respect to the exhibit you've just referred to,

5    Government's Exhibit No. 1, the second and third pages of that

6    exhibit, what's depicted in writing and on your screen in the

7    patrol car is a truncated version of what you're getting

8    verbally, is that correct? You're typically getting a little

9    bit more verbally than what you're getting on the screen, is

10   that correct?

11   A    Actually, it's just the opposite oftentimes, sir. We

12   usually get more information sent to our MDCs than we do

13   verbally on the air because we have one frequency for a whole

14   bunch of cops. And to maintain radio discipline you try to keep

15   the chatter down.

16   Q    So, in other words, you're getting different information

17   from both sources, sometimes it's similar, but sometimes you

18   have something verbal that's not in the CAD reports and

19   sometimes you have something in the CAD report that you're not

20   getting verbally, is that correct?

21   A    That's correct, sometimes.

22   Q    Okay. And you don't have a perfect memory of what you were

23   hearing verbally in addition to what's in this CAD report?

24   A    No, no, it's generally the same.

25              MR. FILIPOVIC: I have no further questions. Thank

1    you.

2            THE COURT:  If there's nothing further, you may step

3    down.  Thank you very much.  Counsel, let me ask you -- you say

4    you have eight witnesses.

5            MS. MILLER:  That's correct.

6            THE COURT:  Are they all going to be this length?

7            MR. MIYAKE:  No, Your Honor.

8            MS. MILLER:  No, Your Honor.

9            THE COURT:  Are there going to be some that are going

10   to be shorter?

11           MS. MILLER:  Yes, Your Honor

12           THE COURT:  Do you think we can finish today?

13           MR. MIYAKE:  I'm optimistic that we can finish.  What

14   we -- our plan was this, Your Honor:  To put the testimony on.

15   Counsel had filed a recent response to -- a response brief to

16   our brief, and we were going to ask the Court for some

17   additional time to respond to some of the issues that he raised

18   in that.  I understand that the Court is not available next

19   week.

20      The other addition --

21           THE COURT:  I'm available on Thursday.

22           MR. MIYAKE:  Okay.

23           THE COURT:  But probably only for a short time.  I

24   wouldn't have the whole day

25           MR. MIYAKE:  Shorter is better.  It cuts down Mr.

1  Filipovic.  I'm just kidding.  The other --

2            THE COURT:  Hey, he wasn't very long.  He really

3  wasn't.

4            MR. MIYAKE:  I'm sorry.  The other issue was we were

5  going to be asking to continue the trial from October 28th to

6  either the first or second week in December, so that gives the

7  flexibility --

8            THE COURT:  December?

9            MR. MIYAKE:  Yes.

10           THE COURT:  Is that okay with you, Mr. Filipovic?

11           MR. FILIPOVIC:  Your Honor, I've discussed this with

12  Mr. Koplin.  Also, given the fact that there's a new count in

13  the indictment -- the second superseding indictment that was

14  filed -- I'm not sure if the Court is aware of that yet.

15           THE COURT:  No, I wasn't aware of that.

16           MR. FILIPOVIC:  And we were also handed almost 60

17  audiotapes last week that I have to review.  So there's no way I

18  could be ready by October the 28th.

19           THE COURT:  Well, with that in mind, I feel a lot -- I

20  feel easier about the fact that even if we didn't finish today,

21  or if you need time for a response -- I've seen a brief, but I

22  haven't seen the most recent briefs, and you'll want to respond

23  to that.  Yes.  Okay.  Then I suggest what we do is keep going

24  today, get through as much as we can.  If we don't finish -- I'm

25  just trying to figure should we come back at one o'clock, rather

1  than 1:30. It's hard on the marshals to do that. It's hard on

2  everybody. But how urgent is it to get some extra time this

3  afternoon?

4  MR. MIYAKE: 1:30 is fine, Your Honor. We have -- just

5  to give the Court an idea of the lineup of the witnesses. There

6  are two officers who breached the door, or who went to the door,

7  Officer Krauss and Officer Lorette.

8  The reason why we have to call both of them, they both did a

9  little different regarding the consent, but we'll try and tailor

10  our questions to that so that we don't go through the same

11  information that Sergeant Gustafson already has.

12  We're going to have testimony from the CPS worker. Again,

13  that should be brief. There is testimony regarding a statement

14  that the defendant gave at the Kent city jail. So we have two

15  detectives that -- we may just call one, but there are two. But

16  if one of them covers it, then it will be one.

17  We also have the detective from Utah who conducted --

18  applied for the search down in Utah, where they found some

19  information, and the reason why we are calling that witness is

20  the defense is moving to suppress the search warrant down in

21  Utah. So we felt it's important that we lay some factual

22  background for that. But, again, that should be very brief.

23  THE COURT: Okay. I think the one person you want to

24  be sure to get on today is the Utah person, so you don't have to

25  bring them up here again. Okay. Let's go ahead.

1           MR. MIYAKE:  Okay.  Thank you, Your Honor.  Our next

2   witness is Ben Krauss.

3           THE COURT:  If you'll step forward, please.  Raise your

4   right hand.

5   BENJAMIN KRAUSS,              BEING SWORN, TESTIFIED AS FOLLOWS:

6           THE COURT:  Okay.  Do you want to take the stand right

7   there?  And once you're seated, if you'd state your full name

8   and spell your last name for the court reporter.

9           THE WITNESS:  My name is Benjamin Raoul Krauss.  Last

10  name is spelled K-r-a-u-s-s.

11                       DIRECT EXAMINATION

12  BY MR. MIYAKE:

13  Q   And you're employed with the city of Kent?

14  A   That's correct.

15  Q   How long have you been with the city of Kent?

16  A   Approximately three years.

17  Q   And prior to that, did you have any law enforcement

18  experience?

19  A   Yes, I have nine years of law enforcement experience.  I was

20  with the Tukwila Police Department for two and a half years

21  prior to that, and the Honolulu Police Department for three and

22  a half years.

23  Q   What brought you here to the Pacific Northwest?

24  A   A 40 percent pay raise

25  Q   Ah.  And 40 percent less sun.

1 A    True.

2 Q    I want to direct your attention to June 6th of this year.

3 Were you dispatched to the Marriott Hotel in Kent?

4 A    Yes, I was.

5 Q    We've heard some testimony about that.  What was the nature

6 of the information you received from dispatch?

7 A    It was a welfare check to check on an 11-year-old child that

8 was in the company of a 68-year-old man.

9 Q    Was there any information that you received that you recall

10 about a history of sexual abuse?

11 A    The information we had was -- it was initially called in by

12 a CPS worker.

13 Q    Okay.

14 A    There were also references to a call from the 68-year-old

15 man's sister.  We had information of that.  That they had come

16 from Utah, that the 68-year-old man had a history of

17 molestation, and there was a gun involved.

18 Q    Okay.  Obviously that raised some concerns in your mind?

19 A    Significant concerns.

20 Q    What concerns did you have?

21 A    You had molestation.  You had possible kidnaping, a child

22 coming from Utah in Washington state.  You had a 68-year-old man

23 and you had a young child victim.

24 Q    Did you know if they were related or not?

25 A    The information that I had was that they were not related.

1    Q    I want to jump forward.  When you arrived at the Marriott

2    Motel, who was present?

3    A    Officer Lorette and Sergeant Gustafson

4    Q    And what did you do when you arrived?

5    A    I went to the management office.

6    Q    What happened at the management's office?

7    A    Because of the nature of the call -- we had reported a male

8    suspect, the gun, the possible molestation -- what I did is I

9    went into the management office and asked the manager on duty

10   for several maintenance uniforms.

11   Q    What was the reason for getting maintenance uniforms?

12   A    What I wanted to do was contact the child and get her safely

13   away from the suspect.  I felt that there were exigent

14   circumstances regarding her being detained and the subject

15   having a gun.

16   Q    How was the maintenance uniforms going to further your goal

17   of getting this child away from the 68-year-old?

18   A    My thought was that if I approached the room in my police

19   uniform, the subject may panic.  And my intent was to get the

20   11-year-old child away from the suspect as safely as possible.

21   And I felt that by wearing a maintenance uniform the subject

22   probably would not -- wouldn't panic if he saw me.

23   Q    Okay.  Did you have any concerns about the motel door if you

24   had to breach it?

25   A    Yes.  Just to kind of explain, in my nine years of law

1    enforcement I've done a significant amount of training. And

2    that includes hostage, rescue training. Trying to breach a

3    door, which I have done in the past, can be extremely difficult

4    for a lot of motel doors, for the newer motels. It's a steel

5    wrapped wood core door. And having tried to breach one of those

6    in the past -- it took me about 10 minutes to kick it in,

7    because the door was steel and the door frame was steel. So I

8    actually had to knock the door and door frame out of the

9    two-by-fours to make entry.

10   Q    Was this Marriott Hotel one of the newer hotels?

11   A    Yes, it was.

12   Q    Okay. After you get the maintenance uniform, do you

13   approach the room where the defendant is staying?

14   A    Officer Lorette, myself, Sergeant Gustafson approach the

15   room.

16   Q    Who knocks on the door?

17   A    Officer Lorette did.

18   Q    And where are you at that point?

19   A    The door opened toward Officer Lorette. So I was on the

20   hinge side, exterior side of the door.

21   Q    Did it open in or out of the room?

22   A    I believe it opened out.

23   Q    Okay. Okay. What did you observe happen at that point?

24   A    Officer Lorette said something to the effect of "I need to

25   see your hands."

1  Q   Okay.  Let's back up a little bit.  You approached the motel

2  room.  You're standing on the hinge side of the door?

3  A   Correct.

4  Q   And Officer Lorette is standing where?

5  A   On the side of the door that opens.

6  Q   Okay.  Who knocks on the door?

7  A   I believe Officer Lorette did.

8  Q   And what happened after he knocked on the door?

9  A   Several moments pass and the door opens.

10  Q   From where you were standing, could you see who opened the

11  door?

12  A   No.

13  Q   What did you -- could you hear what was going on?

14  A   I could hear what Officer Lorette said.

15  Q   What did Officer Lorette say?

16  A   Officer Lorette said something to the effect of "Would you

17  step out of the room?  I need to see your hands."

18  Q   And was there an immediate response?

19  A   No.

20        THE COURT:  Wait, wait.  Did he identify himself as a

21  police officer?

22        THE WITNESS:  I don't believe he did, no.

23  Q   (By Mr. Miyake)  After he asked these questions of the

24  person who had answered the door, what happened?

25  A   There was a pause, and what I did is I came around the

1  corner and grasped the subject that was standing inside the door

2  frame.

3  Q    Do you see the subject in Court today?

4  A    Yes, I do

5  Q    Would you identify him for the record?

6  A    He's the gentleman sitting there wearing the blue

7  short-sleeve shirt.

8  Q    Brown T-shirt?

9  A    Excuse me?

10        MR. MIYAKE:  Let the record reflect the witness has

11  identified the defendant.

12        THE COURT:  It will.

13  Q    (By Mr. Miyake)  Did you have your gun drawn at that point?

14  A    No.

15  Q    Did Officer Lorette have his gun drawn?

16  A    I don't believe so.

17  Q    Did both of you grab him?

18  A    I grabbed him and moved him out, and I believe Lorette

19  assisted.

20  Q    Okay.  Once you had him out of the room, what happened?

21  A    I turned him around.  Initially, when I contacted him, I was

22  facing him.  And without letting go of him, I shifted him around

23  180 degrees so that I could get behind him for handcuffing.

24  Q    Did you handcuff him --

25  A    Yes, I did.

1 Q  -- or was he handcuffed?  After he was handcuffed, did you

2 perform any pat downs?

3 A  Yes.  He was wearing a pair of boxer shorts.  I did a quick

4 look over

5 Q  Okay.  Was that all he was wearing?

6 A  That's all I remember him wearing.

7 Q  Okay.  Where was he taken at that point?

8 A  Out to a patrol vehicle

9 Q  Was he placed inside a patrol vehicle?

10 A  At some point he was inside the patrol vehicle.

11 Q  Okay.  After a period of time, did Sergeant Gustafson return

12 to the area where Mr. Koplin was?

13 A  Yes, he did.

14 Q  And were you instructed or was an officer instructed to

15 unhandcuff Mr. Koplin?

16 A  Yes.

17 Q  Was -- do you recall if the defendant had made any statement

18 about being diabetic?

19 A  Yes, he did at some point.

20 Q  What did he say?

21 A  He said that he was diabetic and that he needed his insulin.

22 Q  Okay.  At some point was he asked to give consent to search

23 the room?

24 A  Correct.

25 Q  And pursuant to that, did you fill out a consent to search

1  form?

2  A    Yes, I did.

3         MR. MIYAKE:    I'd ask the clerk to hand what's been

4  marked as Government's Exhibit No. 1.

5  Q    Do you recognize that?

6  A    Yes, I do.

7  Q    And what is that?

8  A    It's a city of Kent Police Department consent to search

9  form.

10 Q    Did you fill that out?

11 A    Yes, I did.

12 Q    After you filled that out, did you go over that form with

13 Mr. Koplin as he was standing near the car?

14 A    Yes, I did.

15 Q    Okay.  Did you read that to him?

16 A    Yes, I did.

17 Q    After you read that to him, did you ask him if he

18 understood?

19 A    Yes, I did.

20 Q    And what was Mr. Koplin's response?

21 A    He related that he did understand.  He said that he was

22 intelligent, because he had a Master's Degree.

23 Q    Okay.  Did he ask any questions about the rights that were

24 read to him?

25 A    He said he understood.

1  Q  Did he ever say that he did not want you to search the room?

2  A  No.

3  Q  At some point is he taking -- taken back into the motel

4  room?

5  A  Yes.

6  Q  Had he given consent to search the room at that point, if

7  you remember?

8  A  I don't remember.

9  Q  Okay.

10         THE COURT:  When did he -- did he sign it then?

11         THE WITNESS:  He did not sign it -- he signed it when I

12  was not with him.

13         THE COURT:  Okay.

14  Q  (By Mr. Miyake)  At some point did you learn if the consent

15  form had been signed?

16  A  Yes, I did.

17  Q  And were you present when the search was conducted?

18  A  Part of the search, yes.

19  Q  Were you in and out of the room?

20  A  Correct.

21  Q  Who did the search?

22  A  Primarily Sergeant Gustafson and Officer Lorette.

23         MR. MIYAKE:  If I could have just a minute.

24  (Brief Pause.)

25         MR. MIYAKE:  I have nothing further.

1              THE COURT:  Do you want to do your cross now?  Is it
2    going to be long, Mr. Filipovic?
3              MR. FILIPOVIC:  About 15 minutes.
4              THE COURT:  Well, tell you what, why don't we wait
5    until 1·30 then.  And you may step down.
6              THE WITNESS:  Thank you, Your Honor.
7              THE COURT:  We will do the cross at 1:30.  I'll see you
8    back here then.
9              MR. FILIPOVIC:  Thank you, Your Honor.
10             (Recess )
11             THE COURT:  Please be seated.  Ready to go, Mr.
12   Filipovic?
13             MR. FILIPOVIC:  Yes, Your Honor.  Thank you.
14             THE COURT:  Okay.
15                        CROSS-EXAMINATION
16   BY MR. FILIPOVIC:
17   Q    Officer Krauss, my name is Michael Filipovic.  I represent
18   Mr. Koplin.  Officer Krauss, when you approached the motel room,
19   Room D132, the door that you approached was a solid door, is
20   that correct, you couldn't see through the door, there was no
21   window or glass there, was there?
22   A    There were windows, I believe, on either side of the door.
23   Q    But the door itself was solid, is that correct?
24   A    Correct.
25   Q    And as you approached, you could not see into the room,

1  because the shades or the blinds were drawn, is that correct?

2  A  I could not see in the room, that's correct. I don't know

3  if the shades were drawn, but because of the screen and the

4  window tinting and the shades and sun, I couldn't see inside.

5          MR. FILIPOVIC:  If I could ask the clerk, please, to

6  show the witness Defense Exhibit A-10 and A-14

7  Q  Officer Krauss, if you'll look at A-10 first  Does that

8  appear to depict the bedroom area of the motel room?

9  A  Yes, part of it.

10 Q  Okay. And does it appear that the blinds or the curtains

11 are actually drawn on the bedroom from that photograph?

12 A  Yes.

13 Q  And does that appear to be the way that bedroom looked the

14 day you were at the motel on June the 6th?

15 A  Yes, it looks something like that.

16 Q  In fact, you can see the oxygen tanks that belong to Mr.

17 Koplin in that picture, is that correct?

18 A  Yes.

19 Q  Calling your attention to A-14, does that appear to be a

20 photograph looking into the D132 unit?

21 A  Correct.

22 Q  And the window to the right side, it appears that the blinds

23 are drawn, is that correct?

24 A  Yes.

25 Q  Okay. And it's your understanding that these photos were

1  taken that day on June the 6th, is that correct?

2  A    I don't know when the photos were taken.

3  Q    With respect to that photograph, A-14, you testified earlier

4  it was your memory that the door opened out, but in fact doesn't

5  the photo depict that it really opened in?

6  A    That's the way it looks, yes.

7  Q    Okay.  And looking at that photograph now, would your

8  testimony be that the door opened in, rather than out?

9  A    Yes.  What I'll say is I don't remember whether it -- my

10  recollection is that it opened out, but looking at this, it

11  opens in.  So I can't --

12  Q    Assuming later testimony would establish this photograph was

13  taken that day, you would rely on the photograph over your

14  memory for that, is that correct?

15  A    Yes.

16  Q    That day did you take any photographs at all at the scene on

17  June the 6th?

18  A    I don't believe so, but I can't say for certain.

19  Q    Did you have a camera with you that day?

20  A    All patrol -- all patrol cars are assigned cameras.

21  Q    As part of your duties that day -- well, let me ask another

22  question:  When do you take photographs, what's the normal

23  procedure for turning the film in to have it developed?

24  A    Normally what you do is you submit it into the evidence room

25  for processing.

1  Q   Okay.  Do you have to sign a document to that effect, a

2  receipt, or something of that sort?

3            THE COURT:  Mr. Filipovic, where is this going?  Do we

4  really have a dispute about the accuracy of these pictures?

5            MR. FILIPOVIC:  Your Honor, I think the photographs

6  become relevant because some of the photographs that appear to

7  be taken fairly early depict that some searches were done.  In

8  fact, it's our position that taking the photographs before the

9  consent to search was signed is itself a search of the room.

10            THE COURT:  I see.  Okay.

11  Q   (By Mr. Filipovic)  What's the procedure?  Do you have to

12  sign a receipt when you put the photographs into evidence at the

13  Kent evidence room?

14  A   You submit it after it comes back from processing.  Then you

15  submit it into evidence.

16  Q   Okay.  Now, in this case, have you gone back and looked at

17  any reports or documents you've generated as a result of this

18  case?

19  A   Yes.

20  Q   Okay.  And what have you found that you have generated?  Was

21  it just your two-page supplemental case narrative, or was there

22  anything else?

23  A   I don't know about additional paperwork.  Well, there was a

24  two-page narrative.  There was a consent to search form.  And I

25  don't know about additional documents.

1  Q   Okay.  You have no memory of any other documents that you
2  generated?
3  A   No.
4  Q   Did you take any handwritten notes?
5  A   No, not that I recall.
6  Q   And if you had handwritten notes, you would have kept those,
7  is that correct?
8  A   Not necessarily.
9  Q   So you don't recall if you took notes, or if you did take
10  notes whether they were destroyed?
11  A   I don't recall.
12         MR. FILIPOVIC:  If I could have the witness shown
13  Exhibit A-5, as well as A-9 and A-13.
14  Q   Okay.  Officer Krauss, A-5 is a picture of Sergeant
15  Gustafson, CPS worker Hendricks and Amanda Brinkley, is that
16  correct?
17  A   That does look like the child and the CPS worker, and that
18  is Sergeant Gustafson.
19  Q   And that day, when you responded to the motel, there were
20  only four police officers present during this entire event, is
21  that correct, you, Officer Lorette, Officer Wales and Sergeant
22  Gustafson?
23  A   I'm not sure if other people came during the course of the
24  day.
25  Q   Do you have a memory of any other officers besides the four

1    of you?

2    A    Not that I recall, no.

3    Q    Okay.  And there's no other officers reflected in your

4    report, is that correct?

5    A    Only the people I articulated.

6    Q    Now, were you in and out of the motel room -- well, strike

7    that.  Let me ask you another question.  You placed Mr. Koplin

8    under arrest and handcuffed him with Officer Lorette and took

9    him out to the patrol car, is that correct?

10   A    We detained him initially when we contacted him.

11   Q    Well, you detained him in handcuffs and took him out to the

12   patrol car, is that correct?

13   A    Correct.

14   Q    And did you remain with him out in the patrol car in

15   handcuffs until officer Gustafson came to the car, or did you go

16   back to the motel room before Gustafson came out and had you

17   unhandcuff Mr. Koplin?

18   A    Primarily the day -- on the day I was with him, Mr. Koplin,

19   for most of the time.

20   Q    So during the time Mr. Koplin was handcuffed, is it your

21   testimony that you did not leave his presence to go back to the

22   room?

23   A    I don't remember leaving him.

24   Q    Now, when you went to the door with Officer Lorette dressed

25   in maintenance uniforms, were you and Lorette armed at that

1   point?

2   A    Absolutely.

3   Q    So you had your weapons but they were not drawn, is that

4   correct?

5   A    No.

6   Q    They were holstered somewhere on your body?

7   A    (Nods head.)

8   Q    That's a yes?

9   A    Yes.

10  Q    And both you and Lorette grabbed Mr. Koplin and pulled him

11  out of the room, is that correct?

12  A    Correct.

13  Q    And he was immediately handcuffed, is that correct?

14  A    Correct.

15  Q    And at that time he was only wearing his boxer shorts, is

16  that correct?

17  A    Yes, that's what I recall.

18  Q    And when you grabbed his hand, his hands to handcuff them --

19  you were the one that actually put the handcuffs on him?

20  A    Primarily it was me.

21  Q    It was apparent at that point that he did not have a weapon,

22  is that correct?

23  A    Well, you have to check, I mean, the groin area, the back

24  area.

25  Q    But you knew that he didn't have a gun or any kind of weapon

1    in either hand, is that correct?

2    A    No, he didn't have it in his hands, that's correct.

3    Q    Okay.   And you could check visually that he was wearing a

4    loose pair of white or light blue boxer shorts, is that correct?

5    A    That's correct

6    Q    That's a yes?

7    A    Yes.

8    Q    And you could not see a weapon, or a bulge, or anything?

9    A    No.

10   Q    And is it also correct that you did a pat down and you

11   didn't find a weapon?

12   A    I did not.

13   Q    Okay.   So you were confident at that point, before you moved

14   him into the patrol car, that he was unarmed, is that correct?

15   A    Before I put him in the patrol car?

16   Q    Yes.

17   A    Before I put him in the patrol car I was confident that he

18   was not armed.

19   Q    If you could take a look at Exhibit A-13, please.   Now,

20   that's a picture depicting Mr. Koplin in the parking lot, is

21   that correct?

22   A    Yes.

23   Q    Okay.   Now, there's a bandage hanging from one of his arms,

24   is that correct?

25   A    Yes.

1  Q    And that bandage was provided by one of the officers, is

2  that correct?

3  A    The Officer Lorette.

4  Q    And was that because he had suffered a scrape during the

5  time when he was handcuffed?

6  A    Correct.  He had abrasions on his arms.

7  Q    On both of his arms, is that correct?

8  A    I see it on one arm, and I'm not sure if it was on the other

9  arm.

10  Q    Now, you testified that when you reported to the motel

11  initially, it was for a welfare check, is that right?

12  A    It was for a welfare check, correct.

13  Q    Now, you had no -- going into this you did not bring any

14  heavy equipment, such as a battering ram, or stun grenades, or

15  anything of that sort, did you?

16  A    No, I did not.

17  Q    So you weren't going in expecting to have to break down the

18  door, did you?

19  A    I didn't know.  We don't keep stun grenades or battering

20  rams in our cars.

21  Q    No, but if you have information that that might be

22  necessary, you can call a SWAT team, or some other officers with

23  that equipment, to the scene, is that right?

24  A    Depending on the time.  If you need to make immediate entry,

25  you can't wait.

1   Q   In this case you did not ask for any kind of backup of that

2   nature, have anybody on standby with that kind of equipment, did

3   you?

4   A   No, I did not.

5   Q   Now, you spoke to CPS worker Hendricks before you made the

6   entry into the room?

7   A   I don't recall.  I don't believe I did.

8   Q   Did you make any effort to contact the source of the

9   information that was coming to the 911 dispatcher?

10  A   No, I did not.

11  Q   And when you saw Mr. Koplin, when he was placed under

12  arrest, he appeared to be sober to you, is that correct?

13  A   When he was placed under arrest he did appear sober.

14  Q   And in fact when he was put in handcuffs and you were

15  walking him to the patrol car, he appeared to be sober as well,

16  is that correct?

17  A   When I initially contacted him, I didn't have enough time to

18  really make a determination whether he was sober or intoxicated.

19  When he was finally arrested a while later, I had spent enough

20  time around him to say based on my training and experience that

21  he wasn't intoxicated.  But when I initially detained him, I

22  didn't know.

23  Q   Well, let me ask you it this way:  At no point in time did

24  he appear to be intoxicated or under the influence of some kind

25  of a drug when you were with him?

1  A    I can't testify to the facts of all drugs.  He didn't appear

2  intoxicated or under the effect -- under the effects of the

3  drugs I generally -- the narcotic drugs that I generally see

4  people under the influence of.

5          THE COURT:  Mr. Filipovic, why raise an issue that

6  isn't an issue in the case?  I don't think anybody is contesting

7  he was under the influence of any drugs, are they?

8          MR. FILIPOVIC·  I'm done with that area of questioning.

9          THE COURT:  Okay.

10  Q    (By Mr. Filipovic)  Officer Krauss, just one last area of

11  questioning.  If you had to go back and find out whether you had

12  taken any of these pictures, how would you go about doing that?

13  Is there a method by which you can check with the Kent police to

14  see whether you were the photographer?

15  A    One of the things you can do is go back through evidence

16  logs and see if you submitted any film.

17  Q    Have you made that effort in this case?

18  A    No, I have not.

19  Q    And have you seen any of the photographs in this case other

20  than the ones that were shown to you just now by the clerk?

21  A    No.

22  Q    And it's your memory that you did not take any of the

23  photographs, is that correct?

24  A    I can't say for certain.

25          THE COURT:  Well, did you take these photographs?

1    THE WITNESS:  I don't think so.

2    MR. FILIPOVIC:  I have no further questions.

3    THE COURT:  Any redirect?

4    MR. MIYAKE:  I have one question.

5                    REDIRECT EXAMINATION

6    BY MR. MIYAKE:

7    Q   You -- after Mr. Koplin is taken out of the room, at some

8    point you noticed that he had a -- he was bleeding from his arm?

9    A   Correct.

10   Q   Did you -- did you know how he got that wound on his arm?

11   A   My assumption -- I can't say for certain, but my assumption

12   is when I grasped him, when I grabbed him and turned him around,

13   that his skin ripped

14   Q   Okay.  Did you talk -- did he make some mention to you about

15   having a skin condition that caused him to bleed easy or to

16   bruise easy?

17   A   Not that I recall.

18                    MR. MIYAKE:  Nothing further.

19                    MR. FILIPOVIC:  If I may have the Court's indulgence in

20   one area.

21                    THE COURT:  Okay.

22                    RECROSS-EXAMINATION

23   BY MR. FILIPOVIC:

24   Q   If you could take a look at A-13, Officer Krauss.

25   A   Okay.

1  Q   In that picture you can see Sergeant Gustafson, is that

2  correct?

3  A   Yes.

4  Q   You can also see -- is that Officer Lorette standing to

5  Sergeant Gustafson's right?

6  A   Yes.

7  Q   And then there's Mr. Koplin, is that correct?

8  A   Yes, that appears to be him.

9  Q   And then there's a hand with a glove in the bottom

10  right-hand picture?

11  A   Yes.

12  Q   And the arm that you can see appears to be that of a

13  Caucasian person?

14  A   Yes.

15  Q   By process of elimination, assuming there's only four police

16  officers there and that that hand is a police officer, would it

17  be fair to say that you probably took this picture?

18  A   I couldn't tell you.  I don't know whose arm that is.  I

19  don't know if it's a Caucasian person.  So I can't answer that.

20  Q   Okay.  Now, were you wearing blue gloves at the scene, as

21  Officer Lorette appears to be wearing, and this other individual

22  appears to be wearing?

23  A   I don't know.  Generally if I was in close proximity to the

24  subject and I thought I was going to get blood on me, I'd

25  probably put gloves on.

1          MR. FILIPOVIC:  I have no further questions.

2          THE COURT:  You may step down.  Watch your step.  There

3     are two steps there.

4          THE WITNESS:  Thank you, Your Honor.

5          MR. MIYAKE.  Officer Lorette.  If you'll take the stand

6     and be sworn.

7          THE COURT:  Will you step forward, please, and raise

8     your right hand.

9          THE WITNESS:  Right here?

10    MATTHEW LEE LORETTE,        BEING SWORN, TESTIFIED AS FOLLOWS:

11         THE COURT:  Okay.  Do you want to take the stand?  And

12    once you're seated, state your full name, spelling your last

13    name for the court reporter.

14         THE WITNESS:  Okay.  Matthew Lee Lorette,

15    L-o-r-e-t-t-e.

16                        DIRECT EXAMINATION

17    BY MR. MIYAKE:

18    Q    And you're employed by the city of Kent?

19    A    Yes, sir.

20    Q    How long have you been a police officer?

21    A    On October 31st it will be two years.

22    Q    Okay.  Prior to that did you have any type of investigatory

23    experience?

24    A    Yes, sir, for Boeing Employees Credit Union.

25    Q    And what was that?

1   A    I was a fraud investigator.

2   Q    For how long?

3   A    Approximately four years.

4   Q    Do you have a Bachelor of Arts?

5   A    Correct.

6   Q    Undergraduate degree?

7   A    Yes.

8   Q    In what?

9   A    Law and justice.

10  Q    I want to direct your attention to June 6th of 2002.  Do you

11  recall responding to a dispatch directing you to go to the

12  Marriott Hotel in Kent?

13  A    Yes, sir.

14  Q    And that was to check on the welfare of an 11-year-old girl?

15  A    Correct.

16  Q    After you arrived there, did you go to the manager's office?

17  A    Yes, sir.

18  Q    And what was the purpose of going to the manager's office?

19  A    I wanted to make sure that --

20       THE COURT:  Wait, wait.  Let me try to help you all

21  here.  Don't you think we've reached a point where some of the

22  facts are pretty clear and actually not contested?  I don't

23  think Mr. Filipovic is contesting the fact that two of the

24  police officers went and got into maintenance men uniforms,

25  right?  So they went to the manager's office, got the uniform.

1   I don't need to hear it again.

2            MR. MIYAKE:  Okay.  Thank you, Your Honor.  What I do

3   want to highlight is what he did at the door.

4   Q   (By Mr. Miyake)  After getting the maintenance shirt, did

5   you go to the unit that the defendant was staying in?

6   A   Yes, sir, I did.

7   Q   And what did you do?

8   A   I knocked on the door and said, "Maintenance "

9   Q   Where was Officer Krauss?

10  A   He was on my right side.

11  Q   You said, "Maintenance"?

12  A   Correct.

13  Q   And after you knocked on the door, did anyone answer?

14  A   Yes.

15  Q   And who answered the door?

16  A   Mr. Koplin.

17  Q   Now, does the door open -- it opens in?

18  A   Correct.

19  Q   When he answered the door what was he wearing?

20  A   Just light blue or almost white boxer shorts.

21  Q   And could you see both hands?

22  A   No, sir.

23  Q   Tell us what you saw.

24  A   He was smoking a cigarette with one hand, and the other hand

25  was slightly behind his back

1   Q   Okay.  What did you say to him at that point?

2   A   I asked him if I could see his hands.

3   Q   And how did he respond to that?

4   A   He kind of gave me a puzzled look, and he didn't show me his

5   other hand.

6   Q   Did you explain that you were an officer?

7   A   No, sir.

8   Q   After he didn't respond to you, is that when both you and

9   Officer Krauss grabbed him?

10  A   That is correct.

11  Q   After grabbing him we've heard testimony he was taken to the

12  car.  Did you notice that he was bleeding from the arm?

13  A   Yes, sir.

14  Q   And did you get a bandage for him?

15  A   Yes, sir, I did.  And I also applied like an alcohol wipe to

16  his arm.

17  Q   Okay.  Did you ask him about the wound?

18  A   He said he bruised very easily, and he had some type of skin

19  disorder.  So I took it at that.

20  Q   Okay.  After you get him to the car, did you advise him of

21  his Miranda rights?

22  A   Yes, sir, I did.

23  Q   Did you use anything to assist you in advising him of his

24  Miranda rights?

25  A   I do it every time I read somebody the rights.  I just use

1    my department issued code book.

2    Q    And do you have that with you?

3    A    Yes, sir, I do.  It's just printed on the back.

4    Q    Read those rights into the record, unless the defense would

5    stipulate to those.

6    A    Okay.  You have the right -- I'm sorry.

7         MR. FILIPOVIC:  Your Honor, I haven't seen the card he

8    used.  I'm not prepared to stipulate.

9         THE COURT:  Let me see the card.  These are the ones

10   you read him?

11        THE WITNESS·  Yes, Your Honor.

12        THE COURT:  Do you want to see them, Mr. Filipovic?

13   They're the standard Miranda warnings.

14        MR. FILIPOVIC:  Perhaps the government can make a copy

15   and admit them as an exhibit then, Your Honor.

16        THE COURT:  That would fine.  Okay.  You don't have to

17   read them.

18        THE WITNESS:  Thank you, Your Honor.

19        THE COURT:  I've heard enough.

20   Q    (By Mr. Miyake)  You advised him of his Miranda rights.  Did

21   he acknowledge or did he indicate that he understood those

22   rights?

23   A    Yes, he did.

24   Q    Did you inform him as to why you were detaining him?

25   A    Yes, I did.  I explained to him the fact that we were

1  responding to a call where he was to have a gun.  That's why

2  he's being detained in this fashion.

3  Q    And what did he say to you?

4  A    He said, "Well, I do have a gun, but it's --" or, "Yes, I do

5  have a gun, but I have a permit."

6  Q    Okay.  Were you present when he was asked to consent to

7  search his room?

8  A    Yes.

9          MR. MIYAKE:  And I'd ask the clerk to hand Government's

10  Exhibit No. 1 to the witness.

11  Q    At some point did the defendant, after being read the rights

12  that are on that form, Government's Exhibit No. 1, sign that

13  form?

14  A    Yes, sir.

15  Q    And where did he sign that form at?

16  A    He actually signed the form inside the hotel room.

17  Q    And do you recall Officer Krauss reading that to him?

18  A    Yes, I do.

19  Q    Were you present when he signed that form?

20  A    Yes, I was.

21  Q    Okay.  Did he have any questions about that form?

22  A    Not that I can recall.

23  Q    After he signed the consent to search, did you then begin to

24  search the room?

25  A    Yes, I did.

1  Q   Had you searched the room before that at all?

2  A   No.

3  Q   During the search of the room you found a number of items in

4  the dresser?

5  A   Correct.

6  Q   A number of sex related items?

7  A   Yes.

8  Q   You also found a couple of books?

9  A   Yes.

10 Q   One was Horse-Happy Girl?

11 A   Horse-Happy School Girl, I believe

12 Q   Okay.  There was also a suitcase in the closet?

13 A   That's correct.

14 Q   And that also had a book called Animal Four Bizarre?

15 A   Yeah, Animal Bizarre Number Four, or something to that

16 effect, and Sex Before 12.

17 Q   Okay.  In a black bag near a closet did you also find some

18 Viagra pills?

19 A   That's correct.

20 Q   Lubricating jelly?

21 A   Correct.

22 Q   And a pink dildo?

23 A   Correct.

24 Q   Under the -- did you find a bag that you thought was

25 initially garbage?

1   A   Yep, yes, I did.

2   Q   Where was that at?

3   A   On the couch underneath a sleeping bag near the kitchen.

4   Q   Pardon?

5   A   On a couch underneath a sleeping bag.

6   Q   Okay.

7   A   Oh, the sleeping bag was on top of the couch.

8   Q   Okay.  And inside that what did you find?

9   A   A couple smoked cigarettes, bills, or something to that

10  effect, letters mailed to Mr. Koplin, and a green notebook.

11  Q   Was there anything in that green notebook that caught your

12  attention?

13  A   Yes, there was.

14  Q   What was that?

15  A   There were several handwritten statements or journal

16  entries, or questions.  I couldn't really make a whole lot of

17  sense out of it, but it said something to the effect of "Amanda,

18  does this make you want to come fast?"  And other statements

19  like that.

20  Q   Okay.

21          MR. MIYAKE:  That's all I have.  Thank you.

22          MR. FILIPOVIC:  Your Honor, could I have the clerk show

23  the witness Defense Exhibit A-23?  And while he's looking at

24  that exhibit, could I have the clerk get Exhibits A-3 through

25  A-10.

1                          CROSS-EXAMINATION

2    BY MR. FILIPOVIC:

3    Q    Officer Lorette, you took photographs while you were at the

4    scene on June the 6th, is that correct?

5    A    That's correct.

6    Q    And did you turn the film in to have it developed, is that

7    correct?

8    A    Yes, sir.

9    Q    Did you see any other officers taking photographs at the

10   scene?

11   A    Yes.  Officer Wales was taking photos also.

12   Q    Now, is it correct that Officer Wales, however, never

13   entered the room and actually cleared the scene before the rest

14   of the officers involved in this?

15   A    I'm not aware.  He could have.

16   Q    Did you ever see Officer Wales inside of the motel room?

17   A    I didn't see him in it.

18   Q    But you did see him taking pictures outside of the motel

19   room, is that correct?

20   A    Correct.

21   Q    Looking at Exhibit A-23, it's the negatives from row 5404,

22   is that correct?

23   A    Correct.

24   Q    If you could take a look at those negatives.  Were those the

25   pictures that you took with your camera?

1   A    I don't recall taking these photos.

2   Q    Okay    Did you take any pictures in the motel room of

3   Sergeant Gustafson, Amanda Brinkley, or CPS worker Hendricks?

4   A    I don't recall taking those photos    It's possible I could

5   have, but I don't -- I don't recall taking them.

6   Q    Do you recall what type -- what pictures you took then?

7   A    The ones of the evidence.

8   Q    So let me ask another question.   When did you start taking

9   pictures, was it when Sergeant Gustafson directed you to do so?

10  A    Correct.

11  Q    Or was this after the consent to search was signed?

12  A    Correct.

13  Q    Now, it's correct that the consent to search was signed

14  after Mr. Koplin was brought back into the room, after he had

15  his insulin shot and after he was given his oxygen, is that

16  correct?

17  A    That's correct.

18  Q    And so all of these photographs that are taken depicting

19  Hendricks, Amanda Brinkley and Sergeant Gustafson in the room

20  must have been taken before he gave the consent to search, is

21  that correct?

22  A    I'm assuming so.   I don't know.

23  Q    And you have no idea which officer took those?

24  A    No, I do not.

25  Q    Okay.   Which officers were present that day -- well, let me

1  ask you another question.  Is it your memory that there were

2  four officers present, Gustafson, yourself, Wales and Krauss?

3  A    That's correct.

4  Q    And you have no memory of any other officers being present?

5  A    That's correct.

6  Q    And if there were other officers present, would their

7  numbers show up on the -- well, let me ask you another question.

8  Would you have referenced them in your report if there had been

9  other officers present?

10  A    If they had some influence on the case, yes, if they came in

11  contact with me, or had some bearing on the case.

12  Q    Okay.  And you've reviewed your report before you came here

13  today?

14  A    Correct.

15  Q    And there's no mention of any other officers besides the

16  four I've mentioned?

17  A    Other than detectives, no.

18  Q    And the detectives did not respond to the scene?

19  A    Correct.

20  Q    They were contacted later?

21  A    Correct.

22  Q    When you took the photos, did you take a photo log?

23  A    No.

24  Q    Did you take any notes of what you were photographing as you

25  were taking the photos?

1  A    I may have in a notebook to reference where things were at,

2  but I don't recall taking notes.

3  Q    Okay.  Did you bring such a notebook with you today?

4  A    The ones from this past week, or two weeks, of my patrol

5  work, yes.

6  Q    Okay.  So you don't have the notebooks from back on June the

7  6th?

8  A    I could try and find it, but I don't have it with me, no.

9  Q    Okay.  You testified on direct that when officer -- when Mr.

10  Koplin answered the door and didn't show you his second hand,

11  that you then grabbed him, is that correct?

12  A    That's correct

13  Q    It's also correct that you had to pull him outside of the

14  room at that point?

15  A    That's correct.

16  Q    And he was immediately handcuffed?

17  A    Correct.

18  Q    And when you took him out to the parking lot, he was put in

19  the back of the patrol car still in handcuffs, is that correct?

20  A    Correct.

21  Q    And you indicated that you read him his Miranda rights from

22  your car, is that right?

23  A    From my card, that's correct.

24  Q    From your card, rather.

25  A    Right.

1  Q   Did you have him sign anything or initial any document

2  indicating that he understood?

3  A   No.

4  Q   Did he sign any kind of a written waiver form?

5  A   No.

6  Q   Okay.  And you only gave him his Miranda rights that one

7  time, is that correct?

8  A   That's the only time I did, correct.

9  Q   Okay.  And that was while he was still handcuffed, is that

10 correct?

11 A   Correct.

12 Q   Was he in the back of the patrol car, or just about to be

13 put in the back of the patrol car when you read him his rights?

14 A   He was seated inside the patrol car, with the door open.

15 Q   So this reading of the Miranda rights occurred within five

16 minutes or so of the time that he was yanked out of the room,

17 handcuffed and walked out in his boxer shorts to the patrol car,

18 is that correct?

19 A   That's correct.  I also advised him that he wasn't under

20 arrest, but I needed to read him those rights anyway.

21 Q   But when you told him that he was still in handcuffs and

22 then he was put in the back of the patrol car?

23 A   Correct.

24 Q   And at some point the door was closed, is that correct?

25 A   Not that I'm aware of, no.

1   Q   Did you ever go into the room to get any clothing for him,

2   like a shirt, a jacket, a pair of pants, shoes, anything?

3   A   I did not.  I was -- I was not -- I did not

4   Q   And essentially he's out in a public parking lot naked, with

5   just a pair of boxer shorts on --

6   A   Right.

7   Q   -- is that correct?

8   A   Eventually somebody did go get him some clothing.  I don't

9   know who it was.  It wasn't me   But he wasn't completely naked.

10  Q   But he was wearing boxer shorts.  And if you see Exhibit

11  A-13 on the sheet that you have in front of you -- well, let me

12  ask a different question.

13          MR. FILIPOVIC:  If I could have the clerk show the

14  witness Exhibit A-13.

15  Q   A-13 is a picture of Mr. Koplin after --

16  A   I don't have --

17          MR. FILIPOVIC:  I guess apparently the witness does not

18  have A-13.  If I could have the clerk show the witness A-13.

19  Q   A-13 is a photograph of Mr. Koplin after the handcuffs are

20  removed, is that correct?

21  A   That's correct.

22  Q   Okay.  And at that point he still does not have any clothing

23  other than his boxer shorts, is that correct?

24  A   That's correct.

25  Q   Okay.  And that picture -- well, let me ask a question about

1   that.  There's -- let me ask another question.  Officer Krauss

2   is African American, is that correct?

3   A    I believe so.  A mix of African American and something,

4   correct.

5   Q    Well, he's a dark skinned individual --

6   A    Correct.

7   Q    -- is that correct?  And all the other officers, the other

8   three officers, are Caucasian?

9   A    Correct.

10   Q    Okay.  And in this photograph it depicts two of the

11   officers, Officer Wales and Officer -- or Sergeant Gustafson?

12   A    And that's actually myself.

13   Q    Oh, that's you -- that's Officer Lorette?

14   A    Correct.

15   Q    Okay.  The hand that's depicted in the lower right-hand

16   corner --

17   A    Mm-hmm.

18   Q    -- does that appear to be Officer Wales by a process of

19   elimination?

20   A    It appears so.  I don't know who else -- I don't know who

21   that is.

22   Q    But it appears to be another police officer, given where he

23    -- where that hand is located?

24   A    I assume so.

25   Q    And the blue glove located on the person's hand?

1 A    I would assume so.

2 Q    Now, you've testified that when you went to give Mr. Koplin

3 the Miranda rights, that what you told him was that the reason

4 he was being detained was that there was a report of a gun, is

5 that correct?

6 A    Correct, that he had a gun.

7 Q    And you did not tell him that he was being detained because

8 there were some concerns about him and the 11-year-old girl in

9 the room with him, is that correct?

10 A    I made up some story.  I don't exactly recall what I said.

11 Something of a Fred -- or the McGruff, the crime dog -- excuse

12 me, McGruff, the crime dog, the tip line, and that we were

13 investigating an incident.  I didn't mention go into specifics.

14 Q    But you did mention a gun, is that correct?

15 A    Correct.

16 Q    So you basically did not want to tell him that you were

17 there interviewing -- investigating the situation with the

18 little girl, is that correct?

19 A    Initially because I didn't want to tell him who the

20 reporting party was.

21 Q    So when you went to the door you used a ruse to get in by

22 saying you were maintenance, is that correct?

23 A    That's correct.

24 Q    And then when you gave him the Miranda rights, you basically

25 lied to him about why he was being detained, is that right?

1   A    No, I didn't lie.  Well, I lied about the crime, the tip,

2   but I didn't say -- go into specifics as to what crime we were

3   investigating.

4   Q    But that was told to him right in that same time period when

5   you were giving him the Miranda warnings, is that correct?

6   A    Right.

7              MR. FILIPOVIC:  May I just have one moment, Your Honor?

8        (Brief Pause.)

9              MR. FILIPOVIC:  I have no further questions, Your

10  Honor.

11             THE COURT:  Okay.  Any redirect?

12             MR. MIYAKE:  Yes, Your Honor.

13                       REDIRECT EXAMINATION

14  BY MR. MIYAKE:

15  Q    Was there a period of time after the defendant was taken

16  back into the room when Amanda, the 11-year-old, was in the room

17  as well?

18  A    Yes.

19  Q    With the CPS worker?

20  A    Correct.

21  Q    And Sergeant Gustafson?

22  A    Yes.

23  Q    And that was just for a short time?

24  A    Yes.

25  Q    Do you recall the defendant making any comments to Amanda?

1   A    Yes, I do.

2   Q    What was he saying?

3   A    He asked Amanda to get him some coffee, where his black

4   shirt was, which he wore the day prior, and a couple other

5   questions.

6   Q    Okay.  At any time after you advised the defendant of his

7   Miranda rights, did he ever say to you or did you ever overhear

8   him say that he wanted an attorney?

9   A    No, I did not.

10  Q    Did you ever overhear him say or did he ever tell you that

11  he did not want to be questioned?

12  A    No.

13  Q    Shortly after you advised him of his Miranda warnings did

14  Sergeant Gustafson come to your location?

15  A    Yes, he did.

16  Q    And did Sergeant Gustafson tell the defendant what they were

17  investigating?

18  A    Yes, he did.  I believe -- yes, he did.

19  Q    Okay.

20  A    Because he said it didn't add up.  That's what stood out in

21  my mind.

22  Q    And it was at that point that the defendant is then

23  unhandcuffed?

24  A    When Sergeant Gustafson first walked out, he said, "Take the

25  cuffs off him," the first words out of his mouth.

1  Q   Okay.

2  A   So I took the handcuffs off him.

3  Q   How much time do you think had passed from the time you

4  detained him at the door and brought him to the police car till

5  when Gustafson came to your location?

6  A   A few minutes.  Not long.

7          MR. MIYAKE·  Nothing further.

8                      RECROSS-EXAMINATION

9  BY MR. FILIPOVIC:

10  Q   Officer Lorette, Mr. Koplin was actually removed from the

11  scene and taken to the jail at about 11:15 a.m., is that

12  correct?

13  A   I'd have to refer to my report, or somebody else's report.

14  I don't know --

15  Q   But based on your memory, he was there about two hours, is

16  that correct?

17  A   That's about right.

18  Q   And you were there about two hours?

19  A   More or so.

20  Q   Is it also correct that when he was taken to the jail

21  instructions were given to the jail staff that he should not be

22  allowed to make any phone calls pending contact by Kent police

23  detectives?

24  A   I know nothing of that.

25  Q   Did you -- does your name appear on a suspect arrest report?

1  Do you recall preparing such a report?

2  A   I don't recall completing the suspect sheet, no.  It's quite

3  possible, but I don't recall doing that.

4         MR. FILIPOVIC:  I have no further questions.

5         THE COURT:  You may step down.  Watch your step,

6  please.

7         THE WITNESS:  Thank you, ma'am.

8         THE COURT:  There are two steps there   We'll get

9  those.

10        THE WITNESS:  Okay.  Thank you.

11        MR. MIYAKE:  We call Detective Janet Bell.

12        THE COURT:  If you'll step forward, please, and raise

13 your right hand.

14 JANET BELL,                   BEING SWORN, TESTIFIED AS FOLLOWS:

15        THE COURT:  Do you want to take the stand right there?

16 And once you're seated, state your full name and spell your last

17 name for the court reporter, please.

18        THE WITNESS:  My name is Janet Bell.  Last name

19 B-e-l-l.

20                    DIRECT EXAMINATION

21 BY MR. MIYAKE:

22 Q   And what is your occupation?

23 A   I'm a deputy sheriff with the Salt Lake County Sheriff's

24 office.

25 Q   Deputy Bell, I want to direct your attention to May 20th of

1   2001.  Are you aware of if your department received a report

2   regarding Edward Koplin?

3         THE COURT:  I'm sorry, what date?

4         MR. MIYAKE.  May 20th.

5         THE COURT:  May 20th.

6   A   Yes, we did.

7   Q   (By Mr. Miyake)  What was the nature of the report?

8   A   A deputy responded to the residence of Karen Mangum, or

9   maybe called her on the phone.  I'm not sure which.

10        THE COURT:  Tell you what, Ms. Bell, if you could move

11  that microphone closer to you and speak directly into it, so

12  that we can all hear you, okay?

13  A   (continued)  Deputy Grant took a report from Karen Mangum,

14  stating she was concerned about Amanda, and the interaction she

15  had had with a man named Ed Koplin.

16  Q   You mentioned the name Amanda.  Is that Amanda Brinkley?

17  A   Yes.

18  Q   Okay.  And what caused her to call the police department?

19  What was she concerned about?

20  A   There had been a church function that Mr. Koplin had been

21  with at -- been to with Amanda, and she was concerned about the

22  interaction and the way he touched her  And she knew that

23  Amanda had been with Mr. Koplin several times, and wanted her

24  daughter to go with Amanda over to Mr. Koplin's house on

25  occasion.  And one time Amanda was over at her house and Mr.

1  Koplin called to wish her daughter happy birthday, and asked her

2  if she was feeling sexy.

3  Q   Okay.   Let's back you up just a little bit.   Amanda is over

4  at Karen Magnum's house?

5  A   Yes.

6  Q   And Amanda's friend is Karen's daughter Paige?

7  A   Yes.

8  Q   And approximately -- is Paige approximately the same age as

9  Amanda?

10  A   Yes.

11  Q   And on that date the defendant called over to the Mangum

12  house and spoke to Paige?

13  A   Yes.

14  Q   And that's when he said happy birthday, and he wanted to

15  know if she was feeling sexy?

16  A   Yes.

17  Q   Okay.

18          THE COURT·  He said this to Paige, or to Amanda?

19          THE WITNESS:  He said this to Paige.

20  Q   (By Mr. Miyake)  Did Karen also report that she had spoken

21  to another neighbor by the name of Mary Lou Degoyer?

22  A   Yes.

23  Q   And what did Ms. Degoyer tell Ms. Mangum?

24  A   That she was concerned also, and that she had seen pictures

25  of Amanda hanging on Mr. Koplin's wall, wearing nothing but her

1  panties.

2  Q  Did Ms. Mangum also report something to the effect that the

3  defendant had been buying some inappropriate clothing for an

4  11-year-old?

5  A  Yes.

6  Q  And that included a leather skirt?

7  A  Yes.

8  Q  Some high heeled boots?

9  A  Yes.

10 Q  Based upon this report did you intend on following up on

11 this information?

12 A  Yes, I did.

13 Q  Were you planning on speaking with Amanda Brinkley?

14 A  Yes.

15 Q  Did you get a chance to speak to Amanda Brinkley prior to

16 June of 2001?

17 A  No, I hadn't.

18 Q  At some point did you hear that Mr. Koplin was arrested?

19 A  Yes.  I got a call from the Kent Police Department.

20 Q  Do you recall what date that was?

21 A  If I could refer to my report, I could tell you.

22 Q  Sure.

23 A  June 7th.

24 Q  Okay.  Also on June 7th did you yourself speak with Mary Lou

25 Degoyer?

1  A    Yes, I did.

2  Q    And did she tell you something about the photograph she saw?

3  A    Yes.  She said she saw photographs of Amanda wearing nothing

4  but her panties on Mr. Koplin's wall, and it appeared that she

5  had been -- she was jumping from one bed to another bed.

6  Q    Did Ms. Degoyer tell you that she had asked the defendant

7  about that photograph?

8  A    Yes.

9  Q    And what was the defendant's response?

10 A    He just thought it was cute.

11 Q    On June 11th did you receive a call from Detective Walker of

12 the Kent Police Department?

13 A    Yes, I did.

14 Q    And why was Detective Walker calling you?

15 A    He told me that Mr. Koplin's son had called him and told him

16 that Mr. Koplin had called him from jail and wanted him to go in

17 the house and destroy a red book that was in the nightstand in

18 his bedroom.

19 Q    Okay.  Based upon the call from Detective Walker, did you

20 contact Darrell Koplin?

21 A    Yes.

22 Q    And what did Darrell Koplin tell you?

23 A    He told me that there was -- his father had described a red

24 type book in the nightstand of his -- in his bedroom, and he

25 asked him to go in the house and destroy it for him.

1  Q    Where was -- did he tell you where his dad was calling him

2  from?

3  A    Yes.  He told me he was calling him from jail.

4  Q    What did Darrell do in response to that?  Did he go to the

5  house?

6  A    No    He told me that he had called the Kent Police

7  Department, and they gave me the information   I called him.  He

8  said he had not been back to the house and didn't want to go

9  back there, because he didn't want to get involved in that.

10 Q    Okay.  Also on June 11th of 2001 did you yourself contact

11 Amanda Brinkley?

12 A    Yes, I did.

13 Q    And did you interview her regarding her relationship with

14 the defendant?

15 A    Yes, I did.

16 Q    And did she disclose to you any inappropriate behavior?

17 A    Yes.  She explained about the vibrating sex toys and porn

18 films that Mr. Koplin made her watch

19 Q    Did she say anything to the effect that he had touched her

20 inappropriately?

21 A    Yes.  She said on several occasions he had tried to touch

22 her private parts and tried to have her touch his.

23 Q    Did she make mention of him encouraging her to watch horses

24 mate?

25 A    Not at that time, no.

1  Q   Did you -- okay.

2  A   Oh, she may have.  I'd have to go back to the transcript.

3  Q   Okay.  Based upon the information that you had received up

4  to that point, did you apply for a search warrant for Mr. -- for

5  the defendant's trailer home?

6  A   Yes, I did.

7        MR. MIYAKE:  And I'd ask the clerk to hand you what's

8  been marked and admitted as Government's Exhibit No. 4.

9  Q   Do you recognize that?

10 A   Yes.

11 Q   And is that the affidavit in support of the search warrant?

12 A   Yes, it is.

13 Q   Okay.  Lastly, after you had received information about

14 Edward Koplin back in May of 2001, you indicated that you had

15 planned on following that information up?

16 A   Yes.

17 Q   Had you heard of Mr. Koplin before?

18 A   Yes.  I've had a previous case involving Mr. Koplin and

19 another little girl.

20 Q   About when was that case investigated?

21 A   It was about two -- about two months prior to this one.

22 Q   So approximately March of 2001?

23 A   Probably around there.

24 Q   Did you interview Mr. Koplin --

25 A   Yes.

1   Q    -- in relation to that?

2   A    Yes, I did.

3   Q    And what -- what do you recall about the conversation you

4   had with him?

5   A    He told me that he was into reflexology, and he -- the

6   little girl had told me about when he had given her a massage

7   with some vibrating machines, that he had made her change into

8   some shorts that he just happened to have in the house   And

9   when I interviewed him, he told me it was a reflexology thing,

10  and that he was using the vibrating machine to give her a

11  message.

12  Q    Okay.  Did he mention the name Amanda during your interview

13  with him back in March?

14  A    Yes, he did.  He was explaining that he had a little girl

15  come over to work for him.  And he had a jewelry business, and

16  he was going to have her help him with that.  But Amanda wasn't

17  there, and Amanda knew more about his jewelry business than he

18  did.  I asked him who Amanda was at that time, and he said, "I'm

19  not going to send you on a fishing expedition."

20                  MR. MIYAKE:   Thank you   I have nothing further.

21                         CROSS-EXAMINATION

22  BY MR. FILIPOVIC:

23  Q    Detective Bell, while you've been testifying you have been

24  referring to a document that's in front of you, is that correct?

25  A    Yes.

1    Q    And is that essentially the Salt Lake County Sheriff's

2    police report?

3    A    Yes, it is.

4    Q    It's about a 10-page document in length?

5    A    Yes.

6    Q    Now, on that document, it begins with -- on page 2 with a

7    complainant information in the name of Karen Mangum, is that

8    correct?

9    A    Yes.

10   Q    And going on to page 3 it indicates document initial report

11   office from the field, and it lists a Debra Grant, is that

12   correct?

13   A    Yes.

14   Q    And that the May 20th information, in which it says, "I

15   received a call of suspicious activity, I spoke to Karen," and

16   then what you testified to earlier about Karen Mangum's report

17   on May 20th, that was actually information supplied to Officer

18   Debra Grant, is that correct?

19   A    Yes.

20   Q    So on May the 20th did you have any contact with this

21   investigation based on the information that Debra -- that was

22   being provided to Debra Grant?  Were you involved on May 20th,

23   in other words?

24   A    Deputy Grant called me and advised me of the situation, that

25   I would be getting the report.

1  Q   Okay.  And she called you on May the 20th, is that your

2  testimony?

3  A   Yes.

4          THE COURT:  She said yes.

5          THE WITNESS:  Yes.

6  Q   (By Mr. Filipovic)  Now, you actually prepared the search

7  warrant affidavit in this case, is that correct?

8  A   The district attorney did.

9  Q   And you were the affiant on the affidavit, is that right?

10 A   Yes.

11 Q   And you read the affidavit carefully before you signed it?

12 A   Yes.

13 Q   And that's Government's Exhibit 4 --

14 A   Yes.

15 Q   -- that you have in front of you?

16 A   Yes.

17 Q   Now, the search warrant was asking to look for five groups

18 of items in the -- Mr. Koplin's home, is that correct?  On pages

19 1 and 2 of Exhibit 4, if you'll look at the bottom

20 A   Yes.

21 Q   So you were -- the object of the search was to look for

22 sexual vibrators, pornographic movies, pictures of A.B., and

23 sexually explicit photos of A.B. or other children, and a red

24 book in a bedroom nightstand, is that correct?

25 A   Yes.

1   Q   Now, if you can look at the facts in the affidavit,

2   beginning at the bottom of the second page, the paragraph that

3   begins, "On June 7th," and then going on to the first and second

4   paragraphs on page 3 of the affidavit.

5       Would it be fair to say that all of that information in

6   those three paragraphs was information you obtained from the

7   Kent police and the Washington -- State of Washington

8   authorities?

9   A   Yes.

10  Q   And similarly with the third paragraph on page 3, the

11  information there was information that Detective Hemmen provided

12  to you based on an interview that was conducted of Amanda

13  Brinkley in Washington?

14  A   Yes.

15  Q   And on June 11th you interviewed Amanda Brinkley personally,

16  is that correct?

17  A   Yes.

18  Q   And during that interview you had a copy of a report, or

19  some type of a report of the interview that was conducted of

20  Amanda Brinkley in the State of Washington on June 7th, isn't

21  that correct?

22  A   Not of the interview at that time, no.

23          MR. FILIPOVIC:   If I could ask the clerk to show the

24  witness Defense Exhibit A-31, please.

25  Q   Does that appear to be a transcript of the taped interview

1  that you conducted with Amanda Brinkley on June 11 of 2002 in

2  this case?

3  A    Yes.

4  Q    If I could call your attention to page 12 of that report --

5  that transcript, and specifically -- well, let me have you go

6  back to page 11 at the bottom, lines 26 -- beginning at line

7  261.

8       Is it correct that you asked Amanda:   "Is there a time that

9  he did something different that you remember?"

10 A    Yes.

11 Q    And Amanda responded, "No, not really."  And then was

12 mumbling.

13 A    Yes.

14 Q    And then going to the top of the next page, you told her,

15 "Okay.  I need you to explain to me, you know, everything that

16 he did, okay?"  And there was no verbal response from her at

17 that point?

18 A    Yes.

19 Q    And then at line 268 it says, "In the report it says

20 something about the things that he bought to have you use."  Do

21 you recall that?

22 A    I had a report from the Kent Police Department, but I don't

23 believe I had the transcript yet.

24 Q    Okay.  So you had a report from the Kent Police Department

25 concerning the interview of Amanda Brinkley that was conducted

1  on June the 7th, is that correct?

2  A    Yes

3  Q    And you used that report during your interview with Amanda

4  Brinkley on June 11th, is that correct?

5  A    I didn't have it with me, no.

6  Q    But you used the information you gleaned from that report in

7  your interview of Amanda Brinkley on June 11th, is that correct?

8  A    In that statement, yes.

9  Q    And if I could call your attention to pages 14 to 15 of that

10  same transcript.  At line 329, at this point in the interview

11  you're asking her about the horses that Ed had purchased for

12  her, is that correct?

13            THE COURT:  Where are you?

14            MR. FILIPOVIC.  Page 14, line 329.

15            THE COURT:  Got it.

16  Q    (By Mr. Filipovic)  And you asked her, "Did anything else

17  happen with the horses," is that right?

18  A    Yes.

19  Q    And she says, "No."

20  A    Yes.

21  Q    And at that point you confronted her about what she had told

22  the people in Washington?

23  A    Yes.

24  Q    Then, again, if you could look at page 15, line 347.  Again,

25  are you referring to the -- that same report?  You say, "Okay

1  This report said that you had sleepovers at his house."

2  A    Yes.

3  Q    Okay.  Were you referring to a report that you had reviewed

4  earlier, or a report that you had in your possession at that

5  time during the interview?

6  A    I believe it's one that I had read earlier.

7  Q    Is it possible you could have had the report with you as

8  well?

9  A    It's possible, but I doubt it.

10 Q    I'm calling your attention again to the affidavit for search

11 warrant, Government Exhibit No. 4, at page 3.  You have a

12 paragraph that begins, "On June 11th, 2002, your affiant

13 interviewed A.B.," is that correct?

14 A    Yes.

15 Q    The interview you referred to in that paragraph, is that the

16 same interview that is transcribed at A-31 that you've just been

17 looking at?

18 A    The transcript I just --

19 Q    Yes.

20 A    Yes.

21 Q    Okay.  You only interviewed Amanda one time on June 11th, is

22 that correct?

23 A    On June 11th, yes.

24 Q    And you obtained the search warrant that same day, I

25 believe, is that correct?

1 A    Yes.

2 Q    Now, you testified about the information that Darrell Koplin

3 had received a phone call from his father, asking him to destroy

4 some evidence, is that correct?

5 A    Destroy a red book, yeah.

6 Q    Destroy the red book.  That information came to you from

7 Detective Walker of the Kent Police Department, is that correct?

8 A    He told me about it, and I called Darrell Koplin.

9 Q    But prior to hearing that from Detective Walker of the Kent

10 police, you didn't hear that same officer from Mr. Koplin's son,

11 is that correct?

12 A    No.

13 Q    Now, you discussed some of this information of investigation

14 being conducted prior to June the 6th, the May 20th report from

15 one individual, and the investigation that you did of Mr. Koplin

16 a few months earlier.

17     As far as the affidavit for search warrant in Government's

18 Exhibit No. 4, the only information concerning that -- those

19 previous matters is that contained in the paragraph that begins

20 at the very bottom of page 3, and then continues on to the top

21 of page 4, is that correct?

22 A    What was the question?

23 Q    Okay.  You had testified earlier about investigation that

24 either you or your department had conducted prior to June the

25 6th involving Mr. Koplin, either reports that had been made --

1   A    Yes.

2   Q    -- or interviews that you had done.

3   A    Yes.

4   Q    The only reference to that is that very last paragraph of

5   your search warrant affidavit, is that correct?

6   A    June 7th was the first -- I first was told about the

7   situation on May 20th, when the deputy took the report.  On June

8   7th is when I talked to Mary Lou Degoyer.

9   Q    And the search warrant affidavit makes no reference to any

10  of the investigation that was done prior to June the 6th, is

11  that correct?

12  A    The information that was in the initial report that Mary Lou

13  Degoyer knew about the pictures.

14  Q    Is it correct that all you state in the affidavit, actually

15  what you have typed on this document, is that you spoke to her

16  on June the 7th.

17  A    That I spoke to her that day, yes.

18  Q    Yes.  So it's only the information that she provided to you

19  directly that made it into the search warrant affidavit, is that

20  correct?

21  A    Yes, that's also in there.

22  Q    Okay.  Is it also correct -- and if you could look at page

23  22, again, of A-31, beginning at the top of the page -- that you

24  asked Amanda if he ever -- if Mr. Koplin ever took pictures of

25  her, and her answer was, "No, not that I know of."

1    And then you followed up and asked, "When you're on your

2    trips or anything?"  And Amanda said, "Not that I know of,

3    unless he took them while I was asleep in the back."  Is that

4    the exchange between you and Amanda on that date?

5    A    Yes.

6    Q    So basically what she told you during that interview was

7    that as far as she knew Mr. Koplin never took any pictures of

8    her, is that correct?

9    A    No.  The first line there says, "Is there any other pictures

10   that he ever took of you?"  So I don't know whether we talked

11   about any before that or not.

12   Q    Well, going back to the previous page, 21, line 502, you

13   first asked about pictures, and you ask, "Or does he have

14   pictures of you?"  And she said of her horses.  And then you

15   said, "Of your horses?"  And she says, "Yeah, with my family."

16        Is that correct?

17   A    Yes.

18   Q    At no point did Amanda tell you that Mr. Koplin took

19   pictures of her, other than what's reflected in that section of

20   the transcript, is that correct?

21   A    That's correct.

22   Q    And when you prepared the search warrant affidavit, that was

23   prepared almost immediately after this interview of Amanda

24   Brinkley?

25   A    Yes.

1   Q    And you represented in the search warrant affidavit that

2   Ms. Degoyer had told you on June 7th that she had observed a

3   picture of Amanda Brinkley with nothing on but her panties.

4   A    Yes.

5   Q    Okay.  But nowhere in the search warrant affidavit do you

6   ever tell the Judge that Amanda denied Mr. Koplin ever taking

7   pictures of her?

8   A    No

9            MR. FILIPOVIC:  May I just have a moment, Your Honor?

10           THE COURT:  Surely.

11      (Brief Pause.)

12           MR  FILIPOVIC:  I have no further questions.  Thank

13   you.

14           THE COURT:  Redirect.

15                      REDIRECT EXAMINATION

16   BY MR. MIYAKE:

17   Q    You interviewed Amanda Brinkley again on June 26th of 2002?

18   A    Yes, I did.

19   Q    And during that interview did you ask her questions about

20   pictures?

21   A    Yes, I did.

22   Q    And in fact didn't she admit that the defendant had taken

23   pictures of her using the vibrator?

24   A    Yes.

25   Q    When you did the search warrant, did you find photographs of

1  Amanda with the vibrator?

2  A   Yes, we did.

3  Q   Were they -- where were those photographs found?

4  A   They were found in some red books in the nightstand in Mr

5  Koplin's bedroom.

6  Q   Okay.  She had mentioned something about a frog, a

7  pornographic movie involving a frog?

8  A   Yes.

9  Q   Did you find that as well?

10 A   Yes, we did.

11            THE COURT:  Involving a what?

12            MR. MIYAKE:  A frog   I have nothing further

13                      RECROSS-EXAMINATION

14 BY MR. FILIPOVIC:

15 Q   The interview that was done on June 11th of Amanda Brinkley,

16 the entire interview is captured in this transcript of A-31, is

17 that correct?

18 A   Yes.

19 Q   I'm sorry, was that yes?

20 A   Yes.

21 Q   Well, you just testified to about what she told you on June

22 26th.   That could not have been put into the search affidavit

23 because that had already been prepared on June the 11th and the

24 search had already taken place by that point in time, is that

25 right?

1  A   That's correct.

2  Q   And the reference to the frog, that would be -- that's

3  contained within this transcript of the June 11th interview?

4  A   I'd have to look back in here, but she did tell me about a

5  frog in a pornographic video.

6  Q   And that was on June the 11th, is that correct?

7  A   I'd have to go back to the transcript and look.

8  Q   If I can call your attention to page 5 of the June 11th

9  transcript, line 119.

10 A   Yes.

11 Q   Do you see that?

12 A   Yes.

13 Q   At that point Amanda says, "The only thing I really know is

14 there was this frog," and then you started questioning her about

15 a frog?

16 A   Yes.

17 Q   And then she says, "Yeah.  I can't remember anything else,

18 though."

19 A   Yeah, that's what was --

20 Q   And then when you asked her, "What was the frog doing?" she

21 said, "He was talking"?

22 A   Mm-hmm, yes.

23 Q   And you appear kind of confused because she was referring to

24 it as an adult movie, but she was not giving you any information

25 that the contents of the movie were of an adult nature, is that

1  correct?

2  A    Yes.

3  Q    Okay    And the reason she thought it was an adult movie was

4  from seeing the cover of the VCR tape?

5  A    Not on the frog one, I don't believe.

6  Q    So she did not describe anything of an adult or pornographic

7  nature that the frog was doing, or that people in this frog

8  movie were doing?

9  A    Just from what she talked about, the pornographic videos

10 that she was watching, and one included a frog.

11         MR. FILIPOVIC:  I have no further questions.

12         THE COURT:  You may step down, but watch your step.

13 There are two steps there.

14         MS  MILLER:  Your Honor, the government calls Bill

15 Hendricks, the CPS worker.

16         THE COURT:  Okay.  While you're getting Mr. Hendricks,

17 could you just tell me if Mr. Wales -- are you calling Mr.

18 Wales?

19         MS. MILLER:  We are not, Your Honor.

20         THE COURT:  You're not.  So how many more witnesses

21 after Mr. Hendricks?

22         MS. MILLER:  We have Detective Hemmen, Detective Walker

23 and Kera Wulbert.

24         THE COURT:  Just hold on a minute.  What are they

25 testifying to that hasn't already been testified to?

1      MS. MILLER:  They're going to be testifying about the

2    interview with the defendant at the Kent jail.

3      THE COURT:  Hemmen, Walker and who else?

4      MS. MILLER:  And then Kera Wulbert, the FBI agent, is

5    actually going to be testifying about information that she

6    received from the defendant's sister, a phone call and follow-up

7    visit that the sister made to the Kent jail, and she relayed

8    that information to Ms. Wulbert.

9      THE COURT:  Okay.  Would you raise your right hand,

10   please.

11   WILLIAM HENDRICKS,         BEING SWORN, TESTIFIED AS FOLLOWS:

12      THE COURT:  Okay.  Do you want to take the stand, which

13   is right over here?  And once you're seated, would you state

14   your full name and spell your last name for the court reporter.

15      THE WITNESS:  William Paul Hendricks,

16   H-e-n-d-r-i-c-k-s.

17                    DIRECT EXAMINATION

18   BY MS. MILLER:

19   Q    Mr. Hendricks, where do you work?

20   A    I work for the Department of Social & Health Services,

21   Children Protective Services, the State of Washington.

22   Q    Okay.  And how long have you done that?

23   A    About 16 years.

24   Q    And what are your duties or responsibilities with respect to

25   your employment?

1  A    To investigate and respond to referrals that our office gets

2  pertaining to child abuse and neglect.

3  Q    And on June 6th, 2002, did you become involved in a CPS

4  referral regarding an Amanda Brinkley?

5  A    That's correct.

6  Q    And when did you first become involved with this referral?

7  A    I believe the referral came in around the 4th.  I got it to

8  work on the 5th of that month, June.

9  Q    So you got the actual referral yourself on June 5th?

10  A    Correct.

11  Q    And where did this referral come from?

12  A    I am somewhat confused, because we have an intake division

13  that generates the referrals.

14  Q    I'm not talking about in your office.  I'm talking about who

15  called CPS.

16  A    The individual that called was the sister of Mr. Koplin.

17  Q    And did you follow up with Mr. Koplin's sister?

18  A    Correct.

19  Q    And what information did you receive from her?

20  A    The information that I first received on the 5th was that

21  Mr. Koplin and young Amanda were possibly on their way to

22  Marysville, and that they were no longer at the residence in

23  Kent.  And --

24  Q    Did she tell you also why she was calling?

25  A    Correct.

1  Q    And what did she tell you?

2  A    She had some concerns about the appropriateness of young

3  Amanda traveling with her brother.

4  Q    Did she also tell you about a history of child sexual abuse

5  with Mr. Koplin?

6  A    She said there had been a history.

7  Q    Did she also tell you that he was possibly armed?

8  A    That's correct.

9  Q    And she told you on June 5th that he was in the process of

10  traveling and was no longer in Kent?

11  A    That was my -- that was my assumption, yes.

12  Q    Did you do anything to act on this referral on June 5th?

13  A    I called the -- called the detective that I usually work

14  with in the Kent area.  Also faxed a copy of the referral to the

15  Kent Police Department.

16  Q    And would that be Detective Hemmen that you called?

17  A    Correct.

18  Q    And did you subsequently receive a call from the defendant's

19  sister on June 6th?

20  A    No.  I called the sister on June 6th.  I had instructed her

21  on the 5th if she was that concerned about the situation and Mr.

22  Koplin was no longer in the Kent area, if she knew exactly where

23  he was, she should respond to the appropriate police department,

24  or she could give CPS a call and we would take the information

25  and ask that department to respond.  When I got to the office on

1  the 6th, there was no message waiting for me from Mr. Koplin's

2  sister.  So I called her to ascertain where they possibly were.

3  Q   And did she give you information regarding the defendant's

4  whereabouts?

5  A   She said they were back in Kent

6  Q   And did she tell you specifically where?

7  A   Yes.

8  Q   What did she say?

9  A   The Marriott Towne Suites, I believe.

10 Q   In Kent, Washington?

11 A   In Kent.

12 Q   And would that have been in the early morning hours of June

13 6th?

14 A   Yes.

15 Q   And what did you do with that information?

16 A   I called Detective Hemmen again, and she asked me to call

17 911, which I did.

18 Q   And what did you do after you called 911?

19 A   I went to meet the police officers at the Marriott Towne

20 Suites.

21 Q   Did the defendant's sister also tell you anything regarding

22 the defendant's activities, such as how long he would be at the

23 Marriott Towne Place Hotel?

24 A   She mentioned that he was not going to be there for very

25 long, that he could possibly be moving that morning.

1    MS. MILLER:  Thank you.  I have no further information

2    -- or no further questions.

3                    CROSS-EXAMINATION

4    BY MR. FILIPOVIC:

5    Q   Mr. Hendricks, you have been working for CPS since 1986, is

6    that correct?

7    A   Correct.

8    Q   When you spoke with sister, she told you that Mr. Koplin was

9    about 68 years old, is that correct?

10   A   Correct.

11   Q   And that the history of the sexual abuse that she was aware

12   of was history between herself and Mr  Koplin when they were

13   children?

14   A   No.  I think it was another family member, as I recall.

15   Q   But was it information that this sexual activity had

16   occurred many years in the past with another family member?

17   A   I believe so.

18   Q   Now, Detective Hemmen basically said she was too busy that

19   morning to deal with the situation and that's why she told you

20   to call 911 to get a uniform to go out with you for a welfare

21   check?

22   A   Yes, she was occupied with something else, correct.

23   Q   And you've done these welfare checks before, isn't that

24   correct?

25   A   I haven't done welfare checks myself, no.  The police

1  usually handle the welfare checks.

2  Q    Okay.  But on this one you went along?

3  A    Yes, I met the police at the residence -- at the suites.  As

4  I recall, the operator -- the 911 operator asked that I meet

5  with detectives -- or not the detectives, but the officers

6  there.

7  Q    Now, when you went to the location, you were there when the

8  officers went in and arrested Mr. Koplin, isn't that correct?

9  A    Correct.

10 Q    And after he was arrested or taken into custody, put in

11 handcuffs and removed, you and Sergeant Gustafson went into the

12 room and met with Amanda, is that correct?

13 A    Correct.

14 Q    And before I get into that, you didn't have any information

15 that Amanda Brinkley was being held against her will or had been

16 kidnaped or abducted, or anything along those lines, did you?

17 A    No, just suspicions that the sister had -- had made to us.

18 Q    So as far as you knew she was traveling with Mr. Koplin with

19 her parents' permission, but there were concerns about Mr.

20 Koplin being an appropriate person to be traveling with for an

21 11-year-old?

22 A    Correct.

23 Q    And in fact after you entered the room and spent a little

24 time with Amanda, you had her call her mother, isn't that

25 correct?

1  A    Yes.

2  Q    And she used her own cell phone to do that?

3  A    That's correct.

4  Q    And then after she talked to her mom, you got on the phone

5  with the mom as well?

6  A    That's correct.

7  Q    And you found out that the parents indeed did give

8  permission for her to travel with Mr. Koplin?

9  A    That's correct.

10 Q    And the mother told you that she trusted Mr  Koplin 100

11 percent?

12 A    That's correct.

13 Q    Okay.  And that was done -- that phone call was done fairly

14 early in the time that you were with Amanda in the motel room at

15 the Towne Plaza Suites?

16 A    Yes

17 Q    And during that entire time she denied that anything

18 inappropriate had occurred?

19 A    Correct.

20 Q    Now, you prepared a -- you actually took some written notes

21 during the time that you were with Amanda, is that correct?

22 A    I took a few written notes, yes

23        MR. FILIPOVIC:  Your Honor, if I could ask the clerk to

24 please show the witness Defense Exhibit A-9 and A-12.

25        THE COURT:  Actually, Mr. Filipovic, why don't we take

1  our afternoon break now, if that's okay.  I don't know how much

2  more you have with this witness.

3          MR. FILIPOVIC:  About 15 minutes, Your Honor.

4          THE COURT:  Let's take our break now, and we'll resume

5  in 15 minutes.  You may step down, Mr. Hendricks.

6          THE WITNESS:  Thank you.

7          THE COURT:  Watch your step, okay?

8          (Recess.)

9          THE COURT:  Have a seat.  Whenever you're ready, Mr.

10 Filipovic.

11         MR. FILIPOVIC:  Thank you, Your Honor.

12 Q   (By Mr. Filipovic)  Mr. Hendricks, I believe the clerk had

13 earlier showed you Exhibit A-9 and A-12, two photographs.  Do

14 you have those in front of you?

15 A   Not yet.

16         MR. FILIPOVIC:  Your Honor, could I ask the clerk to

17 hand up Defense Exhibits A-9 and A-12?  They're two photographs.

18 Q   Mr. Hendricks, could you please take a look at A-9 and A-12.

19 Is it correct that A-9 and A-12 are photographs that appear to

20 have been taken of you and Amanda Brinkley on June the 6th of

21 this year?

22 A   That's correct.

23 Q   In the Towne Place Suites Motel?

24 A   Correct.

25 Q   Now, first looking at A-9, there's a photograph of a legal

1   pad and what appears to be your hands and a pen and a set of

2   glasses sitting on top of the legal pad, is that correct?

3   A    Uh-huh.

4   Q    Were you taking notes during your interview of Amanda

5   Brinkley?

6   A    Not extensive notes, no.  At this time I was basically

7   reassuring her that everything was okay.  She was quite upset

8   with the police involvement and everything.  I was just at that

9   point trying to reassure her that everything was going to be

10  okay.  And she -- I had asked her to make a call to her mom.

11  And I had made a couple of notes in regards to the phone number,

12  where she was from, things of this sort.

13  Q    But A-9 depicts a legal pad that you were using, is that

14  correct?

15  A    I carry a yellow pad with me just about at all times, yes.

16  Q    Okay.  In fact, that's a picture of the yellow pad you were

17  using that day --

18  A    Correct.

19  Q    -- to take notes on this case?  And if you'll look at A-12,

20  that also depicts what appears to be the same yellow pad?

21  A    Correct.

22  Q    And with your hand poised with a pen above it?

23  A    Uh-huh.

24  Q    Okay.  And would it be fair to say that it appears that that

25  A-12 was taken later than A-9, because there's more handwriting

1   on that pad than on the previous picture?

2   A    Possibly.

3   Q    Okay.  And it's in A-12 where Amanda is on the cell phone,

4   is that correct?

5   A    Correct.

6   Q    And as far as you can recall, she only made that one

7   telephone call to her mother, is that correct?

8   A    Correct.

9   Q    Now, the notes you took from that day, you did not maintain

10  those notes, you've destroyed them or thrown them away, is that

11  correct?

12  A    That's correct.

13  Q    But before you destroyed the notes, you actually drafted or

14  typed up your report of the events of that day, is that correct?

15  A    That's correct.

16  Q    And is it correct that as you typed up your notes that you

17  followed the same order -- chronological order as the notes that

18  you had taken -- the handwritten notes that you had taken?

19  A    Correct.

20  Q    And all the information in your written report -- well, let

21  me ask another question.  All the information that you had

22  written down in handwriting, you made sure that that made it

23  into the typed report as well, is that correct?

24  A    As a rule, yes.

25  Q    And that's what you would have done in this case?

1   A    Correct.

2   Q    Now, with respect to the typed report here that you drafted,

3   as you write the report you're describing things as they're

4   occurring in a chronological fashion, is that correct?

5   A    Correct.

6   Q    Do you have in front of you page 3 and 4 of your

7   chronological report, which references the contact with Amanda

8   Brinkley at the motel room?

9   A    Yes.

10  Q    Okay.  Is it correct that shortly after you entered the

11  motel room with Sergeant Gustafson, you basically immediately

12  contacted Amanda Brinkley, along with the sergeant?

13  A    Yes.

14  Q    That's basically the first thing you did, right?

15  A    Correct.

16  Q    And --

17  A    We heard her before we saw her, actually.

18  Q    She was crying, is that correct?

19  A    Right.

20  Q    And this was moments after two men had just yanked Mr.

21  Koplin out of the room, is that correct?

22  A    I don't know if yanked is the proper term, but he was taken

23  out of the room, yes.

24  Q    By two -- let me ask you this question:  You had never met

25  Amanda Brinkley before that day, had you?

1  A    No.

2  Q    And as far as you knew, she had never seen any of these

3  police officers before that day?

4  A    That's correct.

5  Q    And the two officers that actually made the arrest weren't

6  even dressed in police uniforms, they were dressed in

7  maintenance uniforms?

8  A    As I recall, they had a maintenance shirt on, and the rest

9  was a police uniform.

10 Q    Yeah, but the purpose of wearing the maintenance shirt was

11 so that whoever answered the door, saw them at the door, would

12 think they were maintenance men, is that correct?

13 A    I wasn't privy to that.  I would assume.  But the police

14 didn't share that with me.

15 Q    All right.  Now, when you entered the room, where was

16 Amanda?

17 A    She was over in a corner by the -- by the refrigerator.

18 Q    Okay.  So in the kitchen area, is that right?

19 A    In the kitchen area, correct.

20 Q    And when you went in the room, you opened the refrigerator

21 to see what was inside the refrigerator?

22 A    Not at that time.  We tried to get her calmed down    I

23 thought there might be something, maybe some juice, or

24 something, that she would like.  So I looked in the refrigerator

25 for something along those lines.

1   Q    Okay.  And that was done before she called her parents,

2   according to your report?

3   A    I believe so.

4   Q    Now, when she talked to her mother on the phone, do you

5   recall if Sergeant Gustafson was in the room?

6   A    I don't recall.

7   Q    Okay.  Do you recall sharing with Sergeant Gustafson or any

8   of the other police officers the fact that the parents -- or the

9   mother, at least, indicated that Mr. Koplin had permission to

10  have Amanda with him?

11  A    I think I did, but I'm not 100 percent sure.

12  Q    And is it correct that before Mr. Koplin was brought into

13  the room, back into the room later, your report reflects the

14  police made a cursory search of the apartment to see if a gun

15  was present?

16  A    Uh-huh.

17  Q    Okay.  Do you see that in your report where that's written,

18  on the third page?

19  A    Yes.

20  Q    And in that same paragraph, right after you indicate that

21  they made a cursory check to see if a gun was present, you note

22  that a number of items of a sexual nature are also discovered,

23  vibrators, literature depicting a woman with a horse, and other

24  electrical sexual stimulators --

25  A    Mm-hmm.

1    Q    -- is that correct?

2    A    Uh-huh.

3    Q    So all of those items were discovered during a search

4    conducted before Mr. Koplin was brought back into the room, is

5    that right?

6    A    I don't know if search is the right word.  As I recall, this

7    stuff was pretty well out in plain sight.

8    Q    Well, you did not do a search of the room?

9    A    No.

10   Q    You were focused on Amanda?

11   A    No, exactly.

12   Q    You did not find these items?

13   A    No.

14   Q    Okay.  So you don't know where they were found, do you?

15   A    I found -- I saw a couple of them that were out in plain

16   sight, but I didn't see all of them, no, because I was stationed

17   in one particular part of the room.

18   Q    Okay.  But other items were brought and shown to you, is

19   that correct, by the police officers?

20   A    Correct.

21   Q    And that was done before Mr. Koplin was brought back into

22   the room, is that right?

23   A    I believe so, yes.

24   Q    Now, looking at photo A-12 and A-9 --

25   A    Mm-hmm.

1  Q    -- those photos were taken while Mr. Koplin was out in the

2  parking lot, is that correct?

3  A    I believe so.

4        MR. FILIPOVIC:  And if I may have the clerk show the

5  witness photo -- Exhibit A-5 as well.

6  Q    And that was also taken while Mr. Koplin was out in the

7  parking lot, is that correct?

8  A    Correct.

9  Q    Now, in each of those photographs depicting you and Amanda

10 Brinkley and in A-5, which also contains Sergeant Gustafson, do

11 you recall which officer took those photographs?

12 A    No, I don't recall.

13 Q    And, of course, you didn't take the photographs, because

14 you're in the photographs, is that right?

15 A    Correct.

16 Q    Now, while you were in the room with Amanda Brinkley,

17 Sergeant Gustafson came in and out of the room, is that correct?

18 A    That's correct.

19 Q    And it's your understanding he was going out to talk to Mr.

20 Koplin and then coming back in?

21 A    I would imagine so.  I don't know what he did out of my

22 sight.

23 Q    Do you recall if any of the other officers were entering the

24 room during that period from the time that you first entered the

25 room until the time you saw Mr. Koplin come back with the

1 police?

2 A I couldn't say 100 percent for sure. There was a lot of

3 activity in a relatively small space. And as you said, I was --

4 I was focused on Amanda.

5 Q So it's possible that some other officer was coming in and

6 out, but you don't recall who that was, or --

7 A No.

8 Q Now, after Mr. Koplin came back in the room, you were asked

9 to basically take Amanda and take her away from that location,

10 is that correct?

11 A Correct.

12 Q So that the time that Amanda and Mr. Koplin were in the room

13 or in the motel unit together while you were there was a

14 relatively short period of time, isn't that right?

15 A That's correct.

16 Q And you actually took her then to the Harborview Medical

17 Center?

18 A I took her to my office first.

19 Q Okay. And then later took her to Harborview?

20 A That's correct.

21 Q At no time during your interviews of Amanda Brinkley did she

22 ever say to you that Mr. Koplin had engaged in any inappropriate

23 sexual behavior with her, did she?

24 A No.

25 Q And --

1  A    I didn't -- I didn't question her to that extent either.

2  No, you're right.

3  Q    And similarly, when she was taken to the Harborview Medical

4  Center for a sexual assault exam, she did not disclose, to your

5  knowledge, anything of an inappropriate sexual contact with Mr.

6  Koplin to those individuals, is that correct?

7  A    I -- I don't believe so.  I can't -- I can't recall exactly

8  the --

9           THE COURT:  Mr. Filipovic, what does this have to do

10  with the issues before the Court?

11          MR. FILIPOVIC:  Your Honor, it goes to the question of

12  how that information is later obtained from Amanda Brinkley and

13  how certain information makes its way into the search warrant

14  affidavit.

15          THE COURT:  Well, nobody is claiming it came from

16  Harborview, so let's go on.

17          MR. FILIPOVIC:  If I may just have a moment, Your

18  Honor.

19          THE COURT:  Sure.

20       (Brief pause.)

21  Q    (By Mr. Filipovic)  Mr. Hendricks, in your report on page 3,

22  where you indicate that the police make a cursory check of the

23  apartment to see if a gun is present, and then describe the

24  items of a sexual nature that are later found, when you refer to

25  the police, do you recall which officer or officers made that

1  cursory search?

2  A    No, but I think Sergeant Gustafson was one, and exactly who

3  of the other two walked around the apartment and looked in the

4  bathroom, I couldn't say with 100 percent certainty.

5  Q    Okay.  Do you recall if it was a Caucasian officer or an

6  African American officer?

7  A    No

8  Q    You're nodding no, is that correct?

9  A    I don't -- I don't know.

10  Q    Now, if you could look at page 4 of your report.

11  A    Mm-hmm.

12  Q    At some point is it true that you talked to Amanda about

13  whether Ed had used any of the toys on her?

14  A    Sergeant Gustafson had.

15  Q    Okay.  So what you're describing there is your report of

16  Sergeant Gustafson's --

17  A    Exactly.

18  Q    -- interview of Amanda?  Okay.  And this is also before Mr.

19  Koplin is brought back into the room --

20  A    Yes.

21  Q    -- is that correct?  Because once he's brought back into the

22  room you're no longer questioning her about this, is that true?

23  A    Correct.

24  Q    I have --

25  A    It's not -- if I could just clarify one point.  I know that

1  the youngster is going to be talked with, talked to, questioned

2  by at least one or two other professionals, and to minimize the

3  trauma to the youngster at this particular time, I didn't give

4  her any sort of a third degree.  I just wanted to calm the

5  youngster, get her in contact with her parents.

6  Q    But you and Sergeant Gustafson are trying to find out if

7  there's any kind of sexual abuse going on between Amanda

8  Brinkley and Mr. Koplin, is that correct?

9  A    Yes.

10  Q    That's the purpose of the welfare check, is that right?

11  A    To make sure the youngster is okay, that's correct.

12           MR. FILIPOVIC:  I have no further questions.

13           MS  MILLER:  I just have one follow-up, Your Honor.

14                       REDIRECT EXAMINATION

15  BY MS. MILLER:

16  Q    You stated on cross-examination that when the police did a

17  cursory check of the room that there was a number of items of a

18  sexual nature out in plain sight  Could you briefly describe

19  what those items were?

20  A    There was some sort of -- I guess it was a massage

21  mechanism, sort of an electrical massage appliance, which was

22  somewhere -- I believe it was on the floor close to the sofa.

23  And when I walked around the little bit that I did, there was

24  something that was, I believe, plugged into the -- one of the

25  outlets in the bathroom that was either laying on the bed, or

1   the -- the nightstand next to it.

2          MS. MILLER:  I have no further questions, Your Honor.

3          MR. FILIPOVIC:  Your Honor, I do have a follow-up on

4   that.  If I could please ask the clerk to show the witness

5   Exhibit A-4, A-7, A-11, A-21 and A-22.

6          THE COURT:  Okay.  What about them?

7                      RECROSS-EXAMINATION

8   BY MR. FILIPOVIC:

9   Q   First, Mr. Hendricks, with respect to A-22 -- it's the last

10  one, I believe, you were handed.  Do you see the numbers in the

11  upper left-hand corner?

12  A   Yes.

13  Q   Does that depict the item that you saw next to the couch?

14  A   Correct.

15  Q   Now, that item there, isn't it correct, that it had words on

16  it like Health-o-meter, is that correct?

17  A   I don't know.

18  Q   Okay.  You didn't see anything on that item that indicated

19  to you that that was a sexual device, did you?

20  A   No, no.

21  Q   In fact, it appears to be a large two-headed item that may

22  be used for a massage, or something along those lines?

23  A   Correct.

24  Q   Now, showing you in order A-4, and then also -- if you could

25  look at A-4 and A-11.

1   A    Correct.

2   Q    On A-11, is that the other device that you're referencing

3   that you saw?

4   A    That's one of them, yes.

5   Q    Now, looking at those two pictures, is it correct that A-4,

6   it appears that the drawer in which that blue item is seen in

7   A-11 is actually closed?

8   A    Uh-huh.

9   Q    And is it also correct on A-4, what appears to be the

10  earlier photograph, there's a pair of eyeglasses sitting on top

11  of the dresser?

12  A    Mm-hmm.

13  Q    And then in A-11 there are no eyeglasses and the drawer is

14  now open?

15  A    Mm-hmm

16  Q    Now, who are the first people to go into the room, you or

17  the police?

18  A    The police.

19  Q    So the police officers had first contact with the interior

20  of the motel room?

21  A    To the best of my knowledge, yes, definitely.

22  Q    So if you saw this blue item -- you indicated that you did

23  see the blue item, is that correct?

24  A    Correct.

25  Q    Did you see it in the drawer like that with the drawer open?

1   A    I believe so.

2   Q    Okay.  Were you the person that opened the drawer to reveal

3   the blue item?

4   A    No.

5   Q    Do you know who opened the draw to reveal the blue item?

6   A    No, I don't.

7   Q    Do you know what happened to those eyeglasses that are

8   depicted in A-4 that are now missing on A-11?

9   A    No, I don't.

10           MR. FILIPOVIC:  Just one moment, Your Honor.

11        (Brief pause.)

12           MR. FILIPOVIC:  I have no further questions, Your

13   Honor.

14           THE COURT:  All right.

15                     FURTHER REDIRECT EXAMINATION

16   BY MS. MILLER:

17   Q    Mr. Hendricks, do you know what order those pictures were

18   taken in?

19   A    I have no idea.

20           MS. MILLER:  No further questions

21           THE COURT:  Anything?

22           MR. FILIPOVIC:  No, Your Honor.

23           THE COURT:  You may step down.

24           THE WITNESS·  Thank you, Your Honor.

25           THE COURT:  Watch your step.

1              MR. MIYAKE:  Susan Hemmen.

2              THE COURT:  Step forward, please.

3    SUSAN HEMMEN,                    BEING SWORN, TESTIFIED AS FOLLOWS:

4              THE COURT:  Do you want to take the stand?

5              THE WITNESS:  Thank you.

6              THE COURT:  And once you're seated, state your full

7    name and spell your last name for the court reporter.

8              THE WITNESS:  Okay.  My full name is Susan Hemmen.

9    Last name is spelled H-e-m-m-e-n.

10                         DIRECT EXAMINATION

11   BY MS. MILLER:

12   Q   And you're a detective, isn't that correct?

13   A   That's correct.

14   Q   Where do you work?

15   A   I work for the Kent Police Department.

16   Q   Okay.  And how long have you done that?

17   A   11 years.

18   Q   And is there a particular unit that you're in right now?

19   A   I'm working in the crimes against persons unit.

20   Q   And how long have you been working in that unit?

21   A   For the past three years.

22   Q   Is there any special type of training that you must go

23   through in order to do your job that you have right now?

24   A   Yes.

25   Q   And what is that?

1   A    Well, currently I'm assigned to working on cases involving

2   children, primarily cases involving child abuse, primarily sex

3   and physical abuse, and the state mandates training regarding

4   the investigation of those type of cases.

5   Q    And have you gone through that training?

6   A    I have.

7   Q    And were those the same duties and responsibilities that you

8   had on June 6th of 2002?

9   A    Yes.

10  Q    And on June 6th, 2002, were you involved in an interview at

11  the Kent jail with the defendant?

12  A    Yes.

13  Q    And how did you become involved?

14  A    My partner was assigned this case.  His name is Detective

15  Walker.

16  Q    Detective Walker?

17  A    Yeah.

18  Q    And when you say your partner, how closely do the two of you

19  work together?

20  A    Very close.  He's been my partner, and we work on these

21  cases because they are very time consuming and require a lot of

22  investigation.  So we kind of work hand-in-hand.

23  Q    So basically you work in tandem?

24  A    Yes.

25  Q    Prior to going to the Kent jail, what information did you

1  have about the defendant?

2  A    I was briefed by Sergeant Gustafson.  And I had also had

3  some phone contact with the CPS caseworker the day before, when

4  we first learned of the emergent referral that came in.

5  Q    And about what time did you go to the Kent jail?

6  A    I believe we got down there at about 1430 hours.

7  Q    And did you meet with the defendant?

8  A    Yes.

9  Q    Tell us what first happened when you met with the defendant.

10  A    We introduced ourselves, and he was very cooperative and

11  very talkative.  We sat down.  And he began to speak about

12  Amanda, obviously very concerned about her welfare, because he

13  didn't know where she was.  And began speaking about Salt Lake

14  City.  And I stopped him and read him his Miranda warning.

15  Q    And what happened when you read him his rights?  What did he

16  say?

17  A    He stated that he understood his rights and he was willing

18  to talk to us.

19  Q    Did he say anything else about those rights?

20  A    He did, but I'd like to refer to my notes, because I have it

21  written down verbatim.

22  Q    Go ahead.

23  A    Okay.  He stated that he did understand them by stating,

24  "Sure," and then commented that he probably needed an attorney.

25  And then continued to say that, "I'm willing to talk to you if I

1   understand you." He said, "I could get an attorney, but I'm

2   willing to talk to you now."

3   Q   Was the defendant asking you if he needed an attorney?

4   A   At that time, no.

5   Q   And he stated that he wanted to talk to you then?

6   A   Yes.

7   Q   And did he also say why he wanted to talk to you?

8   A   Well, he was very concerned about Amanda. And he didn't

9   know where she was at. And very concerned about getting out of

10  jail, because Amanda had to be back to Salt Lake. Her parents

11  were expecting her. And he basically just wanted to get out of

12  jail either that night or the next morning.

13  Q   And after that did you proceed to interview the defendant?

14  A   Yes, we did.

15  Q   And generally what did he tell you?

16  A   Generally he told us about his relationship with Amanda and

17  how the two had met and how the relationship had progressed.

18  And how he had -- they ended up pretty much spending time

19  together anywhere from three to five days a week.

20      And he explained that she'd come from an underprivileged

21  family in Utah, and that he had kind of felt bad because she was

22  pretty much ignored at her home. And so he was helping her with

23  her schoolwork. He bought her a bike. He bought her a karaoke

24  machine, one for his house when she visited him, and one for her

25  family's residence.

1    He purchased two horses for her. And basically their

2  relationship grew very close, where he at some point ended up

3  setting up a college account for her so that she could go to

4  college. She was interested, I guess, in going to veterinary

5  school, and he supported that idea.

6    He talked about purchasing clothes for her, making sure that

7  she went to church on Sundays  And also mentioned that she

8  would come over to his house anywhere -- several times a week

9  for two to three hours at a time to sort through some jewelry

10  that he'd inherited. And he was paying her like $5 an hour to

11  help him sort through this jewelry.

12  Q  And after talking about that preliminary information with

13  the defendant, did he go into more detail about his relationship

14  with Amanda?

15  A  He did.

16  Q  Could you please tell us what he told you?

17  A  Yeah. He spoke of approximately 90 days after their

18  relationship had begun how she began to ask him about things of

19  a sexual nature, and specifically about masturbation. And so he

20  taught her about masturbation.

21    And I -- we asked him specifically if he taught her how to

22  use a vibrator, and he said that he just taught her how to turn

23  it on, but that she already knew how to use it, because she had

24  seen some sort of video, or something, at his house.

25  Q  Did he describe anything further about his relationship with

1  Amanda?

2  A    He did.  He went on to say that she was learning things from

3  him that she probably shouldn't know for two to three years

4  But that he took it upon himself to teach her a few of these

5  things.

6      And mentioned that the two of them had taken a couple of

7  trips.    They'd been up to Rigby, Idaho, where he's got

8  relatives, and then on their way here to the Seattle area they

9  stopped in Boise, and then came to the Seattle area.

10     He did mention some of the sexual activities the two were

11 engaged in in Salt Lake, in Boise and in Seattle.

12 Q    Such as what?

13 A    He mentioned performing oral sex on her in Salt Lake, Boise

14 and Seattle, and mentioned sticking his finger in her rectum in

15 Boise and here in Kent at the hotel, and mentioned that she

16 didn't like it very much, but said that he had used a rubber

17 glove and lubed it up really well, and she had complained at

18 some point that he had a hangnail.

19 Q    Did he say why he was doing those things?

20 A    To help her climax more readily.

21 Q    And was that about the extent of your conversation with the

22 defendant, that initial statement?

23 A    Yeah.

24 Q    At any time during that time while you were speaking with

25 him did he ever request an attorney?

1  A    No, he did not.

2  Q    Did he ever ask you to stop the interview?

3  A    He did.

4  Q    At that point in time?

5  A    After the -- after our initial conversation with him?

6  Q    Yes.

7  A    No, we spoke initially, and then after we concluded that

8  discussion, we asked him to provide us with a taped statement.

9  Q    Okay.  I'm talking about prior to that conversation about

10 the taped statement; did he ever ask you to stop the interview?

11 A    No.

12 Q    Did he ever indicate that he was not willing to talk to you

13 any further?

14 A    No, not at all.  He was very willing, he was very

15 cooperative, and, again, he was very concerned about Amanda.

16 Q    Now, let's move on to the taped statement that you were just

17 talking about.  Did you ask him if he was willing to make a

18 taped statement?

19 A    Either myself or Detective Walker did.

20 Q    And did he agree to do so?

21 A    He did.

22 Q    Did he have any questions about making the taped statement?

23 A    As Detective Walker was reading his Miranda rights again on

24 tape, a question came up, and at that point he asked my partner

25 to turn off the tape, because he wanted some clarification.

1   Q   And at what point was that?

2   A   During the second reading of the Miranda.

3   Q   And the defendant asked you to turn the tape off?

4   A   Yes.

5   Q   And did you turn the tape off?

6   A   Yes.

7   Q   And what was discussed while the tape was turned off?

8   A   He wanted to know about the seriousness of the crimes, and

9   pretty much if he had done something wrong, how serious was it.

10  And then he was mainly concerned, again, about when can I get

11  out of here, can I get out of here tonight, or get out of here

12  tomorrow.  I've got to get Amanda back.  He was instructed that,

13  you know, this was a very serious matter.

14  Q   Okay.  Let's take those questions that the defendant had one

15  at a time.  He wanted to know how serious the charges were?

16  A   Mm-hmm.

17  Q   And what did you tell him?

18  A   Can I refer to the statement?

19  Q   Sure.  Yes.

20  A   He had asked about the -- about getting an attorney.  Not

21  asked for one, but questioned.  It was his understanding that he

22  could have an attorney appointed the following day.  And he

23  asked about the seriousness of the crime, and wanted to know if

24  he could walk away either tonight or tomorrow.

25      We informed him that the sexual acts he described doing to

1  Amanda were against the law, and that the charges were serious.

2  And he still agreed to talk on tape.

3  Q   And when he asked if he could have an attorney the following

4  day, what did that mean?  Could you please tell us more about

5  that particular part of the conversation?

6  A   Well, up until this point he had been -- he was very

7  cooperative and was willing to talk, and gave us no indication

8  that he wanted an attorney present.  He was told of the process,

9  and that he would see the Judge in the morning.  That he

10  wouldn't be getting out of jail that night, and that he could

11  have an attorney appointed tomorrow, if that is what he desired.

12  And he was -- he seemed to be okay with that.  Didn't have any

13  questions.  And it was during that second reading of Miranda

14  where he's starting to wonder, I think, again about the process

15  and how serious these crimes were.

16  Q   Did you tell him at that point when he was questioning about

17  having an attorney the following day that he could have an

18  attorney right then?

19  A   Yes.  And can I refer to the statement again?

20  Q   Sure.  I'm referring to the time specifically when you're

21  off tape.

22  A   Okay.  And what was the question again?

23  Q   The question was did you make it clear to the defendant when

24  he was asking about whether he would get an attorney the

25  following day that he could have an attorney right then?

1    A    Yes.

2    Q    And what was his response?

3    A    He was willing to talk to us.

4    Q    Did you ever intimate to the defendant that if you talk to

5    us there's a better chance for you to get out?

6    A    Absolutely not.

7    Q    When the defendant off tape said that he would just go with

8    the attorney the following day, did you tell him that he didn't

9    have to talk to you, that he could get an attorney right then?

10            THE COURT:  I think you asked that already, and she

11   said yes.

12            MS. MILLER:  Okay.

13   Q    (By Ms. Miller)  Was that about the extent of your

14   conversation off tape?

15   A    Yes.

16   Q    Okay.  And what happened at that point?

17   A    Then my partner again started with the Miranda rights again

18   on tape while they're being recorded.

19            MS. MILLER:  And if you could show the witness what's

20   been marked as Government's Exhibit No. 2.

21   Q    And what is Government's Exhibit No. 2?

22   A    It's the statement of Mr. Koplin

23   Q    Is it the complete statement?

24   A    No.

25   Q    Okay.  Could you look at the last page and just -- actually,

1   if you could just look through the first several pages of this

2   statement, and if you could just let the Court know whether that

3   contains the first part of the Miranda warning that you just --

4          THE COURT:  I'm sure it does.

5          MS. MILLER:  Okay.

6          THE COURT:  I don't think Mr. Filipovic is debating

7   that.  So let's just move on.

8          MS. MILLER:  Okay.

9   Q    (By Ms. Miller)  And during the taped statement did the

10  defendant give you the same type of information that he had

11  spoken with you about during the non-taped statement?

12  A    He did.

13  Q    And after you were done taking his statement, did you have

14  any further involvement in this case?

15  A    No, I did not

16         MS. MILLER:  I have no further questions, Your Honor.

17                       CROSS-EXAMINATION

18  BY MR. FILIPOVIC:

19  Q    Detective Hemmen, were you the lead case agent on this

20  investigation?

21  A    No, that would be Detective Walker.

22  Q    But you were the first detective to have contact concerning

23  this investigation, is that correct, from the CPS?

24  A    That's correct.

25  Q    And that was on June the 5th, is that correct?

1  A    I believe that's correct.

2  Q    The day prior to your interview --

3  A    Yes.

4  Q    -- of Mr. Koplin, is that correct?

5  A    Yes.

6  Q    Now, given the information that you were provided by Mr.

7  Hendricks, which he had received from Mr. Koplin's sister, you

8  didn't see this as sufficiently emergent to go out to the

9  sister's house to interview her, or to have another officer do

10  that, did you?

11  A    No, I felt that it was emergent, but the information that

12  Mr. Hendricks shared with me, we had no idea where Mr. Koplin

13  was staying with the child.

14  Q    But you knew -- you had a phone number for the sister and

15  knew how to contact her, is that correct?

16  A    Yes, he did.

17  Q    But you didn't have a police officer do that, or you didn't

18  do that yourself, is that correct?

19  A    No, I was not given that information.  And the sister I was

20  told lives in Bellevue, which is out of our jurisdiction.

21  Q    You contact witnesses outside of Kent, you don't have to go

22  to that police department to have witnesses interviewed, do you?

23  A    No.  But if the case is going to end up in Kent, we need to

24  make sure that we have jurisdiction before we get involved.

25  Q    Okay.  But you can call people to follow up on a report, is

1  that correct?

2  A    That's correct.

3  Q    And you didn't do that here, did you?

4  A    No.

5  Q    Now, calling your attention to the next day, June the 6th,

6  did you have any contact on June the 6th with any federal

7  authorities, any FBI agents, or any other federal authorities,

8  concerning this investigation?

9  A    I don't believe so.

10 Q    Do you know if any of the other detectives had any contact

11 with federal authorities?

12 A    I do not know.

13 Q    So on the day that you went to interview Mr. Koplin in the

14 jail, was it just you and Detective Walker?

15 A    Yes.

16 Q    Okay.  And were you aware of the fact that the officer who

17 had Mr. Koplin booked into the jail left instructions that he

18 should not be allowed to make any phone calls until he was seen

19 by the Kent police detectives?

20 A    No, I was not

21 Q    Okay.  Is that a standard practice in a new investigation?

22 A    I wouldn't say it's standard practice.  It's really up to

23 officer discretion.

24 Q    Now, when you went to see Mr. Koplin in the jail, he was

25 clearly in custody at that point, is that correct, he had been

1   formally arrested?

2   A    That's correct.

3   Q    Was he in a jail uniform at that point?

4   A    I believe so.

5   Q    Okay.  And it was about 2:30 in the afternoon?

6   A    That's correct.

7   Q    And it was your understanding that he had actually been

8   booked into the jail sometime before noon that same day?

9   A    Without looking at the case, I'm not sure what time he was

10  booked.

11  Q    Okay.  But you -- you had met earlier in the day with some

12  of the uniformed officers who debriefed you?

13  A    Yes.

14  Q    Okay.  So --

15  A    I don't know if that was before noon or after noon.

16  Q    But it was about a couple hours before you interviewed him

17  that you knew he had been taken into custody, is that correct?

18  A    Yes.

19  Q    So you go down to the jail and you interview him starting at

20  2:30, and you have a tape recorder with you, is that right?

21  A    That's correct.

22  Q    Now, the first part of your interview and the first time you

23  give him the Miranda -- that you or Detective Walker give him

24  Miranda rights, that part is not put on tape at all, is that

25  correct?

1  A   That's correct.

2  Q   So all you have for that is your handwritten notes?

3  A   Right.

4  Q   Okay.  And no other reports but your handwritten notes?

5  A   Right.

6  Q   Do you have your handwritten notes in front of you?

7  A   I do.

8  Q   And in parts of your notes you put quotation marks around

9  statements, is that correct?

10  A   That's correct.

11  Q   And as with most people, when you put a quotation mark

12  around something, you're trying to leave a note of exactly what

13  that person had told you at the time, is that correct?

14  A   Correct.

15  Q   Now, referring to the first page of your notes, upper

16  left-hand side, it says, "Jail 1430 hours"?

17  A   Right.

18  Q   And then about midway down the page you have a line that

19  says, "rights, question mark," and then the word "sure" after

20  it?

21  A   Right.

22  Q   And then the next line right underneath that is "understand,

23  question mark"?

24  A   Correct.

25  Q   Okay.  And then a begin quote at that point?

1   A    Right.

2   Q    And then what it reads is "Sure, I --" and it either is a --

3   reads as "really" or "probably need an attorney."

4   A    Actually, it says, "p-r-o-l-l-y," and that is shorthand that

5   I use for probably.

6   Q    Okay.  So in quotes you write, "Sure, I probably need an

7   attorney"?

8   A    Correct.

9   Q    Okay.  And that's what Mr. Koplin said right after you gave

10  him -- he was given his Miranda rights, is that correct?

11  A    Part of what he said, yes.

12  Q    Okay.  But that's the part you quoted?

13  A    Well, there's a part underneath that that's quoted as well,

14  when he continued on.

15  Q    I'll get to that next.

16  A    Okay.

17  Q    So the next thing you quote is he says, begin quote, "I'm

18  willing to talk to you if you understand -- you said I could get

19  an attorney, but I'm willing to talk to you now."  Is that what

20  you put in quotes?

21  A    No, I think you misstated it.

22  Q    Okay.  Let me read it to you again.  Isn't it correct that

23  it says in the beginning quote, "I'm willing to talk to you --

24  if I understand you," and then it says, "you said I could get an

25  attorney, but I'm willing to talk to you now"?

1  A    That's correct.

2  Q    End quote.

3  A    Right.

4  Q    Now, when you're giving these Miranda rights in the front

5  end here, does your department use or have you ever used these

6  forms that actually have the Miranda rights where you ask the

7  individual to initial each right?

8  A    The department does have them.

9  Q    Okay.  Did you use that on this occasion?

10 A    No.

11 Q    Okay.  And those forms also typically have a section where

12 it says -- there's an acknowledgment that the defendant actually

13 understands the rights and you ask the defendant to sign where

14 he understands, is that correct?

15 A    I believe so.  I don't typically use those forms.

16 Q    And there's also a form that then has another place to sign

17 that says not only do they understand, but they're giving up the

18 rights and are willing to speak at that time, is that correct?

19 A    I believe so.

20 Q    Now, it was your understanding that Mr. Koplin had not been

21 taken to a Court or to see a Judge yet that day, is that right?

22 A    Right.

23 Q    Now, later, after you conduct -- you conducted about an

24 hour's length interview of him before you put on the tape

25 recorder and reinterview him again?

1  A    I think that's correct, yes.

2  Q    And in fact this interview commenced at 1430 hours and the

3  taped interview commenced at -- is it 1540 hours?  1545 hours,

4  is that correct?

5  A    Right.

6  Q    Okay.

7  A    There was a break in there where he could use the restroom

8  and he could get a drink of water.

9  Q    Did you let him go to an office to use a phone during that

10 break?

11 A    No.

12 Q    Was there a phone available to him in the room that he could

13 use, in the interview room?

14 A    I don't believe there's a phone in there

15 Q    Now, in the taped statement, at the very beginning of the

16 tape Officer -- or Detective Walker starts reading the rights

17 again, is that correct?

18 A    That's correct.

19 Q    And if I can call your attention to page 2 of that document,

20 which I believe is Government Exhibit 2 -- yes, Government

21 Exhibit No. 2, at page 2.  When Mr. -- or Detective Walker says

22 to him, "You have the right to talk to a lawyer and have him

23 present with you while you're being questioned," Mr. Koplin's

24 immediate response to that is, "I understand.  I'd like that.  I

25 mentioned that."

1    Is that correct?

2   A    Yes.

3   Q    And then Detective Walker says, "Pardon me?"  And Mr. Koplin

4   says, "I say I've already mentioned that.  I would like to have

5   that happen."  Is that correct?

6   A    Yes.

7   Q    And then Detective Walker says, "But are you willing to talk

8   to us?"  And Koplin says, "Well, yes.  I've already talked to

9   you for an hour."  Is that right?

10  A    Yes.

11  Q    Okay.  And then Detective Walker goes on to explain about if

12  you can't afford to hire a lawyer, one would be appointed for

13  him before any questioning, and again asks Mr. Koplin if he

14  understood.

15       And wasn't his response on the tape, "Now, before we even

16  started, is that what you're saying?  I should have done that.

17  Or at any time from now on?  Or I'm not understanding totally

18  what that means "

19  A    Right.

20  Q    Okay.  So at that point he's telling you that he didn't

21  really understand what his right to counsel was at that point?

22  Is that correct, he told you he did not understand?

23  A    He's not understanding totally what that means.

24  Q    And then shortly thereafter he says, "I probably need an

25  attorney," is that correct?

1  A    Right.

2  Q    And was it your testimony that your last contact with this

3  case was that day, that interview with Mr. Koplin?

4  A    Yes.

5         MR. FILIPOVIC.  If I may just have one moment, Your

6  Honor.

7         (Brief pause.)

8  Q    Okay.  Now, you did actually have some involvement the

9  following day, isn't that correct?  Let me ask the question:

10  The next day, did you go to an interview conducted of Amanda

11  Brinkley at the prosecutor's office?

12  A    Yes, that's correct, I did.

13  Q    And you and Detective Walker observed the interview through

14  a one-way mirror?

15  A    Yes.

16  Q    Okay.  Did you take any notes of that interview?

17  A    Of Amanda's interview?

18  Q    Yes.

19  A    I don't recall.

20  Q    Do you recall if that interview was actually taped?

21  A    No, it was not taped.

22  Q    You don't recall if you have any notes of the interview?

23  A    I'd have to check my file for that.  Can I explain why?

24  Q    Sure.

25  A    The reason being is that normally we had always taken very

1   stringent notes when we -- every time we go to one of these
2   child interviews, or witness it, but sometime this year, it may
3   have been May, King County, the prosecutor's office changed
4   their protocol, and they no longer wanted the detectives to take
5   notes.  And it was just relying on the interviewer's near
6   verbatim statement.
7   Q    And they intentionally did not audiotape those interviews as
8   well, isn't that correct?
9   A    And that's per King County prosecutor's protocol
10  Q    Let me ask you this:  Would you be able to look back in your
11  file to see if you have any notes of this interview?
12  A    Yes.
13            MR. FILIPOVIC:  Your Honor, at this point I have no
14  further questions, but if there are such notes, I assume the
15  government will provide those to me, and then I could recall
16  this witness at a later date.
17            THE COURT:  Sure.
18            MR. MIYAKE:  Of course.
19            THE COURT:  Any redirect?
20            MS. MILLER:  Yes, Your Honor.
21                      REDIRECT EXAMINATION
22  BY MS. MILLER:
23  Q    If you could flip to Government's Exhibit No. 2, the second
24  page on there, specifically several lines down where the
25  defendant says -- or where Detective Walker says, "You have the

1  right to talk to a lawyer and have him present with you while

2  you're questioned."  And the defendant says, "I understand.  I'd

3  like that.  I mentioned that."

4      Had he mentioned that before?

5  A    He'd mentioned about that he was okay with the fact of --

6  the process was described to him that he would be appointed an

7  attorney the following day, and he was okay with that, but

8  willing to talk to us now.

9      Up until that time -- when Rusty Walker goes on to say,

10  "Pardon me?", up until that time the defendant was very

11  cooperative and had given us every indication that he intended

12  on giving us a statement.

13      And so when we were going through Miranda again the second

14  time, all of a sudden now the defendant says, "I understand

15  that.  I'd like that.  I mentioned that."  So then that called

16  for further clarification on my part, well, what exactly did the

17  defendant want at that point?

18  Q    Did that surprise you when he said that?

19  A    Yes.

20  Q    And why is that?

21  A    Because he had been cooperative and was more than willing to

22  give us a statement and talk to us.  And like I said before, he

23  was very concerned about Amanda and just wanted to do whatever

24  he could do.  He wanted to get out of there as soon as possible

25  and was concerned about her welfare.

1  Q    In fact, in your notes, in your non-taped statement, you

2  have quoted that the defendant said to you, "I'm willing to talk

3  to you -- if I understand you, I can get an attorney, but I'm

4  willing to talk to you now."

5  A    Yes.

6  Q    Is that correct?

7  A    Yes.

8  Q    And is that an exact quote from the defendant?

9  A    Yes.

10 Q    And that was during your non-taped statement?

11 A    Yes.

12 Q    If the defendant had asked to speak to an attorney, would

13 you have terminated the interview?

14 A    Absolutely.

15 Q    And in your mind had he ever asked you to speak to an

16 attorney?

17 A    No.

18          MS. MILLER:  No further questions, Your Honor.

19                       RECROSS-EXAMINATION

20 BY MR. FILIPOVIC:

21 Q    If a suspect that you're interviewing requests to speak to

22 an attorney and continues to request to speak to an attorney and

23 won't talk to you, is it your policy at that point to terminate

24 the interview?

25 A    Yes.

1   Q    Okay.   And that's what you would have done here, you would

2   have terminated the interview?

3   A    Yes.

4   Q    So you would not have provided him with an attorney for the

5   interview, you would have just terminated the interview?

6   A    Correct.   It's not up to us to get him an attorney.

7   Q    So when you told him that he can have an attorney present

8   while he was being questioned, that's not really accurate,

9   because once he insists or continues to insist on having an

10  attorney, you just don't bother continuing with the interview,

11  you just leave him sit in the jail, is that right?

12         THE COURT:   Well, it is accurate, because they're not

13  questioning him anymore.   If the procedure goes as you describe

14  it, they wouldn't be questioning him.

15         MR. FILIPOVIC:   Let me ask another question, Your

16  Honor.

17  Q    (By Mr. Filipovic)   Was it pretty clear that if you needed

18  to get an attorney for an interview that you couldn't have done

19  it on a moment's notice, that it would be -- you'd probably be

20  coming back another day to interview him, is that correct?

21  A    Yes.

22  Q    And when you were interviewing him on the 6th, that was the

23  same day that he was separated from Amanda and the same day that

24  he was arrested, is that correct?

25  A    Yes.

1   Q    And he was very concerned about Amanda's well-being?

2   A    That's correct.

3   Q    Did you tell him that Amanda was being taken care of and

4   that she would be flown back to Utah?

5   A    No, I didn't tell him Amanda would be flown back to Utah,

6   because we didn't know that at that point.  But he was told that

7   she was taken into protective custody and that she was safe

8            MR. FILIPOVIC·  I have no further questions.  Thank

9   you

10           THE COURT:  You may step down.  Watch your step.  There

11  are two steps there.  Wait a minute, Mr. Miyake.  You're not

12  planning on calling -- you can step down.  You're not planning

13  on calling Officer Walker, are you?

14           MR. MIYAKE:  We were.

15           THE COURT.  Why?  What can he possibly say that would

16  add to what we have already heard?  They were both present at

17  the same interview, right?

18           MR. MIYAKE:  I understand, Your Honor, but --

19           THE COURT:  If Mr. Filipovic wants to ask him some

20  questions, I think that's fair game, but I really don't think I

21  need to hear the same stuff over again, right?

22           MR. MIYAKE:  I understand that.  There was other

23  information that goes to another issue.

24           THE COURT:  Ah, that's fine.  I just don't want to go

25  through the same statement again.

1          MR. MIYAKE:  I wasn't really planning on covering all

2    of that, Your Honor.  There may have been some areas that I

3    would have, but -- there's really only a couple of areas that

4    he's going to testify to.  He should be very short.

5          THE COURT·  Okay.  Raise your right hand.

6    RUSSELL WALKER,            BEING SWORN, TESTIFIED AS FOLLOWS:

7          THE COURT:  Do you want to take the stand?  Once you're

8    seated, state your full name and spell your last name for the

9    court reporter, please.

10         THE WITNESS:  My name is Russell L. Walker.  Last name

11   is spelled W-a-l-k-e-r.

12                       DIRECT EXAMINATION

13   BY MR. MIYAKE:

14   Q   Detective Walker, you're employed with the city of Kent?

15   A   Yes, I am.

16   Q   And you're familiar with the case involving Edward Koplin?

17   A   Yes, I am.

18   Q   Are you familiar with the procedure when a person is

19   arrested without a warrant?

20   A   Yes.

21   Q   Do you fill out what's known as a certificate for probable

22   cause?

23   A   I do.

24   Q   And what do you do with that?

25   A   That is attached to a suspect information report, which is a

1  document required for the booking process, and attach what's

2  called an Aukeen form.  And that's where the -- that packet is

3  turned over to Aukeen court, or over to the Regional Justice

4  Center, depending on where a Judge may be available.

5  Q   Once a person is arrested, within 24 hours are they supposed

6  to have a hearing for a Court to make a determination of

7  probable cause?

8  A   They are.

9  Q   In Kent are they always physically taken into Court?

10 A   Not always.

11 Q   In fact, if that doesn't happen, how is that procedure

12 accomplished?

13 A   Usually it's a --

14       MR. FILIPOVIC:  Your Honor, I object to how it's

15 usually done.  If this detective has personal knowledge of how

16 it was done in Mr. Koplin's case, I have no objection.

17       MR. MIYAKE:  It's background information, Your Honor.

18       THE COURT:  Why don't we just get to what was done in

19 this case?

20       MR. MIYAKE:  Well --

21       THE COURT:  Does he know?

22 Q   (By Mr. Miyake)  Do you know if Mr. Koplin was taken in

23 front of a Judge?

24 A   I do not.

25 Q   Okay.  I'm going to ask if you'd take a look at Government's

1  Exhibit No. 3.

2          MR. MIYAKE:  If the clerk could hand that to him.

3  Q   Now, you were talking about the hearing.  Do you

4  recognize -- let's take a look at pages 2 through 6, or 7.  Do

5  you recognize what those are?

6  A   Yes, I do.

7  Q   And what are those?

8  A   That's the packet that I put together for the first

9  appearance.

10 Q   So this is the packet you put together for the first

11 appearance.  Did you receive a copy of the first two sheets

12 back, or second and third sheet, I should say?

13 A   Yes, I did.

14 Q   Okay.  And based upon that could you -- you could determine

15 that there was a finding of probable cause?

16 A   Yes, I can.

17 Q   And that was done on which date?

18 A   It appears to be the 7th day of June 2002.

19 Q   Okay.  Was bail also set on that date?

20 A   Yes, it was.

21 Q   For how much?

22 A   $350,000.

23 Q   Okay.  I want to direct your attention to another subject

24 area.  On June 11th did you receive a call from the defendant's

25 son?

1    A    Yes, I did.

2    Q    And was that -- what was that person's name?

3         THE COURT:  Darrell, wasn't it?

4    A    It was Darrell.

5         THE COURT:  That's what I mean by getting repetitious.

6    When I know the answer before the witness tells it to you --

7         MR. MIYAKE:  Okay.  Well, I apologize, Your Honor.

8         THE COURT:  -- it's been asked once too often, all

9    right?

10        MR  MIYAKE:  All right.

11   Q    (By Mr. Miyake)  And you relayed that information to

12   Detective Bell?

13   A    Yes, I did.

14   Q    Okay.  We've already heard testimony about that.  On June

15   7th were you contacted by another relative of the defendant's?

16   A    Yes, I was.

17   Q    And what was that person's name?

18   A    That would have been Cheryl Espinoza.

19   Q    And why was she calling you?

20   A    She was inquiring whether her father, Edward Koplin, had

21   been incarcerated.

22   Q    Okay.  Either that day or a subsequent day, did she come in

23   and provide information to you?

24   A    I believe it was later on that same day.  I told her that I

25   wanted to get a more detailed statement from her.

1          THE COURT:  This is June 7th?

2          THE WITNESS:  Yes.

3   A    (continued)  And she originally called me at 11:54, and I

4   told her that I would be back in touch with her, because I

5   wanted to talk to her more in depth, but I was -- there was some

6   sort of a time element there, that I needed to move on to

7   something else and then get back with her.

8   Q    Both of those individuals, Darrell and Cheryl, they called

9   you on their own, they called you, you didn't call them?

10  A    That's correct

11         MR. MIYAKE:  I have nothing further.

12         MR. FILIPOVIC:  Your Honor, with the Court's

13  permission, I would first like to go into the notes that this

14  detective took of the initial interview with Mr  Koplin with

15  reference to the request for an attorney.

16                    CROSS-EXAMINATION

17  BY MR. FILIPOVIC:

18  Q    Detective Walker, you met with Mr. Koplin in the afternoon

19  of June 6th, 2002, along with Detective Hemmen, is that correct?

20  A    Yes, I did.

21  Q    And is it also correct that you took some handwritten notes

22  of the first part of that interview before a tape recording was

23  made?

24  A    I did.

25  Q    And with respect to the tape recording -- do you have

1   Government's Exhibit 2 in front of you?

2   A    If it's my notes, I have that.

3   Q    No, it's another exhibit.

4            MR. FILIPOVIC:  If I can ask the clerk --

5            THE COURT:  It's a transcript of the tape recording

6            THE WITNESS:  Yes, I have it.

7            THE COURT:  He has it.

8   Q    (By Mr. Filipovic)  So that is a verbatim transcript of

9   everything that was stated during the interview beginning at

10  1545 hours, is that correct?

11  A    That's correct.

12  Q    And the handwritten notes you referenced are notes of the

13  interview that preceded that, is that correct?

14  A    That's correct.

15  Q    Okay.  And on page 1 of your handwritten notes you have a

16  time notation of 1440 Miranda-Hemmen?

17  A    Yes.

18  Q    And right below that you write "understand," and then the

19  words you write in your notes are "sure I need attorney if I

20  understand what is going on."

21  A    Okay.  I was primary on starting the interview, and when I

22  put notes down, I just jot down real brief.  What that was was

23  more of a question than a statement.  He had had some questions

24  concerning, you know, when he could -- he was going to be

25  provided with an attorney.

1  Q    Okay.  But you wrote -- you didn't put a question mark after

2  that phrase?

3  A    No, I did not.

4  Q    You wrote "sure" -- the words "sure I need attorney "  Those

5  are your words describing what Mr. Koplin had told you at the

6  beginning of your interview?

7  A    A part of what he had told me.

8  Q    Now, going to Exhibit No. 3 that you were shown earlier,

9  which is the printout from Aukeen District Court, as well as the

10 probable cause determination by the District Court Judge.  That

11 document indicates that a Judge Thompson found probable cause on

12 June the 7th?

13 A    That's what it appears to be, yes.

14 Q    Nowhere on that document does it indicate whether that

15 determination was made in open court, or in the Judge's office,

16 or chambers, does it?

17 A    It does not.

18 Q    And there's no reference to a defense lawyer being involved

19 in any of these proceedings?

20 A    It does not.

21 Q    And on this copy of this document there is no signature of

22 Mr. Koplin, indicating that he had received a copy of it?

23 A    There doesn't appear to be, no.

24 Q    Although there's a place at the bottom of the second page

25 that calls for such a signature?

1   A    Yes.

2   Q    Now, Detective Walker, you indicated you're the lead case

3   agent on this investigation?

4   A    Yes.

5   Q    At least before the case was turned over to the FBI?

6   A    That's correct.

7   Q    Okay.  When was it turned over to the FBI?

8   A    I believe -- this case started on a Thursday, and I believe

9   it was the beginning of the next week.  I really can't remember.

10  But due to the nature of the interstate -- the possibility of

11  crimes occurring in the state of Utah, I just made an inquiry

12  with Ilene Miller on whether this would be something that they

13  would want to take a look at.

14  Q    And that inquiry actually occurred on June the 7th, the next

15  day after your first involvement in the case?

16  A    It could have been, yes.

17  Q    Do you have your supplemental narrative report in front of

18  you?

19  A    Yes, I do.

20  Q    If you can look at page 3 of the supplemental narrative.  I

21  think it's Bates number 36 at the bottom.  The very last

22  paragraph.

23  A    Yes.

24  Q    Okay.  Does that refresh your memory?  Going back to the

25  previous page, it gives a date.

1 | A     Yes, yes, it does.

2 | Q     But the date on the previous page is in error, it says July

3 | 7th, that should read June 7th?

4 | A     Correct, June 7th.

5 | Q     So the federal authorities were at least aware of the case

6 | and somewhat involved on June the 7th, is that correct?

7 | A     That appears to be the case, yes

8 | Q     Now, did you have responsibility for managing the evidence

9 | that was obtained in this case, at least while it was still a

10 | state prosecution?

11 | A     Well, the management is usually up to the Kent police

12 | evidence technicians.  The officers -- the original responding

13 | officers are the ones that place evidence into the evidence

14 | lockers.

15 | Q     Did you have any involvement in obtaining -- either

16 | obtaining or putting in for developing photographs that were

17 | taken by the uniformed officers in this case?  Did you have any

18 | involvement whatsoever in that?

19 | A     No.

20 | Q     Okay.  Were you asked to do any investigation of who took

21 | photographs and where those photographs were located?

22 | A     No.

23 | Q     And the following day, after your interview with Mr. Koplin,

24 | you also appeared with Detective Hemmen at the King County

25 | Prosecutor's office and observed the interview of Amanda

1  Brinkley, is that correct?

2  A    Yes, I did.

3  Q    Did you take any notes of that interview?

4  A    Yes, I did.

5  Q    Okay.  Do you still have those notes?

6  A    I do.  I don't have them with me here, but I did take notes.

7         MR. FILIPOVIC:  Your Honor, I would make the same

8  request of this witness, that I be provided the notes and have

9  the opportunity to recall him.

10        THE COURT:  I don't think we're going to finish today,

11  so you'll have an opportunity to requestion on that subject, if

12  you want.

13        MR. FILIPOVIC:  If I might again have your indulgence

14  for a moment, Your Honor.

15        THE COURT:  Sure.  Now, is it an Officer Wulbert -- or

16  who's the remaining witness?

17        MR. MIYAKE:  It's Special Agent Wulbert, Your Honor.

18        THE COURT:  And he or she is testifying --

19        MR. MIYAKE:  She's right here.

20        THE COURT:  Ah.  What is she testifying about?

21        MR. MIYAKE:  She is testifying about contacts that she

22  had with various members of the -- well, primarily one member

23  And the reason why we're calling her, as I indicated earlier,

24  was because the defense is moving to suppress a number of

25  things, including testimony of witnesses, and I think it goes to

1  that particular issue of the testimony of those witnesses,

2  whether it should be suppressed or not.

3       MR. FILIPOVIC:  I just have a couple more questions on

4  a point of clarification.

5  Q  (By Mr. Filipovic)  Detective, again if you could look at

6  your supplemental narrative at page 2, at the bottom, right

7  below, where it says 7/7/02, but really should be 6/7/02.

8  A  Correct.

9  Q  Where it reads, "See Amanda Brinkley interview," does that

10 refer to your notes, or to some formal report, or a taped

11 statement?

12 A  That refers to the transcripts, the actual typed transcripts

13 from the child interviewer.

14 Q  When you say a typed transcript, is that a transcript made

15 from handwritten notes or a transcript made from the tape

16 recorder?

17 A  The child interviewer takes verbatim notes and then they --

18 then they type them out.

19 Q  Okay.  The child interviewer -- the person taking the notes

20 in the room is the same person asking the questions?

21 A  That's correct.

22 Q  And there's nobody else in the room besides the interviewer

23 and the child?

24 A  Yes.

25 Q  And is that person trained as a court reporter, or --

1    A    They're trained as a child interviewer.

2    Q    But as far as you know, there's no tape recording made of

3    that interview?

4    A    No.

5             MR. FILIPOVIC:    I have no further questions.

6                        REDIRECT EXAMINATION

7    BY MR. MIYAKE.

8    Q    I want to direct your attention to the -- you interviewed

9    Mr. Koplin, and there were basically two separate interviews.

10   There was an interview that you spoke to him prior to turning on

11   the tape, and then there was a taped interview?

12   A    That's correct.

13   Q    Mr. Filipovic questioned you about -- in your notes there's

14   a line 1440 Miranda, and then there's a name Hemmen.   That was

15   the time that Detective Hemmen had advised Mr. Koplin of his

16   Miranda rights?

17   A    It is.

18   Q    And then you write down there "understand, sure I need an

19   attorney if I understand what is going on."   Now, is that a

20   verbatim statement of what Mr. Koplin had said to you?

21   A    It is not.

22   Q    Is that a truncated version?

23   A    Do you mean if it's like just --

24   Q    Okay.   What I mean is it's just an abbreviation?

25   A    Yes.

1   Q   What did he say to you?

2   A   He had some questions concerning, you know -- he had some

3   questions, first of all, concerning the seriousness of the

4   crimes.   He was also concerned about Amanda.   He seemed to still

5   think that he was going to be able to get out and take her back

6   to Utah.

7   Q   Okay.   Now, and this is before -- I'm talking about before

8   the taped statement.

9   A   That's correct.

10  Q   What do you tell him, if anything, about an attorney?

11  A   He asked -- we explained to him that an attorney would be

12  provided for him, and it was also explained to him that if he

13  wanted an attorney present before any questioning, then that

14  would be the case.

15  Q   Now, after you tell him that, what does he say to you?

16  A   It was explained to him that he would see a Judge the

17  following day, where an attorney would be appointed for him, and

18  he seemed to be okay with that, and said that he would talk to

19  us.

20  Q   Did you interpret what he -- what he said after he was

21  advised of his right to an attorney as he wanted an attorney

22  right then?

23  A   At no time did he ask for an attorney right then.

24  Q   Did he say or do anything that made you think that he wanted

25  an attorney right then?

1  A    No.

2  Q    Did he appear to not understand his right to an attorney?

3  A    He seemed to understand when it was explained to him that an

4  attorney would be provided for him    And it was also explained

5  to him a number of times that he had the right to have an

6  attorney present with him before any questioning.

7  Q    So only after you assured yourself that he was not asking

8  for an attorney, then and there did you continue questioning?

9  A    If I wouldn't have been sure of that, I would have shut the

10  interview down at that point.

11  Q    Okay.  Now, regarding the determination of probable cause,

12  Mr. Filipovic asked you if that's made in open court, is that

13  right?

14  A    Sometimes.

15  Q    Okay.  Is it ever done by closed circuit TV?

16  A    It is.

17  Q    What -- if it's done by closed circuit TV, if the Judge

18  signs the form indicating that they find probable cause, would a

19  defendant's signature be right under that?

20  A    Not on closed circuit, no.

21          MR. MIYAKE:  Thank you.  I have nothing further.

22          THE COURT:  What do you mean by closed circuit TV?

23  Who's on the TV?

24          THE WITNESS:  The Judge, and then the defendant can see

25  the Judge.

1          THE COURT:  Can the defendant and Judge talk to each

2     other?

3          THE WITNESS:  Yes.

4          THE COURT:  Does the defendant have an attorney?

5          THE WITNESS:  On first appearance, no.

6          MR. MIYAKE:  May I follow up with that, Your Honor?

7          THE COURT:  (Nods head.)

8                    REDIRECT EXAMINATION (continued)

9     BY MR. MIYAKE:

10    Q    Are they advised at that appearance if they can have an

11    attorney?

12    A    Oh, yes, they are.

13          MR. MIYAKE:  Nothing further.

14                    RECROSS-EXAMINATION

15    BY MR. FILIPOVIC:

16    Q    Detective, you don't know if that was the procedure that

17    was used here or not, do you?

18    A    I don't, no.

19    Q    And in fact you do know that when there are those kinds of

20    proceedings there is a taped recording made of those proceedings

21    when they're done in open court and usually you can get access

22    to that tape, is that correct?

23    A    I don't know if there is or not.

24    Q    You don't know one way or the other?

25    A    No.

1          THE COURT:  Pardon my confusion, but how was this one
2     done?  He wasn't on a closed circuit TV.  He wasn't taken into
3     Court.

4          MR. MIYAKE:  Well, Your Honor --

5          THE COURT.  Is there something I don't know about that
6     the Kent --

7          MR  MIYAKE:  Well, there has been some confusion in
8     that regard.  Looking at the paperwork, we don't know if he was
9     brought into Court, or if there was a closed circuit TV.  We've
10    attempted to follow up on that, and I don't believe have gotten
11    an answer to our satisfaction.

12         THE COURT:  Well, how do they do it in -- I mean, what
13    is the Kent Justice Center doing these days in terms of -- I
14    mean, it's either one or the other of these systems?  Is there a
15    third way?

16         MR. MIYAKE:  I can't answer that.  I know, in talking
17    to Detective Walker and Detective Hemmen, that many times these
18    are done by closed circuit TV.  In other words, they're in the
19    jail with a closed circuit TV, and they can speak to each other,
20    and so they're brought there.  It avoids having to have the
21    manpower to transport someone to and from the jail to the Court.

22         THE COURT:  I understand that there's probably a need
23    for that, but I just don't know how this one was done.

24         MR. FILIPOVIC:  Your Honor, based on our investigation,
25    contacting the clerk's office, we were told that there -- that

1    many times these things are done where a person is not brought

2    to Court, there's no closed circuit TV, the Judge simply makes

3    an ex parte determination of probable cause, the document is

4    then faxed to the jail, and the defendant is asked to sign an

5    acknowledgment that probable cause has been found, what his bail

6    amount is, and what the conditions are of that bail.

7         That's what we believe occurred here.  And it's my

8    experience that any time a Judge is on the bench in King County

9    in a District Court or a Superior Court, particularly in the

10   District Court, there's always a tape running and there's always

11   a reference on the docket to a tape number that can be accessed,

12   and we've been unable to find that tape.  And there's no

13   reference on the docket the government has put in suggesting

14   there's a tape, or anything of that nature.

15        THE COURT:  Well, we do know it was signed by a Judge.

16        MR. FILIPOVIC:  We do know it was signed by a Judge.

17        THE COURT:  This is a real Judge who exists on King

18   County Superior Court.

19        MR. MIYAKE:  It's actually a commissioner, I believe,

20   Commissioner Thompson.

21        THE COURT:  It's a commissioner.  All right.  So now

22   we're -- well, surely there will be a docket of some kind that

23   shows how this is done.  Well, I'm not --

24        MR. MIYAKE:  We'll continue to look into that, Your

25   Honor.

1          THE COURT:  Okay.  Are we finished with this witness?

2          MR. FILIPOVIC:  I have just a few brief follow-up

3    questions.

4          THE COURT:  Okay.  Because I really --

5          MR. FILIPOVIC:  I will be quick.

6    Q    (By Mr. Filipovic)  Detective, did you ever offer Mr. Koplin

7    a telephone to use to make a phone call to the -- to an attorney

8    if he wanted to call an attorney?

9    A    No.

10   Q    And there was no telephone in the room, is that correct,

11   where you were doing the interview?

12   A    Not in the interview room, no.

13         MR. FILIPOVIC:  I have no further questions.  Thank

14   you.

15         THE COURT:  Okay.  You may step down.  Watch your step.

16   There are two steps there.

17         THE WITNESS:  Thank you.

18         THE COURT:  You know, we're going to have to hold off

19   on your last witness.  I need closing argument from counsel

20   anyway, so we're going to have to all reconvene.  I don't

21   know -- Mr. Filipovic, were you going to put the defendant on,

22   or any witnesses for your -- on this matter?

23         MR. FILIPOVIC:  I may be calling Mr. Love on some

24   issues that shouldn't take very long.

25         THE COURT:  Okay.  Now, you indicated earlier that you

1  both are going to agree, stipulate to a continuance of this

2  matter.

3         MR. MIYAKE:  And that's just what I was mentioning to

4  him.  We might as well do it now since the defendant is here in

5  open court, if the Court has time to do that.

6         THE COURT:  I have time to do that.

7         MR. MIYAKE:  Right.

8         THE COURT:  But not any more, though.

9         MR. MIYAKE:  Okay.  And then we could -- I don't know

10 if you want to set the date to hear further, or if we should

11 just coordinate.

12        THE COURT:  I think we should set it maybe for Monday,

13 the 28th, to resume.  Is that good for all of you?

14        MR. FILIPOVIC:  I believe so, Your Honor.

15        MR. MIYAKE:  That -- if I may, Your Honor, that poses

16 somewhat of a problem for me, in that I'm supposed to be moving

17 that day.  We bought a new house.  I'm sorry to interject my

18 personal life in that, but I was planning on not being here.

19        THE COURT:  Do you think you should be here?  Do you

20 think you should be there to help out?

21        MR. MIYAKE:  Well, I think my wife thinks I should be

22 there.

23        THE COURT:  You don't think she wants to move all by

24 herself?  I'm trying to figure out -- it could be kind of

25 interesting to see the developments.

1          MR. MIYAKE:  I'm in a tough spot here, Your Honor.

2          MR. FILIPOVIC:  The question is whether Ms. Miller or

3    Mr. Miyake's wife needs him more that day.

4          MR. MIYAKE·  No, it's whether Judge Rothstein wants me

5    here.

6          THE COURT:  Look, that whole week, I think, is good for

7    me.

8          MR. MIYAKE:  Okay.

9          THE COURT:  Ms. Tyree isn't here, and, of course, she

10   usually knows my schedule better than I do.  But I think that

11   I -- I just don't want to put this over too long, because -- I

12   have copious notes, but I just don't want it all to get stale.

13   And as it is, it's going to be over a week.

14      So Tuesday, Wednesday of that week?

15          MR  MIYAKE:  Could I --

16          THE COURT:  I'll tell you what, why don't you do this:

17   Ms. Tyree will be back next week.  I won't be here.  Talk to

18   her, tell her that I would appreciate it being some day next

19   week.  See what days you can agree on.

20      I know you want to get ahold of those notes, Mr. Filipovic,

21   before -- so make sure you get those.  I'd say Tuesday or

22   Wednesday of that week, whenever you think you can -- you know,

23   it's a great excuse not to have to empty boxes, Mr. Miyake, you

24   can be here.  And let's do that.

25      And you decide who you want to put on, so you can let Ms.

1    Tyree know how much time we need.  And I guess there was some

2    more briefs I needed to read on that.  Actually, that will make

3    it better.  Let's move it a little further into the week, so I

4    have time to read the briefs.

5            MR. MIYAKE:  Okay.

6            THE COURT:  On Wednesday or Thursday.  Can you get

7    something on the record in writing about continuing this?

8            MR. FILIPOVIC:  Your Honor, we have a stipulation or

9    proposed order.  There was some discussion about whether the

10   continuance would be to December 2nd or December 9th.  It's our

11   preference that it be December 2nd.  Ms. Tyree indicated there

12   were a large number of trials set for the 9th.  And our concern

13   is that it doesn't end up getting bumped along towards the

14   holidays.

15           THE COURT:  Let's do it the 2nd.  I take it this case

16   would only take how long, about a week to try?

17           MR  MIYAKE:  About a week.

18           THE COURT:  Okay.  So we'll be done by the 9th.

19           MR. MIYAKE:  Your Honor, there's a blank for you to

20   fill in of the exact date.  So we can hand that forward.

21           THE COURT:  Okay.

22           MR. MIYAKE·  I just want it clear on the record that

23   Mr  Koplin is agreeing to the --

24           THE COURT:  Mr. Koplin, are you agreeing to continue

25   this matter until December 2nd?

1    THE DEFENDANT. You've got my body here. I can't go
2  anywhere.

3        THE COURT: No, that's not the issue.

4        THE DEFENDANT: Of course I do, unless you let me go
5  home tonight.

6        THE COURT: You're not going home tonight unless you
7  can post -- I don't even know if the bail is still good. But
8  you can't go home tonight, and you will be awaiting trial
9  longer. Your attorney has told me that he thinks he needs that
10  time.

11    Do you agree with him?

12        THE DEFENDANT: Yes, I do.

13        THE COURT: Okay  I'm signing the continuance until
14  December 2nd  And the government will be filing its brief when?

15        MR. MIYAKE: Could we have until October 25th, which
16  would be the Friday before that following Monday, the 28th. Or
17  would you want it earlier than that?

18        THE COURT: I think a little earlier would be a good
19  idea.

20        MR. MIYAKE: Okay.

21        THE COURT: No, wait a minute, the 25th will be fine,
22  because we're not doing it that Monday. We're probably not
23  going to do it until -- right now we're thinking Wednesday or
24  Thursday of that week  And if we do that, that will be fine.
25        MR. MIYAKE: Okay.

1          THE COURT:  Because that will still give me some time

2     to read the brief.

3          MR. FILIPOVIC:  Your Honor, with the Court's

4     permission, would we be granted permission to file a

5     simultaneous brief at the same time?  Based on the testimony

6     that was presented today, there may be some specific matters we

7     would like to address.

8          THE COURT:  Well, that's what closing argument is going

9     to be for, isn't it?  Do you think there's any more legal

10    authority you need to bring --

11         MR. FILIPOVIC:  I believe -- it will be very short.  I

12    would keep it under five pages.

13         THE COURT:  Well, in that case I need the brief

14    earlier, because when -- I don't like simultaneous briefing, Mr.

15    Filipovic.  I find that it often sort of misses the other side.

16    But I guess in this case you're just going to comment -- it's

17    sort of a supplemental closing argument in a sense.

18       Why don't we move your brief up to the 23rd?

19         MR. MIYAKE:  That would be fine.

20         THE COURT:  And why don't you both file any briefs that

21    would be a comment on the evidence on the 28th -- whatever that

22    Friday is, the 25th, okay?  Okay, counsel.  Thank you.

23         MR. MIYAKE:  Thank you, Your Honor.

24         MR. FILIPOVIC:  Thank you, Your Honor.

25         THE COURT:  Court will be adjourned.

1          THE DEFENDANT:  Thank you for your time, Your Honor

2      (Court adjourned.)

3                          CERTIFICATE

4

5

6

7

8

9

10          I, Joseph F. Roth, Official Court Reporter, do hereby

11    certify that the foregoing transcript is correct.

12

13

14                              Joseph F. Roth

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    MARK GUSTAFSON,           BEING SWORN, TESTIFIED AS FOLLOWS:
     .............. ..................................... 4:8
3    DIRECT EXAMINATION
     BY MS. MILLER: .............. ..................... 4:15
4    CROSS-EXAMINATION
     BY MR. FILIPOVIC:  ........... .. .................. 37:18
5    REDIRECT EXAMINATION
     BY MS. MILLER: .... ............................... 59:1
6    RECROSS-EXAMINATION
     BY MR. FILIPOVIC:...... ........................... 62.2
7
     BENJAMIN KRAUSS,          BEING SWORN, TESTIFIED AS FOLLOWS:
8    ................................................... 66:4
     DIRECT EXAMINATION
9    BY MR. MIYAKE: ............. .................... 66:11
     CROSS-EXAMINATION
10   BY MR. FILIPOVIC: ..............................  .... 75:15
     REDIRECT EXAMINATION
11   BY MR. MIYAKE: ...................................... 86:5
     RECROSS-EXAMINATION
12   BY MR. FILIPOVIC:................................ ... 86:22

13   MATTHEW LEE LORETTE,      BEING SWORN, TESTIFIED AS FOLLOWS:
     ....................................... ........... 88:9
14   DIRECT EXAMINATION
     BY MR. MIYAKE: ............................... ...... 88:16
15   CROSS-EXAMINATION
     BY MR. FILIPOVIC: ................................... 96:1
16   REDIRECT EXAMINATION
     BY MR. MIYAKE. ...........................  ........... 104:13
17   RECROSS-EXAMINATION
     BY MR. FILIPOVIC: ........ ......................... 106:8
18
     JANET BELL,               BEING SWORN, TESTIFIED AS FOLLOWS:
19   ....................................... .... 107:13
     DIRECT EXAMINATION
20   BY MR. MIYAKE: ...................................... 107:20
     CROSS-EXAMINATION
21   BY MR. FILIPOVIC. ...........................  ........... 114:21
     REDIRECT EXAMINATION
22   BY MR. MIYAKE: . .................... ......... ...... 124:15
     RECROSS-EXAMINATION
23   BY MR. FILIPOVIC:............. . ............... .   ..... 125:13

24   WILLIAM HENDRICKS,        BEING SWORN, TESTIFIED AS FOLLOWS:
     ................................................... 128:10
25   DIRECT EXAMINATION
     BY MS. MILLER: ................................. ... 128:17

1   CROSS-EXAMINATION
    BY MR. FILIPOVIC: ....................................... 132.3
2   REDIRECT EXAMINATION
    BY MS. MILLER: ................. . ............. ........ 146:14
3   RECROSS-EXAMINATION
    BY MR. FILIPOVIC:....................................... 147:7
4   FURTHER REDIRECT EXAMINATION
    BY MS. MILLER· ........ ............................ . 149:15
5
    SUSAN HEMMEN,                    BEING SWORN, TESTIFIED AS FOLLOWS:
6   ................................................. ......... 150:2
    DIRECT EXAMINATION
7   BY MS. MILLER: ...................................  ..... 150:10
    CROSS-EXAMINATION
8   BY MR. FILIPOVIC: ...................................... 160:17
    REDIRECT EXAMINATION
9   BY MS. MILLER· .......... .......................... 170:21
    RECROSS-EXAMINATION
10  BY MR. FILIPOVIC: ..................................... 172:19

11  RUSSELL WALKER,                   BEING SWORN, TESTIFIED AS FOLLOWS:
    ...............................      .................. .... 175:5
12  DIRECT EXAMINATION
    BY MR  MIYAKE: ...................................... 175:12
13  CROSS-EXAMINATION
    BY MR. FILIPOVIC. ......................  ........... 179:16
14  REDIRECT EXAMINATION
    BY MR. MIYAKE: ...................................... 186:6
15  REDIRECT EXAMINATION (continued)
    BY MR. MIYAKE: ..................................  .... 189:8
16  RECROSS-EXAMINATION
    BY MR. FILIPOVIC:..................................... 189:14

17

18

19

20

21

22

23

24

25