**CERTIFICATE OF SERVICE**
I certify that a copy of the foregoing
document to which this certificate is
attached was served on the attorney(s)
of record for defendant(s) via teletype/ _HL_
mail/personal delivery on the _29th_
day of _April_ 20 _03_
UNITED STATES ATTORNEY
_KDS_

Judge Barbara Jacobs Rothstein

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

APR 2 9 2003 ZG

AT SEATTLE
CLERK U.S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
DEP

CR 02-00209 #00000073

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

EDWARD DARRELL KOPLIN, SR

Defendant.

)
)
)
)
)
)
)
)
)
)

NO. CR02-209R

GOVERNMENT'S SENTENCING
MEMORANDUM AND MOTION
FOR AN UPWARD DEPARTURE

## I. INTRODUCTION

Comes now the United States of America, by John McKay, United States Attorney, and Ilene J.K. Miller and Bruce F. Miyake, Assistant United States Attorneys for the Western District of Washington, and files this sentencing memorandum recommending an upward departure.

## II. BACKGROUND

On June 6, 2002, the Kent Police were dispatched to do a welfare check on an eleven (11) year old girl traveling with a 68 year old man at the Marriott Hotel in Kent. The officers contacted the defendant, EDWARD DARRELL KOPLIN, at his motel room. The defendant answered the door wearing only his underwear. After being removed from the room, the officers found A.B., an eleven year old girl, in the room too. During a subsequent search, the officers found numerous sexual items in the motel room including, approximately 11 vibrators, three adult pornographic movies, and sex related books entitled: Horse Happy School Girl, Sex Before

GOVERNMENT'S SENTENCING MEMORANDUM/KOPLIN— 1

1  12, and Animal 4 Bizarre (which had sexually explicit photographs with animals).  The officers
2  also found several packets of viagra, several of which were empty.  The officers also found one
3  hundred and eighty-seven pages of handwritten notes written from the defendant to the victim .
4  These notes were extremely sexually graphic in nature  (See Attachment A)

5      After being arrested, the defendant was interviewed by Kent Police Detectives Susan
6  Hemmen and Russell Walker.  The defendant admitted to them that he and A.B  had traveled
7  from Salt Lake City, Utah to the Seattle, Washington area.  He further admitted that while in
8  Kent, Washington he had penetrated A.B.'s anus with  his finger and performed oral sex on her
9  The defendant claimed that any sexual conduct was done to "educate" her.

10      The subsequent investigation has revealed that the defendant has a long history of
11  sexually abusing little girls.  The defendant's younger sister, Tami Welliver (now 63 years old),
12  came forward and revealed that when she was approximately five (5) to six (6) years old, the
13  defendant began forcing her to perform oral sex on him.  The defendant was eleven-years-old
14  when he began abusing Tami.  The defendant's own daughter, Cheryl Espinosa, also came
15  forward and disclosed that between the ages of six (6) through sixteen (16) the defendant
16  sexually abused her by forcing her to have sexual intercourse with him.

17      Following the news reports of the defendant's arrest, Nancy White, contacted the
18  Snohomish County Sheriff's Department and informed them that her 22 year old
19  developmentally delayed daughter, A.W., was victimized by the defendant.  The investigation
20  revealed that at some time in the year 2000, the defendant lived in their neighborhood in Port
21  Susan, Washington.  A.W. told investigators that when she visited the defendant at his trailer, he
22  would have her watch adult pornographic movies.  A.W. also disclosed that he used sex toys on
23  her including wearing a black pair of shorts with a rubber penis attachment so he could have
24  sexual intercourse with her.[1]

25      Also during the subsequent investigation law enforcement learned of at least four (4)
26  other little girls in Salt Lake City to whom the defendant had made sexual overtures towards.
27

28      [1]  During a search of the defendant's trailer in Utah, the Salt Lake County Sheriff's Department
    found the black shorts with the attached dildo

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

# III. GUIDELINE CALCULATIONS

## A. Vulnerable victim.

U.S.S.G. §3A1.1(b)(1) dictates a two (2) level enhancement where "the defendant knew or should have known that the victim of the offense was unusually vulnerable due to age, physical or mental condition, or *that a victim was otherwise particularly susceptible to the criminal conduct...*" (emphasis added). Generally, this adjustment would not apply where the factor which make the victim vulnerable is incorporated into the calculation of the offense guideline, eg... age. However, where there exists factors beyond the victim's age, physical or mental condition, a departure may be appropriate. Under some circumstances a victim's financial circumstances can justify a departure under Section 3A1.1. United States v. Peters, 962 F.2d 1410, 1417-18 (9th Cir. 1992) (vulnerable victim enhancement proper where defendant targeted victims with poor credit history in his mail fraud scheme); United States v. Borst, 62 F.3d 43, 46-47 (2nd Cir. 1995) (vulnerable victim enhancement appropriate where success of defendant's fraudulent scheme depended on the financial desperation of victims); compare, United States v. Castadenada, 239 F.3d 978, 983 (9th Cir. 2001) (vulnerable victim enhancement improper under the Mann Act based upon economic vulnerability of victims since such economic vulnerability typically associated with victims of the Mann Act).

The sentencing court must consider the characteristics of the victim, the victim's reaction to the criminal conduct, and the circumstances surrounding the criminal act. United States v. Peters, 962. F.2d at 1417. It is not necessary that the defendant target the victim because of the vulnerability, rather it is enough that the defendant knew or should have known the victim was vulnerable. United States v. O'Brien, 50 F.3d 571, 755 (9th Cir 1995).

In this case, AB was particularly vulnerable due to her socio-economic status. The victim comes from a very poor family with unsophisticated and uneducated parents. Her family resides in the basement of her grandparents. The defendant observed this situation and preyed upon the victim and her family by luring them with gifts, food and a promise of a better life.

When the defendant first met A B 's mother, Shawna, he bragged to her about his wealth and education. He then asked if A.B. could help him sort jewelry. Shortly after meeting A.B.,

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1  knowing that she was a poor and an unpopular little girl, he began to shower her with gifts. The
2  defendant gave A.B. things that her family could never provide. He bought her a dog, a bicycle,
3  two karaoke machines (one for his house and one for her house), clothes, and eventually bought
4  her two (2) horses. Because of these gifts A.B. gained status and popularity among her friends
5  in the neighborhood and at school.

6      The defendant used the gifts to exert control over A.B. and manipulate her into engaging
7  in the sexual activity. For example, he used the horse to control her and the amount of time that
8  she would have to spend with him. The defendant told her that it was her responsibility to take
9  care of them. This, of course, required her to spend even more time with him to the point where
10 she was with him four to five times a week. Each time she was with him, he expected sexual
11 favors from her If A.B. rejected the defendant's sexual overtures he would threaten to take
12 away the horses and other gifts as was evidenced by his written notes to A.B. (See
13 Attachment A).

14     In addition to buying gifts for A.B., he bought gifts for the rest of her family. The
15 defendant also led A.B.'s mother to believe that A.B. would inherit his estate when he passed
16 away and that he had a college fund set up for her. He would also let A.B.'s mother drive his
17 corvette and use the cellular telephone he had obtained for A.B. As a result, A.B.'s mother put
18 pressure on A.B. to continue to help the defendant. Whenever A.B. protested, her mother would
19 chastise her and force her to go with the defendant to his residence.

20     Through his gifts and promises of future gifts, the defendant exploited A.B. and her
21 family's poverty. He used these gifts to manipulate A.B. into engaging in sexual activity with
22 him. Likewise, the gifts also influenced A.B.'s mother to make A.B. available to the defendant
23 whenever he wanted to see her and to allow him to take A.B. on a trip to Seattle, Washington.
24 The defendant successfully isolated A.B. and was able to impose a great deal of psychological
25 and emotional pressure on her by playing on her guilt, her desire to keep the gifts, and her desire
26 to please her parents.

27     Under the totality of the circumstances, A.B.'s poverty and low socio-economic status
28 made her unusually vulnerable to the defendant's overtures and a two (2) level upward departure

GOVERNMENT'S SENTENCING MEMORANDUM/KOPLIN— 4

1 | should be applied.

2 | **B. Obstruction of Justice.**

3 |       Under U.S.S.G. §3C1.1, a two (2) level enhancement should be imposed where a

4 | defendant obstructed justice. Section 3C1.1 states in relevant part:

5 |         If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or
|         impede, the administration of justice during the course of the investigation,

6 |         prosecution, or sentencing of the instant offense of conviction, and (B) the
|         obstructive conduct related to (i) the defendant's offense of conviction and any

7 |         relevant conduct; or (ii) a closely related offense, increase the offense level by 2
|         levels.

8 |

9 |       The commentary to this section cites "directing or procuring another person to destroy or

10 | conceal evidence that is material to an official investigation" as an example of when this

11 | adjustment would apply See U.S.S.G. §3C1.1, application note 4(d).

12 |       Here, the defendant after being arrested for child molestation by the Kent Police

13 | Department, called his son, Darrell Koplin, and instructed him to go to his trailer and get rid of a

14 | book which had naked pictures of the victim. He further instructed Darrell to burn all of the

15 | pornography in his house. Obviously, the defendant was aware that the photographs of A.B

16 | masturbating with one of the vibrators found in his motel room was extremely incriminating and

17 | he wanted to get rid of it. This willful conduct was calculated to destroy material evidence that

18 | the defendant knew was relevant to the investigation.

19 |       In addition to the above, the defendant attempted to have his son Darrell suborn perjury

20 | and have other family members hide his assets. The defendant also committed other acts after

21 | being arrested which support and constitute acts of obstruction justifying an enhancement.

22 | U.S.S.G. Section 3C1.1, application note 4(b). Here, the defendant called his son, Darrell, and

23 | instructed him to tell anyone who asked that he (Darrell) was being paid $6,200.00 per year to

24 | take care of the horses. The reason the defendant wanted Darrell to lie was so that none of his

25 | assets could be forfeited. The defendant called various members of his family, including his

26 | younger sister, Tami Welliver, from the Federal Detention Center shortly after he was taken into

27 | federal custody. The purpose of some of those phone calls was to tell his family to sell off all of

28 | his assets and hide them in offshore accounts so as to avoid forfeiture or seizure by the

GOVERNMENT'S SENTENCING MEMORANDUM/KOPLIN— 5

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1 | government.

2 |       The defendant's action after being arrested by the Kent Police justify a two (2) level

3 | increase for obstruction of justice.

4 | **C. Acceptance of Responsibility**.

5 |       When a defendant demonstrates acceptance of responsibility for his offense, he is

6 | generally entitled to a two (2) to three (3) level decrease. U.S.S.G. Section 3E1.1. In this case,

7 | the defendant is not entitled to acceptance of responsibility for two reasons: (1) the defendant

8 | has not demonstrated any remorse, and (2) due to his obstructive conduct.

9 |       Whether a defendant has accepted personal responsibility is a factual determination

10 | requiring an inquiry into the defendant's "genuine contrition." United States v. Thompson, 80

11 | F.3d 368, 370 (9th Cir. 1996); United States v. McKinney, 15 F.3d 849, 853 (9th Cir.1994). A

12 | fundamental rationale for acceptance of responsibility is that the defendant accept that what he

13 | did was wrong and express contrition for it.

14 |       Here, the defendant has never expressed any remorse for the sexual abuse and emotional

15 | and psychological trauma he inflicted upon A.B. Based upon statements that he made at the time

16 | of his arrest and statements in letters to his family members, it is clear the defendant does not

17 | believe he did anything wrong.

18 |       When questioned by the Kent Police detectives, the defendant claimed that he was simply

19 | educating A.B about sex and blamed A.B. for initiating their sexual activity by claiming that she

20 | asked him about masturbation. Later in the interview, he stated that he was going to marry A.B.

21 | when she turns 18 years old. He stated: "It is my full intent to marry this girl when she turns

22 | 18 ... This girl is my project. The good lord put her in front of me and I am going to take care of

23 | her and do the very best that I can by her ..." Also, during a conversation with his sister Tammy

24 | Welliver, shortly after his arrest, he claimed that his sexual activity with the victim was done

25 | lovingly. These statements reflect his attitude that there was nothing improper about teaching an

26 | eleven year old how to masturbate and assisting her in achieving a better climax through anal

27 | penetration with his finger.

28 |       In addition to failing to understand that his conduct was wrong, the defendant has also

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1  attempted to minimize and sometimes outright deny any wrong doing. The defendant has
2  consistently denied that he ever showed or encouraged A.B. how to use the vibrator. When
3  interviewed by the Kent Police detectives, the defendant stated that A.B. had asked to use the
4  vibrator When Detective Walker asked him if he showed her how to use it, the defendant
5  stated: "Not really, I mean .. I turned it on so she knew how to turn it on, you know ? But she,
6  she knew to put it between her legs. I mean that's all there was to it.. " (See Attachment B).[2]

7      At the plea hearing on February 21, 2003, for the charges arising in Utah, CR03-436R,
8  the defendant again denied that he ever enticed or encouraged A.B. to use the vibrator.
9  Regarding the photographs of A.B. masturbating, he claimed that he just happened to see her
10  using the vibrator and he took two (2) photographs of her. Under oath, the defendant stated:
11  "Well, I agree with the fact that I did not provide her or entice her or any sort of that thing.... She
12  had found this one particular vibrator in my home. She apparently liked it, she was learning how
13  to do whatever, and I was very permissive ....". (See Attachment C).

14      Through these statements the defendant is again minimizing his role in the offense and
15  blaming the victim for the sexual activity. The defendant has reiterated this view to his family
16  members In a letter written to his sister Tami Welliver on January 26, 2003, he wrote: "Damn
17  Tami - Don't know what else to say - <u>nothing</u> was happening between A.B. and me - she found
18  one of my massagers I was using for my reflexology - <u>no sex no way</u>!!" Similarly, in a letter to
19  his son, Darrell Koplin, on February 3, 2003: " . . Never planned on [A.B.] getting into the
20  massagers but she did, she fell in love with massagers, I allowed it. I always was easy that way -
21  There was <u>never</u> any sex!!!"

22      Since his arrest, the defendant has written various family members and claimed that he
23  did nothing wrong. In a letter to Darrell, the defendant writes. ". . . Will only assure you I did
24  "<u>nothing</u>" wrong, my sister called CPS because I crossed state line . ." In another letter to
25  Darrell "Tell you when you get here, all my stuff is photographed/recorded etc They got me
26  under a microscope my god - 'Nothing' happened here son. Had just bought some gifts for

27

28     [2] The defendant also claimed that A B. was very hyper and that the only way she would settle
  down "was to be on the vibrator." Again, attempting to shift blame to A B

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1 | Gloria - they thought they were for AB . . ."

2 The defendant has not accepted that what he did was wrong. He rationalizes, minimizes,
3 and denies his role in sexualizing A.B.; he has not accepted his own responsibility for the wrong
4 doing and is not entitled to a downward adjustment.

5 Also, a defendant who receives an adjustment for obstruction of justice under Section
6 3C1.1 of the Sentencing Guidelines is generally not entitled to an adjustment for acceptance of
7 responsibility. Only in the "extraordinary" case when a defendant is found to have obstructed
8 justice is a defendant likewise entitled to acceptance of responsibility. U.S.S.G. Section 3E1.1,
9 application note 4.

10 The facts of the instant case, do not constitute the "extraordinary" circumstances
11 contemplated by the guidelines. The defendant's efforts to subvert the investigation into his
12 actions by attempting to have his son destroy evidence is consistent with his attitude that he did
13 nothing wrong   The defendant should not receive the benefit of acceptance of responsibility.

## IV.  UPWARD DEPARTURE

15 Based upon the defendant's repeated and prolonged sexual abuse of the victim (A.B.) in
16 this case, as well as a multitude of victims over the defendant's lifetime, the Government moves
17 for an upward departure, pursuant to the United States Sentencing Guidelines, Sections 5K2 0
18 and 4A1.3(e), and Title 18, United States Code, Section 3553(b), permitting the Court to
19 sentence the defendant to more than the otherwise applicable Guideline range. Given the fact
20 that the defendant has never been prosecuted for any similar adult criminal conduct, and he has a
21 criminal history of I, his criminal history category is significantly under represented. Below is a
22 brief summary of the defendant's history with several of the defendant's victims and the
23 defendant's behavior towards these victims.

24 **A. Victims**

25 **(i) A.B. - The victim in this case.**

26 A.B.'s mother introduced her to the defendant at her place of employment, a
27 laundromat. The defendant asked A.B.'s mother if A.B. could work for him by sorting jewelry at
28 his house. A.B 's mother agreed, and A.B  started sorting jewelry for him. By the third time she

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

went over to his house, the defendant started having sexual contact with her. The sexual contact continued for a period of close to one year and every day that she spent with the defendant, he would use vibrators on her. The defendant admitted to using a vibrator on her and "teaching" her how to masturbate with it. The defendant also admitted to inserting his finger in her anus on various occasions to help her "have what was simply called a good climax rapidly." During the course of the defendant's relationship with A.B., she would go over to his home several times a week. Oftentimes she would end up spending the night. Within several months, the defendant bought A.B. several horses.[3] The horses were yet another way for the defendant to ingratiate himself into A.B.'s life.[4]

The defendant would often try to get A.B. to bring a "friend" over to his house with her. In particular, the defendant tried to get J D.'s mother to allow J.D. to come over and sort jewelry The defendant also asked J.D.'s mother if J.D. could go to Disneyland with him and A.B. J D. is ten-years-old. The defendant also tried to get P.H., another one of A.B.'s friends to come over to his house. Since P.H. only lived two doors down from A.B., the defendant would call out to her when he was in A.B.'s driveway and ask P.H. to come over to his house to sort jewelry. The defendant continually asked A B. what P.H.'s favorite things were, such as animals, cars and toys. Once A.B found out, she would tell the defendant. The defendant would then purchase items that were P.H.'s favorite thing and give them to A.B. to give to P.H. The defendant was clearly trying to entice P.H. with gifts. The defendant even called P H. on her twelfth birthday while A B. was at his house. The defendant asked P.H. if she felt "sexy." Fortunately, none of A B.'s friends' mothers would allow them to go over to the defendant's house.

### (ii) A.K. - April 2002.

The defendant met A K. at an autograph signing for Karl Malone. A.K. was with

---

[3]The horses were yet another way for the defendant to "teach" A.B something about sex. He told her that he bought her a male horse so that she could "jack him off."

[4]The defendant continually reminded A.B of all of the gifts he had given to her and how easy it would be for him to take everything away The defendant would remind A.B. by writing notes to her and asking her multiple choice questions. During the search of the defendant's hotel room, over 187 pages of notes were found A sampling of these notes are attached as Attachment A and demonstrate the sheer manipulation and cruelty of the defendant towards A B

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

her mother,[5] and A.B. was with the defendant. The defendant introduced A.B. to A.K. and her mother as his granddaughter. The defendant asked A.K.'s mother if A.K. could join A B. at his house to sort jewelry. A.K.'s mother agreed, and the defendant picked A K. up at her house a few days later. A.B. was not there. While A.K. was at the defendant's house, he told her to change into shorts so that he could give her a "reflexology massage." A.K. changed into the shorts, and the defendant proceeded to rub her body with a vibrating massager. He rubbed over her breasts and buttocks area. After he was through massaging her, he drove her home On the way home, he took her to a store and bought her a jacket. While in the defendant's car in the store parking lot, he asked A K. if she had ever had sex before When A K. answered "No," the defendant said, "Good." The defendant then asked A.K to kiss him. A.K. gave him a quick peck on the cheek. The defendant became angry and told her to kiss him on his mouth with her tongue and to act like she meant it.

### (iii) A.W. - 2000-2001.

A.W. lives in Port Susan, Washington. The defendant used to own a mobile home near A.W.'s home. The defendant met A.W. and her mother and asked A.W.'s mother if A.W. could come over to clean his house. A.W 's mother[6] agreed and allowed both A.W. and A.W 's brother to go over to the defendant's house to clean and do yard work. Both A.W. and her brother are mentally delayed. A.W. was 22-years-old at the time, but she has the mental capacity of a seven-year-old. Shortly after beginning work at the defendant's house, the defendant started to show A.W. pornographic movies. After a few weeks, the defendant began having sexual intercourse with A.W. and using vibrators on her. While the defendant had sex with A.W., he would make her brother stay outside. A W. told investigators that the defendant told her that she could not tell her mother about their "private times" together. Since the defendant is impotent, he would use shorts that had a penile implant to penetrate A.W. These shorts were identified in the search done in June 2002 by the Salt Lake County Sheriff's Office.

---

[5]Like A B , A K. was eleven-years-old and comes from a very poor family. A K.'s mother is single, has three kids and lives in a trailer park

[6]A W.'s mother is also a single mother, poor and is raising two developmentally delayed children.

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1

### (iv) Cheryl - The defendant's daughter.

The defendant molested his own biological daughter from the time that she was six until she was sixteen. The very first time the defendant touched his daughter, he had full sexual intercourse with her. The defendant told his daughter repeatedly that if she did not do sexual acts with him that she was a "bad daughter" and a "bad person." He even told her that he and Cheryl's mother would not be able to remain married if she did not participate in sexual intercourse with him. Similar to what he would do with A.B., the defendant used gifts and toys to try to entice Cheryl. Also similar to the type of abuse that A.B. endured, the defendant used vibrators and sexual devices During the course of the ten-year abuse by the hands of her father, the defendant would write notes and multiple choice questions to Cheryl on toilet paper. These notes were sexually graphic in nature and similar to the notes he wrote A.B. The defendant would also tell Cheryl that the Bible said that he had the right to have sex with her. The defendant even quoted Bible verses. Cheryl had no idea for many years that what her father was doing was wrong.

When the defendant was confronted by his family with the sexual abuse of his daughter, the defendant told his family that the sex was "loving and consensual." The defendant still not does believe that the abuse of his daughter was wrong. He continually writes to her from FDC Sea-Tac and sends her poems about how she made his life "whole."

### (v) Tami - The defendant's sister.

The defendant began to abuse his sister sexually from the time that he was eleven-years-old and she was about six years of age The defendant showed her "dirty pictures" and tried to get her to give him oral sex. Tami vividly remembers the defendant chasing her around the house with his pants down.

## B. ARGUMENT

The Government is seeking an upward departure on the ground that the defendant's criminal history is understated based upon prior similar adult criminal conduct not resulting in criminal convictions. U S.S.G Section 4A1.3(e). Section 4A1.3 of the Sentencing Guidelines permits a court to increase a defendant's criminal history category where "reliable information

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1 indicates that the criminal history category does not adequately reflect the seriousness of the
2 defendant's past criminal conduct or the likelihood that the defendant will commit other crimes."
3 U.S.S.G. Section 4A1.3. If one of the two prongs are present, a departure is warranted. United
4 States v. Connelly, 156 F.3d 978, 984 (9th Cir. 1998) (departure justified solely on the likelihood
5 of recidivism); United States v. George, 56 F.3d 1078, 1085 (9th Cir. 1995) (propensity to
6 commit further crimes supports departure). In the present case, both prongs are present.
7 Alternatively, the Government seeks an upward departure based upon the numerous victims.

8    As demonstrated above, the defendant's abuse of little girls has spanned for a period of
9 fifty-seven years  Unfortunately, most of his abuse was never reported and none of it resulted in
10 criminal convictions. However, the lack of a criminal conviction does not diminish the
11 seriousness of his criminal past and certainly establishes the great likelihood of reoffense.

12    The defendant has spent the best years of his life out free and never having been charged
13 with any of these crimes. The defendant began preying on little girls when he was 11-years-old
14 when he sexually assaulted his own sister. He continued with his own daughter and then
15 eventually moved on to non-family members  He spent his whole life preying upon the young
16 and the disadvantaged, both mentally and socio-economically.[7] The defendant is the most
17 despicable kind of predator, and nothing can or will stop him from preying upon little girls.

18    By his own admission, he has been impotent for several years. Also, according to the
19 defendant, he has numerous health conditions. Yet, none of those health conditions stopped him
20 from preying upon little girls. At the time he met A B., he was on oxygen, had diabetes and
21 claimed that he was impotent. Yet, none of those conditions slowed him down or deterred his
22 predatory behavior. If anything, he used his health conditions to his advantage by claiming that
23 he truly needed help around his house and with sorting jewelry. Many of the victims' mothers
24 felt that he could not be a threat to their children because of those conditions. Clearly they were
25 wrong.

26

27

28    [7] The defendant became so confident in his predatory prowess that he even stopped taking the
time to "groom" these little girls. This is shown by his sexual abuse of A K. The very first time he was
around her, he was french-kissing her and giving her massages with vibrators.

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1   What further aggravates the likelihood the defendant will reoffend is his belief that he has
2   done nothing wrong. This is evidenced by the numerous letters that he has written to his family
3   over the course of his incarceration. Many of these letters were turned over to the case agent. In
4   most of these letters, the defendant writes "I did 'nothing' wrong" . . . "Again, nothing happened
5   here!" Perhaps the most disturbing letter the defendant has written was dated March 1, 2003.
6   The letter was written to Gabrielle - his five-year-old granddaughter. In this letter, the defendant
7   wrote, "My darling Gabrielle = Put your DAD over your knee and spank him - He doesn't write
8   me enough. . . . I miss you and your sweet kisses on Grandpa's cheek & lips. . . . I love & I miss
9   you very much. . . . Grandpa sent you an envelope & stamp - write me a letter -please! Put me a
10  kiss on the letter, so I can kiss the spot!! Ok! Ok! Ok!  Special one - Love you Write me soon."
11  (See Attachment D). Given the nature of this letter, it is clear that the defendant continues even
12  to this day to prey upon little girls.

13         Based upon the number of prior incidents of sexual abuse which did not result in a
14  criminal conviction, the defendant's criminal history significantly understates both the
15  seriousness of his past and the likelihood of reoffense. A criminal history category of VI most
16  accurately reflects the defendant's criminal history.

17         Alternatively, this Court may upwardly depart based upon the numerous victims and the
18  defendant's pattern of targeting vulnerable victims based upon their socioeconomic status.[8]

19         In United States v. Hersh, 297 F.3d 1233 (11th Circuit 2002) the Eleventh Circuit
20  affirmed a 92 year (ten-level) upward departure where the offense level increases and victim
21  vulnerability did not adequately reflect the seriousness of the defendant's twenty-year history of
22  sexual abuse.  See Id at 1251-1253.  In so affirming, the Eleventh Circuit noted that there were
23  multiple victims that were extraordinarily vulnerable to such a degree that the circumstances
24  were not adequately considered by the Sentencing Commission  See Id. at 1252.

25         This case is similar to Hersh in that the defendant willfully lured and enticed particularly
26  young vulnerable girls. In this case, the defendant used promises of a job "sorting jewelry" as a

27

28         [8]  If this Court finds that the enhancement under 3A1.1 applies for vulnerable victim, it should
    not consider any of the facts as they relate to A B. but only as they relate to the uncharged victims

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

1  ploy to get the girls over to his house and then he continued to ply them and entice them with
2  gifts and toys. In each instance, these little girls were extremely poor. The defendant was not
3  only aware of that fact, but he used it to his advantage  With A.B., he continually threatened to
4  take away those toys and gifts if she did not comply with his demand for sexual favors. As an
5  eleven-year-old girl faced with a threat from a sixty-eight-year-old man, what choice did A B.
6  have? Especially given the fact that he told her never to tell anyone about what they did in their
7  "private time." She was too young to even know that what he was forcing her to do was wrong
8  And she was too young to know that she could have told her mother without being harmed.

## V. **FINE and RESTITUTION**

10  The defendant should be required to pay the $20,000 fine recommended by the Probation
11  Office. This figure represents the low-end of the range. Shortly after the defendant's initial
12  appearance, the government became aware of the fact that the defendant has a substantial
13  amount of assets. Very few of these assets were disclosed on the defendant's financial affidavit.
14  Accordingly, the government filed a motion seeking reimbursement of attorney's fees. Based
15  upon this motion, the defendant filed a revised financial affidavit. The Honorable Magistrate
16  Judge Ricardo Martinez reviewed the revised financial affidavit and ordered the defendant to
17  reimburse the attorney fees  The defendant has numerous accounts totaling over **$193,473.82.**
18  This does not include various other material possessions that the defendant owns such as cars, a
19  boat and a large quantity of jewelry. The defendant does have the ability to pay a fine and
20  should be required to do so.

21  The defendant should be required to reimburse the Crime Victim's Compensation Fund
22  for the cost of counseling for A.B  An estimate of this amount will be provided to the Court and
23  defense counsel at time of sentencing.

## VI. **RECOMMENDATION**

25  If the Court upwardly departs, the Government would recommend a sentence of 684
26  months. This figure represents the number of months that the defendant has spent sexually
27  abusing and preying upon little girls. However, if the Court finds there are insufficient grounds
28  to upwardly depart and that the applicable guideline range is as calculated by the Probation

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

Office, 210-262 months, the Government urges the Court to sentence the defendant to the top of the range   The Government also recommends that the Court impose a $20,000 fine and require the defendant to pay restitution.

Dated:  this 29th day of <u>April</u>, 2003.

Respectfully submitted,

JOHN McKAY
UNITED STATES ATTORNEY

ILENE J.K. MILLER
ASSISTANT UNITED STATES ATTORNEY

BRUCE F. MIYAKE
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903
(206) 553-7970

**ATTACHMENT A**

① 208-745-8504
(ELDON FERREL)

IT WILL COST $300⁰⁰ PER YEAR
FOR GAS FOR THE SUBURBAN TO
HAUL "DAKOTA" TO PLACES TO
RIDE HIM OR PLAY WITH HIM!

IT WILL COST $                    FOR THE
VETERINARIAN TO KEEP HIM
"HEALTHY"

IT WILL COST $360⁰⁰ PER YEAR
FOR YOUR "CELL" PHONE

WHAT DOES ALL OF THIS MEAN?

YOU WON'T HAVE TO CLEAN THE
WORRY ABOUT FEEDING OR CARE
FOR "DAKOTA", ALL YOU
HAVE TO DO IS BRUSH HIM,
RIDE & WALK HIM!!!

(8)

ALL TOTAL IT WILL COST
$7,260 PER YEAR to OWN
"DAKOTA"

AND YOU WANT $100.00, How
ARE you GOING TO EARN
$7,260.00 TO SAVE your
HORSE ??

(9)

IF I WERE A GIRL &
SOMEONE WOULD LOVE ME
ENOUGH TO DO THIS FOR ME
I WOULD DO WHATEVER
THEY ASKED ME TO DO.
I WOULD SUCK THEM & FUCK
THEM EVERY DAY, AND

(9)

FRENCH KISS THEM &
LOVE THEM EVERY WAY
I COULD —

BUT YOU CAN'T OR WON'T
DO ANYTHING, BUT ONLY
SATISFY YOURSELF WITH
THE VIBRATOR.

IF I'M GOING TO SPEND
OVER $17,000.00 PER YEAR
FOR YOUR PLEASURE &
HAPPINESS!!

IF I SPENT $7000.00
TO HAVE SEX, I COULD GET
350 GIRLS TO FRENCH KISS

AND I'll AFRAID YOU
WON'T HAVE ANY TIME FOR
YOURSELF AND WON'T NEED IT
ELSE WILL BE WORE TYPED AND

AND, I'M NOT GOING TO
TAKE CARE OF THE MONEY
BY MYSELF.

I TAKES A LOT OF TIME
& RESPONSIBILITY TO WORK
FOR ME & TAKE CARE OF
THE THINGS WE'VE PLANNED
I'VE SPENT A LOT OF TIME
& MONEY TO MAKE YOU

(2)

I LIKE THE CARTOONS
BECAUSE:

(A) they UNLIKE THINK OR FUCK US

(B) " " " NOT CUM & VIBRATOR

(C) " " " THINK OF CUMMING

ALL ABOVE OR A - B - (C)

I WANT TO EARN SOME MONEY
FUCKING YOU ED
I'D LIKE
(A) $20.00
(B) $30.00
(C) $50.00
(D) $100.00

ALL ABOVE OR A - B - (C)

I'D LIKE TO WATCH YOU PLAY WITH
YOUR COCK TILL:
(A) IT WAS BIG
(B) TILL IT COMES
ALL ABOVE OR (A) - B

(7)

(I) WHAT CAN you do to
MAKE US MORE SEXY till
WE CAN Actually FUCK !!!

ANSWER —

I Don't
KNOW

(J) Do you WANT ME TO FIND
ANOTHER GIRL THAT CAN
DO WHAT I'VE ASKED You
TO DO !
YES — NO

(K) Do YOU WANT TO FIND ANE
GIRL TO BE WITH US TO
DO THESE THINGS ??
YES — NO

Q67 1/1
DLA

TASHONA —

I'M SAD ABOUT YOU NOT STAYING
LAST NITE — I DIDN'T KNOW YOU
HAD AN APPOINTMENT WITH ~~PAIGE~~

BUT YOU WAS NOT HERE

I WANT TO REMIND YOU OF
ALL THE THINGS I'VE DONE FOR
JUST YOU —

#1   A JOB ~~PAYING~~ GOOD MONEY
#2   ALL KINDS OF GIFTS
       (A) YOUR BIKE
       (3)  "  CLOTHES
       (C)  "  BOOTS & SHOES
       (D)  "  TOBEY SOCKS
       (E)  "  ~~CANDY~~ JEWELRY
       (F)  "  JEWELRY & STAND TO SELL
       (G)  "  JEWELRY FOR YOUR FRIENDS
       (H)  "  MONEY (LOTS & LOTS)
       (I)  "  SAVINGS ACCT

Q61 in
DCA

(4)

ALL OF THE ABOVE I HAVE
DONE OUT OF ONLY LOVE & RESPECT
FOR YOU.

NOW I WONDER IF I HAVE
BEEN FOOLISH

YES → (NO)

I DON'T ASK MUCH OF YOU
AMANDA —

I WANT YOU TO KISS ME I
HAVE TO BEG FOR A KISS
DON'T YOU LIKE TO KISS
ME?  (YES) → NO

I SHAVED OFF MY BEARD
JUST FOR YOU BECAUSE YOU
DIDN'T LIKE TO KISS ME WITH
MY BEARD, AND I STILL DON'T
GET ANY REAL KISSES! (YES) → NO

(13)

ALL OF MY OTHER GIRL
FRIENDS ARE AMAZING
BECAUSE I HAVE KICKED THEM
OUT OF MY LIFE FOR YOU!

I'M SORRY IF I HAVE BEEN
WRONG, AND ASKED YOU TO DO
TOO MUCH, FOR PLEASE!
                    LOVE, THE
              SPECIAL MAN IN
              YOUR LIFE
                    Ed

DO YOU WANT TO TALK ABOUT
IT?
ANSWER    YES  (NO)    CIRCLE
                        ONE

Q57th
DLA

Do you really love me, and
need me in your life
or are you just saying
that?

answer ↓ Yes No none
too much of the
much

You will never have
anyone treat you as
good as I do — I am
making plans for my will
for your education & your
life so you can be ~~independent~~
and not have to complicate
your wonders — that's
pretty special of me to
so this —
is it important to you
answer (Yes) No !

My Darling Aumont:

I cancelled 3 appointments
to be with you Friday—
Are you getting bored being
with me
(A) YES — (NO) circle
one!

I don't want ~~you~~ to just
come over with me to get
gifts—or appointments like
Saturday (~~answers~~)

I try to work my time
which is valuable to be
with you, cause I love you
and need you to be with
me.

(9)

THANK YOU ED FOR PUTTING ME
IN YOUR WILL —

I WILL LOVE YOU FOREVER
AND DO WHAT YOU WANT ME
TO DO —

A) MAKE LOVE TO YOU !!
B) GET MY EDUCATION TO WORK
WITH HORSES
C) TO CALL YOU WHENEVER I
NEED TO DISCUSS SEX & LIFE
D) TO MAKE ME CUM & RELAX
MY BODY & SOUL
E) ALL OF THE ABOVE —

(6)

I'd LIKE TO GO ON A TRIP WITH
you

(A) WE COULD HAVE MORE PRIVACY

(B) WE COULD SLEEP NAKED
TOGETHER

(C) WE COULD MAKE EACHOTHER
CUM, A LOT

(D) YOU COULD TEACH ME TO
FUCK REAL SLOW!

(E) ALL OF THE ABOVE

I WANT TO TELL YOU HOW I
FEEL ABOUT US:
25 WORDS OR MORE

ANSWER: I Think That we are
Good together and I Like
to come over here and help
you or Just come over here
Aha have fun.

**ATTACHMENT B**

MASTER CASE NO __02-06800__

STATEMENT OF SUSPECT

DATE_____ JUNE 6. 2002
HOUR_____ 1545 HOURS
STATEMENT OF_ EDWARD KOPLIN _____ DATE OF BIRTH____ 07-02-34
ADDRESS___ 4589 MONTE GRANDE DR SALT LAKE CITY UT 84123 HOME PHONE _801-262-2838
BUSINESS ADDRESS_____BUSINESS PH_____
OCCUPATION_____
LOCATION OF INTERVIEW_KENT CORRECTIONAL FACILITY _____
STATEMENT TAKEN BY_DETECTIVE R. L. WALKER _____
ALSO PRESENT__DETECTIVE S HEMMEN _____

RLW:     What's the case number?

SMH.     I don't know.

RLW:     Okay.  This is going to be a statement of last of Koplin, K-O-P-L-I-N,
         Edward, E-D-W-A-R-D   Date of birth is 07-02-34.   Address 4589
         Monte?

EK:      Monte Grande.

RLW      M-O-N-T-E G-R-A-N-D-E, Drive, Salt Lake City, Utah, 84123   Home
         phone 801-262-2838.  The date is June 6, 2002.  The time  is 1545
         hours   And we're at the Kent Correctional Facility   Present is Detective
         Hemmen.  Um, Ed, I'm gonna advise you of your rights again, just so we
         understand it's on tape.  You have the right to remain silent.   You
         understand that?

EK.     Well, these are reservations that are made. I have relatives with the Marriotts. Um, that are, in fact are Marriotts. But, um, my favorite, um, nephew, Kelly Koplin, he books me all over the nation in Marriott Hotels when I was traveling 300 days a year. Since that time, whenever I've had to go somewhere, I call him up and he gets me a VIP pass. And that's what I'm here on is a VIP pass.

RLW:    And you were supposed to stay at the Marriott how many days here?

EK:     Um, I think 3. And I think today's the 4ᵗʰ.

RLW:    And then you were going to go see your sister?

EK:     Tonight in Bellevue and then go back to Salt Lake on Friday mornin'. Try to stay in Boise one more night on the way down. It's a long drive. It's about 900 I guess miles, maybe more.

SMH:    And your relationship with Amanda, the two of you became very close and it progressed where she began to talk and ask you about things of a sexual nature?

EK:     Things of a more grown-up nature, yes.

SMH:    Like what sorts of things?

EK:     Ah, masturbation. She's heard that in school and girlfriends...and I said, "Do you know anything about it?" And she said, "No." And I said, "What are they tellin' you?" "Nothin'" And I said, "What are they tellin' you then?" Ah, because that's part of our education (inaudible) If they don't tell you somethin', then how in the hell are you gonna learn anything? So I took it upon myself to give her an insight.

SMH:    Okay.

EK.     If that's wrong, pardon me, forgive me Lord, and pardon me.

SMH:    Do you remember about what month maybe she first became inquisitive about masturbation? When this sexual talk began?

EK:     I don't remember that kind of a thing...

SMH:    Was it, ah...

EK:     That kind of thing but I'd say in the last...

SMH:    Would it have been before Christmas? Before September 11th?

EK:     Oh, well yes, of course that's not very long ago. I would say that, ah, within 90 days after we met...probably 9 months ago.

SMH:    Okay.

EK:     Approximately.

SMH:    Okay.

RLW:    So how did it evolve that you ended up helping her learn?

SMH:    Giving her insights.

EK:     I explained to her what masturbation was. And, ah, I said, "People use vibrators to, to..." you know, I've had girlfriends down there that she knows and have met. And, ah, not been around in our circumstance, but, ah, and, ah, she said, "Well get me a, let me use a vibrator." So she liked the big vibrator and she'd been with that every since.

RLW:    Now, did you show her how to use the vibrator?

EK:     Not really. I mean...I turned it on so she knew how to turn it on, you know? But she, she knew to put it between her legs. I mean that's all

there was to it. I have a hunch that she may have been not sexually active but curious enough to have maybe tried, you know, masturbating herself.

RLW       Now you said you used to lubricate it for her? The vibrator?

EK:       Yes.

RLW:      What would you use?

EK:       Well, ah, I use a K-Y Jelly for my arm. You can see what's happenin' here. It's, um, a thing that is, um, I don't know what...it holds water anyway. And I loose water very rapidly. I'm on furosemide and chlorocon (sp?) and ceroxaline (sp?). I mean I've dropped 90 pounds in the last year of weight. And just doing those. But, um, that's what I would use.

RLW:      Now you said that you, you had watched her masturbate. Would she insert the vibrator in any part of her body?

EK:       No. No, there's no insertion of the vibrator. It stays on the outside.

SMH:      But she's got clothes off sometimes and sometimes clothes on?

EK:       Sometimes after a shower, she had clothes that are off.

SMH:      Does she, does she have a problem with you watching her?

EK:       No, not at all.

RLW:      When did she first start asking about oral sex?

EK:       Well, I don't know. I mean that was part of, ah, the education I was tryin' to give her was all of the cartoon things that are there. They're very well done, they're all from Germany and or Sweden or wherever

there. And it obviously shows all of that, but, ah, she didn't really ask about oral sex. Well it didn't come about that way. Um, she wondered, but I'm sure she ..she's not stupid...come on, guys. She got a lot of girlfriends that, ah, you know, were probably around or a little older than she is. But, um....

SMH: So she wondered what it might feel like or she asked you, "Can you show me?" or I'm trying to understand what you're explaining.

EK: Um, probably said, "Show me."

SMH: Okay.

EK: Probably said, you know, try...

SMH: And when did that start?

EK: Well I don't know, but I would say that probably in the last 90 days.

SMH: Okay.

EK: Hundred days, 120 days at the very most.

SMH: So is it a fair statement to say that you have performed oral sex on her over 5 times in the last 90 days?

EK: Ah, that's probably fair to say but it's not oral sex. It is a matter of oral...there's no insertion, there's no nothin'. It is just simply a...

SMH: Your tongue on her clitoris?

EK: Yes.

SMH: Just for stimulation?

EK. Exactly. I was helpin' her have a better...she's very hyper. I don't know if notice that or not. But she's terribly hyper. The only way she would

settle down sometimes was to be on that vibrator. And she would go to the point where she was about bonkers.

RLW     So she would climax?

EK:     Um, she would never tell me she did but when she was gettin' with the program, her feet would go straight like most women would if you're, you know, havin' climax. But, yeah, she would climax. As far as I would know...I've never said, "What does it feel like?" Never asked her that.

RLW:    Do you think she was sexually advanced for her age then?

EK:     Ah, do I think so? Ah, sexually smart maybe is a better word. I don't know if she's sexually advanced. She, ah...

SMH:    But she's curious about sexual....

EK:     She was curious, yeah.

SMH:    Okay.

RLW:    Now did you have oral sex with her when you were in Boise?

EK:     No.

RLW:    But you did here?

EK:     Ah, maybe for 2 minutes.

RLW:    While you were stayin' at the Marriott?

EK:     Ah, maybe for 2 minutes.

SMH:    So that happened inside the hotel room?

EK:     Oh, yeah...

SMH:    On the bed? Out at the pool?

EK:     No, in the hotel room.

SMH:    Okay, on the bed?

EK:     Um, no, probably on the couch. She was sittin' there watchin' TV and she was tryin' to do her thing I think that's where, well I know that's where it happened. And it happened just (snaps fingers) that long. Just for an instant because I put the jelly on to help her, ah, do her thing and she got with the program and I wasn't included I guess is the word.

SMH:    Okay, I guess I'm confused because didn't you just say that you had orally stimulate, stimulated her with your tongue on the couch?

EK:     I think it was on the couch.

SMH:    Okay.

EK:     It may have been on the bed, but I think it was on the couch.

SMH:    Okay.

EK:     Because that's where she was and that's where her sleeping bag was and everything else.

SMH:    Okay. So you were included in the program, but it was mainly about her. It was not her performing any oral stimulation your penis?

EK:     No, no, no, no.

SMH:    Okay.

EK:     No, no, no, no...

RLW:    When did this first start? Did this happen in Utah?

EK:     Well, obviously it happened in Utah, I mean we haven't been anywhere else other than Idaho for one trip. Ah, when did it start? Um, probably 3-4 months ago.

RLW:   Okay.  Did it ever happen in Idaho that you remember?

EK:   No.

RLW:   Just in Utah and here?

EK:   Yeah.

RLW:   Now in your, in your showing her and helping her understand sex and masturbation, there was times where you inserted your finger in her anus, is that correct?

EK:   Very small, very, yes, very limited amount.  And I know that with other girls that is a stimulant, all right?  I was tryin' to help her have what was simply called a good climax rapidly.  And she would, and boom, it'd be over and done and that would be it.

RLW:   Now you said that there was a problem with your fingernail or?

EK:   Well, there was a, what do you call?  A hangnail on it.  So I used a rubber glove.  I get rubber gloves from my doctor to put jellies on my arm.  And I haven't been able to do that today, but you can see what's happenin' to 'em.  Ah, they grabbed me pretty bad this mornin' and I don't know what the hell happened.  They knocked on my door and three of 'em had me on the ground.  I, thought I had a gun over there with me.  Well I had a, I have my own carry permit.  And I have a gun, yeah, but it's in my van.  Never been loaded.  And, yeah, they treat me like I was some kind of guy that knew Osama Bin Laden or something.

SMH:   Okay.  Mr. Koplin, I need to stop you right here...

EK:   Oh.

SMH:    And turn the tape over real quick. The time is now 16....(TAPE SIDE A ENDS. BEGIN SIDE B.) Okay. The time is still 1617 hours and the tape is being restarted. Now, we were talking about, um, you inserting your finger into her anus. And you had said earlier that it happened on your trip to Boise or on this trip, on your way here, in Boise at the Best Western. You were talkin' about wearin' a glove?

EK:    Um...I don't think it happened in Boise. I don't, I don't recall...it could have done but I don't think so. We were, again, swimmin' late, um, there was very little time. We'd go in and we'd crash and that'd be it.

SMH:    Okay.

EK:    But if it did, my memory's bad.

SMH:    Well you had said, you had told...

EK:    But up here, it did one time, I know that.

SMH:    Here in Kent?

EK:    Very briefly, yeah.

SMH:    Okay. And...

RLW:    Did you use the glove here in Kent?

EK:    I did.

RLW    And did you lubricate the glove?

EK:    I did.

SMH:    And which finger did you use?

EK:    Whatever that one is.

SMH:    The middle finger of your right hand?

EK:      Um hum.

SMH.    Okay, and what was her reaction to it?

EK:      Ah, she was tired. We just didn't do anything   She just stopped, and stopped vibrate...when we was watchin' the Cosby Show and which we watched every night and that was the end of it.

SMH:    So, but when you did that to her, did she like it or?

EK:      Well, um, I'm sure that it helped.

SMH:    Okay.

EK:      But, ah, no, she didn't necessarily say she liked it.

SMH:    Okay.

EK:      She's told me that it has, it helps her have a larger climax.

SMH:    Okay.

EK:      So, maybe that's what's good for the goose, that's what's good for the goose.

SMH:    So when you were here, what were the sleeping arrangements at the hotel?

EK:      Well, the first couple of nights, ah, I brought sleeping bags and everything for us. Um, I've had them for a long time. But, um, she wanted to sleep on the, on the couch, which is fine. And so I slept in the bed and put her in the sleeping bag, she loved it. And the first night she fell down and rolled off in the middle of the night. And I tried to get her up and she was sound asleep. Second night, same thing. Third night I said, "Amanda, we're not gonna do that tonight." So she brought her

KENT POLICE DEPARTMENT

sleeping bag over and she put it on the bed and slept in the bed with the sleeping bag on and then last night she slept in the bed with a blanket or whatever you call it.. sheet between her and, ah, what do you call the thing, the comforter. And I was under all of it so that we couldn't touch each other.

SMH:   Okay.

EK:   And she was sound asleep and she wanted me to wake her up at I think 11 or 11:30, whenever (inaudible) down. She wanted me to wake her up again and watch some TV, watch the lotto thing and whatever nights (inaudible) no way in the world and so I never did. So she slept all night and I slept halfway decent all night. I had a couple of smokes and...

RLW:   Did you ever discuss having sexual intercourse with her?

EK:   Nope. Not really havin' sexual intercourse, no. Not really.

RLW:   Do you think that if your relationship continues, eventually it may, that may occur?

EK:   Um, I'm impotent, I told you that. It would probably be a miracle. But, ah, I, it is my full intent to marry this girl when she's 18. I am going to leave, my children don't understand why I'm (inaudible) a whole bunch of stuff to them. I'm not going to. This girl has been, is my project. The good Lord put her in front of me and I am going to take care of her and do the very best that I can by her. As far as school or anything else that happens, ah...

SMH:   You mentioned that you started a college fund for her?

**ATTACHMENT C**

1

2

3

4    UNITED STATES OF AMERICA          )

5        Plaintiff,                    )

6    vs.                               )   Case CR02-436R
                                       )   February 21, 2003
7    EDWARD DARRELL KOPLIN,            )   9:03 a m
                                       )
8        Defendant.                    )
     _____      )

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SA   FEB 2 5 2003

AI SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

9

# ORIGINAL

10

11

12    TRANSCRIPT OF PLEA HEARING
BEFORE THE HONORABLE RICARDO S. MARTINEZ
UNITED STATES MAGISTRATE JUDGE

13

14   APPEARANCES:

15   On Behalf of the United States:   ILENE J.K. MILLER
                                        BRUCE F. MIYAKE
16                                      Attorneys at Law

17   On Behalf of the Defendant:       MICHAEL FILIPOVIC
                                        Attorney at Law

18

19

20
     Caroline R. Castle
21   Official Court Reporter
     (206) 553-1899                    CR 02-00436 #00000010

22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25

1 paragraph in a second--is should you prevail, should you win

2 your appeal, then you are allowed to withdraw your guilty plea

3 in this indictment, as well as the indictment in the other case

4 number

5          THE DEFENDANT    Right    I understand that.

6          THE COURT:    Okay.   Let's move on to the statement of

7 facts, paragraph 9    It says here that you and the government

8 agree that these facts set out here are true and correct, they

9 support your plea of guilty for purposes of restitution,

10 forfeiture and to help calculate the base offense level under

11 the guidelines.   But most importantly, it is what you did that

12 makes you guilty of these charged offenses.   Let me go over what

13 it says.   I'll ask if you agree

14     It says that on June 11th, 2002, the Salt Lake County

15 Sheriff's Department obtained a search warrant to search the

16 residence of Edward Darrell Koplin located at 4589 Monte Grande

17 Drive, Salt Lake City, Utah.  During the search Utah authorities

18 found several photographs of a minor female Jane Doe engaging in

19 sexually explicit conduct.  Specifically, the photographs

20 depicted Jane Doe engaged in the lascivious exhibition of her

21 genital or pubic area while masturbating with a vibrator

22 Koplin took these images sometime between September 2001 and

23 June 2002 using a camera.   The photographs were found in

24 Koplin's nightstand.

25     Koplin knew that each depiction involved a minor engaging in

1  sexually explicit conduct, and he acknowledges that each visual
2  depiction had been produced using a camera that had been
3  transported in interstate or foreign commerce.

4  Koplin agrees that he used Jane Doe to take part in sexually
5  explicit conduct for the purpose of producing these photographs
6  That's the entire statement of facts, Mr. Koplin. Do you
7  agree those facts are true and correct?

8  (Discussion off the record.)

9  MR FILIPOVIC. Your Honor, there's one issue I wish to
10 address. That has to do with Subparagraph (c). And it's
11 focusing on the words "used Jane Doe to take part in sexually
12 explicit conduct."

13 Mr. Koplin's statement of facts is essentially that Jane Doe
14 was using the vibrator to masturbate She was lasciviously
15 exhibiting her genital area doing that. He had his camera, and
16 he basically took advantage of that situation and took the
17 photograph

18 As I've explained to Mr. Koplin, that in my opinion fits
19 within the definition of the statute that he used her to produce
20 the photographs. And I think that's a sufficient factual basis
21 for the plea. I don't think it requires anything more than
22 that.

23 THE DEFENDANT  I didn't use her. It was a normal
24 thing--I understand.

25 THE COURT· Is the government satisfied with that?

1    MR. MIYAKE: If we could have just a minute, Your
2    Honor.

3    MR MIYAKE: Your Honor, we believe that the elements
4    require a little bit more than the defendant, as he's stating,
5    stumbling upon a situation. I mean, it specifically requires
6    that he employed, used, persuaded, induced, enticed or coerced
7    So it has to be something more affirmative on his part, and
8    so we would ask that he state that.

9    MR FILIPOVIC Well, Your Honor, this isn't a matter
10   where he stumbled upon her. Obviously, she was in his living
11   room at the time and he knew it was going on. It's not like he
12   was just snapping pictures and she happened to be in the picture
13   frame. I mean, he saw what she was doing and used her to
14   produce what by legal definition is child pornography.

15   THE DEFENDANT: Two pictures.

16   MR. FILIPOVIC: It's our feeling that that's more than
17   sufficient to establish the elements of the crime. He doesn't
18   have to direct her to do it or order her to engage in the
19   behavior before he takes the photograph.

20   THE COURT: I think he's right, Counsel. In this
21   particular case, given her age, given the setting, given the
22   fact that it was his residence, given the fact that he had the
23   camera and everything was going on, I think it fits within the
24   legal definition of the word "used" in the statute.

25   MR. MIYAKE Well, in light of the fact, Your Honor,

1  that he provided her the vibrator, I think the defendant would

2  acknowledge he provided--

3       THE DEFENDANT    Did not provide it

4       MR. FILIPOVIC    Well, maybe I need to clarify this

5  And I am sure Mr. Koplin would agree    The device used belonged

6  to Mr. Koplin    It was part of materials he had in his home

7       THE DEFENDANT·  My reflexology

8       THE COURT:  All right.  That is satisfactory.

9    Mr  Koplin, with that understanding, do you agree with these

10 facts?

11      THE DEFENDANT    Well, I agree with the fact that I did

12 not provide her or entice her or any of that sort of thing    She

13 had found this one particular thing    I do reflexology, and she

14 had found this one particular vibrator in my home.  She

15 apparently liked it, she was learning how to do whatever, and I

16 was very permissive and--

17      MR  FILIPOVIC    The question is do you agree she was

18 using it--

19      THE DEFENDANT·  Yes.  I had two pictures left in the

20 Polaroid, and I took the two pictures.

21      THE COURT·  All right    Paragraph 11, Mr. Koplin, talks

22 about other charges    Says the U S. Attorney's Office for the

23 District of Utah is agreeing, in return for your plea here, not

24 to prosecute you for any other offenses other than any potential

25 crime of violence that you may have committed in that district

**ATTACHMENT D**

My Darling Gabrielle =    3-1-03

Put your DAD over your knee
And SPANK Him — He doesn't
Write me enough =

Guess what, Kevin & Mindy
had a baby "GIRL" YEAH
4 Boys & 1 girl finally!

I miss you & your sweet Kisses
on Grand PA's CHEEK & Lips —

I Hope All is well with you and
Marl, I Hope Josh's OK too.

I Love you & I Miss you Very
much — I Just got a nice
Letter from Tony!

Tell your mom I miss Her
also — She's a good mom, listen
to Her and you'll BE OK!

(2)

Well, Spring is coming what will
your plans? Keep trying to learn
the Somersault, you can be good
at that!

Grandpa sent you an Envelope &
stamp - write me a letter —
Please! Put me a kiss on
the letter so I can kiss the
spot!! XXX OO XX!


grandpa's

KISS

Special love —
love you
write me soon
Grandpa XX
&